MYRA CLARK GAINES, APPELLANT, v. RICHARD RELF, AND BEVERLY CHEW, EXECUTORS OF DANIEL CLARK AND OTHERS.

Myra Clark Gaines filed a bill in chancery, alleging her claim to certain property upon the ground that Clark, who died seized of the property, had been married to Zulime, the mother of the complainant.

The claim was resisted upon two grounds. 1st, That no such alleged marriage took place; and 2d, That Zulime was, at the date of the alleged marriage, the wife of a man named Desgrange. The marriage with Desgrange was admitted by the complainant, but it was contended that the marriage was void *ab initio*, because Desgrange, at the time of contracting it, had another wife living, and therefore was guilty of bigamy.

In this case, it is decided that the two principal witnesses for the complainant, to es-

tablish the fact of the marriage between Zulime and Clark, (the parents of the complainant,) are unworthy of credit.

That the charge of bigamy against Desgrange is not substantial, because,

1. The depositions of persons who testify to it only state hearsay and rumor.

2. That the naked confessions of bigamy which Desgrange was alleged to have made are incompetent evidence and inadmissible as against the executors of Clark and purchasers holding by sales from them. To hold that either party could, by a mere declaration, establish the fact that a marriage was void, would be an alarming doctrine.

3. A certificate of a priest, given sixteen years after the marriage, that he had married Desgrange to his alleged first wife, was inadmissible as evidence. There was no register of the marriage in the records of the church.

4. A mutilated record of a suit brought by Zulime against Desgrange, and alleged to have been for the purpose of having her marriage with him declared null and void, does not prove the bigamy of Desgrange. The cause of action is not stated, the petition having been lost.

A sworn copy of an ecclesiastical record, taken at the proper office and produced by the lawful keeper of the records, may be admitted as evidence, the original being produced by the bishop who had charge of the records of the bishopric.

This purported to be a trial of Desgrange for bigamy, and his acquittal. It was competent evidence as rebutting testimony inasmuch as proof of the loss of the record and secondary proof of its contents had been given on the other side.

The depositions of Zulime in this ecclesiastical case, and also in a suit brought by her against Desgrange for alimony, are received by this court as competent evidence, because there was notice of a motion in the Circuit Court to suppress the evidence, but in the course of a long trial no such motion was made. If it had been made, the deponent herself was at hand to testify. No objection having been made to it, in the court below, none can be made here. Moreover, the complainant claims under a deed of gift from the deponent, and is estopped by her declarations.

The decree of this court in the case of Patterson v. Gaines, (6 How. 550,) cannot affect other persons, because these persons were not parties to it, and because that case was not a controversy carried on in earnest.

*Mr. Chief Justice Taney* and *Mr. Justice McLean* did not sit in this cause.

THIS was an appeal from the Circuit Court of the United States for the Eastern District of Louisiana.

The bill was originally filed in the Circuit Court by William W. Whitney and Myra Clark Whitney (now Myra Clark Gaines) in 1836. From 1834 to 1836 they had been proceeding in the probate court of Louisiana, until in 1836 their petition was dismissed. They then filed a bill in the Circuit Court of the United States.

At January term, 1839, a motion was made in this court for a *mandamus* to compel the Circuit Court to proceed according to the rules established by this court for the regulation of chancery proceedings. The case is reported in 13 Pet. 404.

It came up again at January term, 1841, upon a certificate of division in opinion between the judges of the Circuit Court, whether chancery practice should prevail there or not, and is reported in 15 Pet. 9.

The defendants below having demurred to the bill, the case came up again upon another certificate of division in opinion at

January term, 1844, and is reported in 2 How. 619, under the name of Gaines et ux. v. Chew et al.

One of the defendants, Patterson, having answered the bill instead of demurring to it, this branch of the case came before this court again at January term, 1848, and is reported in 6 How. 550.

The present case now came up upon pleas, answers, replications, and evidence, constituting a record of upwards of twelve hundred printed pages. Much of the history of the case and the substance of a considerable portion of the evidence is given in the two reports in 2 How. and 6 How., and the reader is referred to those reports. Some of the most important parts of the additional evidence, introduced into the case for the first time, will be noticed in the present statement.

Mrs. Gaines claimed under two distinct titles; one as the forced heir of her father, Daniel Clark, and the other as the assignee of her mother's share of the estate which had been conveyed to her by her mother. In either view, the lawful marriage between Daniel Clark, her father, and Zulime Carrière, her mother, alleged to have taken place in 1802 or 1803, was the great point in the case to be proved; and the first step to establish that was the capacity of Zulime to marry. Her previous marriage with Desgrange was admitted; but it was alleged to have been null and void *ab initio*, because Desgrange had another wife living when he contracted his marriage with Zulime Carrière. Part of the evidence to sustain this charge of bigamy against Desgrange is recited in the opinion of the court: viz. the testimony of Madame Despau, Madame Caillanet, Joseph Bellechasse, and Madame Bengueril. Two other pieces of evidence were relied upon by the complainant to fix the charge of bigamy upon Desgrange, which are referred to in the opinion of the court with an intimation that the reporter should set them forth with more particularity. They were as follows:

1st. The catholic priest's certificate of Desgrange's prior marriage.

The existence of this paper was discovered in the following manner, as stated in the deposition of James Gardette, taken under a commission:

"And afterwards, to wit, on the 10th July, 1849, appeared Dr. James Gardette, a witness, heretofore called and examined on behalf of complainant, and now by them recalled, doth depose and say,—

"Witness being shown document No. 6, filed with the commissioner by complainant on 23d June, 1849, being a certificate of marriage of one Jacobum Desgrange and Barbara Orci, he was asked to state when and where the same was found. Witness

says: My mother and myself were looking over the papers of Dr. Gardette, my father; several papers fell on the floor, and among them this paper was found. This paper was found after the decision of the Patterson case in the Circuit Court of the United States, and before the decision of the same case in the Supreme Court of the United States. And it was handed by my mother to General Gaines or his wife immediately after it was found.       "JAMES GARDETTE.

" Cross-examination waived by Louis Janin, Esq., of counsel for defendants.        "J. W. GURLEY,
             "*Commissioner.*"

The certificate was as follows. The Latin is given as it is printed in the record.

†

"*Omnibus has literas, Inspecturis Salutem in Domino.*

Ego infrascriptus sacerdos Catholicus et Apostilicus, pastor Ecclesiæ S. Petri Apostoli, hinc Præsentibus, notum facio et attestor omnibus et singulis, quorum interest, quod die sexta mensis Julij, A. D. 1790, in matrimonium conjunxerum Jacobum Degrange et Barbara m Orci, Testes præsentes fuerunt, Joannes O'Connell, Carolus Bernardi, et Victoria Bernardi. In quorum fidem, has manu propria scripsi, et subscripsi, vigilloq. muniri. Datum Neo Eboraci, vulgo New York, hac die 11d mensis Septembris, A. D. 1806.
      " GULIELMUS V. O'BRIEN,
" Reg. pag., '45.   "*Pastor Ecclesiæ S. Petri ut supra.*

*[margin: Exhibit A. A. G., U. S. Com'r.]*

" Nous, Gabriel Rey, général divisionaire, commissaire des relationes commerciales de France, à New York, certifione que Monsieur Guillaume V. O'Brien, dont la signature est apposé à l'extrait de mariage en l'autre part, est prêtre et curé de l'Eglise Catholique de Ste. Pierre, en cetté ville de New York, et qu'en cette qualité foi doit être ajouter à sa dite signature tant en jugement que hors.
" En témoin de quoi nous avons signé le présente et scellé fait apposer le timbre du commissariat, à New York, le 13 [L. S.] Septembre, 1806.        REY."

Indorsed: " Admitted by defendants as proved, reserving all legal objections to its admissibility as evidence.
     "J. W. GURLEY, *Commissioner.*"

In order to fortify this certificate, the depositions of Ellen Guinan, John Power, and Charles E. Benson were taken in 1846.

Ellen Guinan was the niece of William V. O'Brien, and resided with him from the time that she was nine years old until he died, being about twenty years. O'Brien was pastor of the church for thirty years, viz., from 1784 to 1814, when he died. She had been accustomed to see him write several times a day, and testified that the whole of the above certificate was in his handwriting. She also deposed as follows:

13. Question. Do you know the persons named in the body of this exhibit, Joannes O'Connel, Carolus Bernardi, and Victoria Bernardi?

Answer. I have heard of them, and think they are dead, but never knew or saw them that I know of.

14. Question. Did you know Jacobum Desgrange and Barbara M. Orci, named in the body of the exhibit?

Answer. I did not — never have known them.

15. Question. Do you know whether the books or records of St. Peter's church were at any time destroyed?

Answer. I heard they were.

16. Question. When did you hear they were, and on what occasion?

Answer. A gentleman from Ireland, Mr. Cruise, who married the sister of Sir John Johnston, of Johnstown and Warrenstown, in Ireland, came to inquire about the marriage of one of his family, whom he had understood was married by my uncle. I told him to go to the church, as we had given up uncle's books after his death to Bishop Connelly, catholic bishop of this city. He came back and told us that he had found that the books had been destroyed by fire.

17. Question. About how long ago was it that you thus heard that the books were destroyed?

Answer. To the best of my recollection, about thirteen or fourteen years ago.

18. Question. What did you hear of Joannes O'Connell, Carolus Bernardi, and Victoria Bernardi, named in the exhibit shown you, and mentioned in a previous question?

Answer. I heard from my aunt, Louisa Jane O'Brien, that they were all attached to the Spanish ambassador's suite. I think O'Connell was his chaplain.

John Power, the vicar-general of the diocese of New York, and pastor of St. Peter's church, deposed as follows:

2. Question. How long have you been pastor of St. Peter's church?

Answer. I have been officiating as clergyman in that church

Gaines *v.* Relf et al.

twenty-six years, (taken in 1846) and pastor of it about twenty years.

3. Question. Have records been kept in said St. Peter's church of the marriages solemnized by the clergymen officiating there?

Answer. There have been, with more or less regularity; there have been frequent omissions arising either from neglect or accident.

4. Question. Is there any written record now existing of the marriages solemnized by the clergymen of the said church previous to the year 1800?

Answer. I don't know that such a record exists; I have heard that it was missing, but have made no particular personal search for it; I don't know that I ever saw it.

5. Question. Have you known, personally or by reputation, William V. O'Brien, now deceased?

Answer. I have no personal knowledge of him; he was dead when I came to this country, but his memory was then fresh in the minds of people, and he was held in high repute.

6. Question. What was his profession, and what place or office did he hold here?

Answer. He was pastor of St. Peter's church.

7. Question. How long had he been pastor of St. Peter's church?

Answer. Many years; I cannot say the precise time.

8. Question. Do there appear to be any records in said church kept by him of the baptisms which he solemnized whilst pastor of said church?

Answer. There do.

9. Question. Have they been universally and at all times received as genuine and authentic?

Answer. They have been always received as genuine and authentic, and I have no doubt that they are so.

10. Question. Have you any knowledge of the handwriting of said William V. O'Brien; and if so whence have you derived it?

Answer. I have a knowledge of his handwriting, which I derived from the register of baptisms in St. Peter's church, which have always been received as —— handwriting.

11. Question. From the knowledge which you have thus derived of his handwriting, do you believe the signature Gulielmus V. O'Brien, in the exhibit marked A, now shown you, to be in the handwriting of said William V. O'Brien?

Answer. I believe it to be his handwriting; it is identically the same handwriting with that of the records now in the church of which I have spoken.

12. Question. In whose handwriting do you believe the writing in said exhibit preceding said signature, that is, the body of the marriage certificate, to which said signature is affixed, to be?

Answer. In the handwriting of said Rev. William V. O'Brien.

13. Question. In what language did said Rev. Mr. O'Brien keep his records before spoken of?

Answer. In the Latin language.

14. Question. How did he sign his name when writing in the Latin language?

Answer. In the same manner as it is signed in the exhibit marked A, which you have shown me — Gulielmus V. O'Brien.

15. Question. Had said Rev. Mr. O'Brien full and legal power to solemnize and perform the ceremonies of marriage while he was pastor of St. Peter's church?

Answer. He had.

16. Question. Have you a knowledge of, and are you versed in, the Latin language?

Answer. I am versed in the Latin language.

17. Question. Please to read said certificate of marriage marked exhibit A, now shown you, and state whether the marriage of Desgrange, therein certified to, was performed according to the usages and formalities of the said church at the time of the date of the said certificate, so far as the same appears in, and by virtue of, the said certificate?

Answer. The certificate is absolutely in due form, and it is to be presumed that the marriage was solemnized according to the rights and ceremonies of the catholic church. Previous to giving this my answer, I have, as requested, read the said certificate, and understand its contents.

18. Question. Do you know any thing of the witnesses to the said marriage mentioned in said certificate, or any of them?

Answer. I do not.

Charles E. Benson, the clerk of St. Peter's church, deposed as follows:

2. Question. Have you the custody of the records of marriages and baptisms solemnized by the pastors and clergymen of said St. Peter's church?

Answer. I have.

3. Question. Is there existing now among those records any record or written memorandums of marriages solemnized by the pastors and clergymen of the said church previous to the year 1800?

Answer. There is now none existing of any date previous to the year 1802.

4. Question. Have you any knowledge of the handwriting of William V. O'Brien, catholic priest, formerly pastor of said St. Peter's church?

Answer. No other knowledge than such as I derive from the records of the church which were kept by him. Those records have been always received as authentic and genuine, and as being in his handwriting.

5. Question. From the knowledge which you have thus derived of his handwriting, do you believe the certificate of marriage, marked exhibit A, now shown to you, to be in his handwriting, including the signature, Gulielmus V. O'Brien?

Answer. I do; I have not the slightest doubt about it.

6. Question. Are there any records of baptisms solemnized by the pastors of St. Peter's church?

Answer. There are.

7. Question. Are there any such records of baptisms belonging to said church kept by William V. O'Brien?

Answer. There are; from the year 1787 to the year 1808 in one register, and from 1808 to 1816 in another. There are in each of these registers other entries by other clergymen attached to the church.

8. Question. In whose handwriting are the first entries in the oldest register spoken of by you?

Answer. In the handwriting of said Mr. O'Brien.

The witness also deposed that he had made diligent search for the register of marriages previous to the year 1802, but was not able to find it.

Another piece of evidence relied upon by the complainants was what is sometimes spoken of as a divorce record, and sometimes as a mutilated record. It was as follows:

" State of Louisiana, third District Court of New Orleans.

" ZULIME CARRIERE ⎫
          v.          ⎬
JEROME DESGRANGE. ⎭

" No. 256 of the docket of the late county court of New Orleans.

" Citation. Mr. Ellery, (curator of Desgrange:)

" You are hereby summoned to comply with the prayer of the annexed petition, or to file your answer thereto in writing, with the clerk of the county of New Orleans, at his office, in New Orleans, in eight days after the service hereof, and if you fail herein, judgment will be given against you by default.

" Witness, James Workman, judge of the said court, this 24th day of June, in the year of our Lord 1806.

      (Signed)                "THOS. S. KENNEDY, Clerk.

" Return on citation served on Ellery, 30th June, 1806.
      (Signed)                " GEO. T. ROSS, Sheriff.
" Plea filed July 1st, 1806."

"Zulime Carriere
*v.*
Jerome Desgrange. }  No. 556.

"*County Court of New Orleans.*

"The plea of Jerome Desgrange, defendant, to the petition of Zulime Carrière, plaintiff:

"This defendant, by protestation, not confessing or acknowledging all or any part of the matters and things in the plaintiff's said petition contained to be true, in such manner and form as the same are therein and thereby alleged, for plea unto the said petition saith, that this court ought not to have cognizance of the same, because the laws by which this court was created, and the jurisdiction thereof established, do not extend the same to cases of divorce, or give to this court any authority to pronounce therein, and because the damages in the said petition prayed for against this defendant cannot be inquired into or assessed, until after the judgment of this court, in touching the validity of the marriage between the petitioner and the defendant, shall be first declared.

"Wherefore, this defendant doth not suppose that this court will or ought to have or hold further cognizance of the petition aforesaid; and therefore this defendant doth plead the premises in bar to the said petition, and humbly demands judgment of this honorable court, whether he shall be put to make further answer thereto, and prays to be hence dismissed, with his reasonable costs and charges in this behalf wrongfully sustained.

(Signed)                "A. R. Ellery, *for Deft.*

"And the said plaintiff saith, that for any thing by the defendant above, in pleading, alleged, she ought not to be barred or precluded from having and maintaining her action aforesaid against the said defendant.

"Wherefore, for want of a sufficient answer in this behalf, the plaintiff prays judgment, &c.

(Signed)         "Brown & Fromentin, *for Pltff.*"
Answer filed July 24th, 1806.

"Zulime Carriere
*v.*
Jerome Desgrange. }  No. 356.

"*County Court of* [*New*] *Orleans.*

"Answer of Jerome Desgrange to the petition of Zulime Carrière.

"This defendant, saving and reserving to himself all manner of

benefit of exception to the many errors, untruths, and imperfections in the said petition contained, for answer thereunto saith, that the facts in the said petition set forth are untrue, and prays that he may be hence dismissed with his costs and charges in this behalf most wrongfully sustained.

(Signed)        -                    " A. R. ELLERY, for Deft."

(Then followed in the record a long certificate of marriage between Geronimo Desgrange and Maria Julia Carriere, performed by a catholic priest on the 2d of December, 1794, which it is not necessary to transcribe.)

"ZULIME CARRIERE  }  Brown & Fromentin, for plaintiff.
       v.                  }  No. 356.
  DESGRANGE.      }  Ellery, for defendant.

"Petition filed June 24th, 1806. Debt or damages, $100. nds 600. Plea filed July 1st, 1806. Answer filed July 24th, 1806. Set for trial on Thursday, 24th July.

"Summons issued for M. Coudrain, Chovot, Mary Marr, Rose Carrière, Christopher Joseph Le Prevost, Trouque, Le Breton d'Orgenoy, and Joseph Villar, senior.

"Attorneys  .    .    $10  00  (  Mr. Fourke, sworn.
 Clerk     .    .    .       7  87½  {  Mr. d'Orgenoy,
                                          (  Madam Marr.
"Judgment for plaintiff. Damages, $100.   July 24th, 1846."

" State of Louisiana, Third District Court of New Orleans.

"I, Charles Weysham, deputy clerk of the third District Court of New Orleans, do hereby certify, that the above and foregoing five pages do contain a full and complete transcript of the case, wherein Mrs. Zulime Carrière is plaintiff, and Jerome Desgrange is defendant, instituted in the late county court of Orleans, under the No. 356, excepting the petition, that cannot be found. And that by operation of law, the records of the said county court of Orleans have been transferred to this court, and are now in the custody of the clerk thereof.

" In testimony whereof I have hereunto set my hand, and affixed the seal of the said court, at New Orleans, on this 14th fourteenth day of June, in the year of our Lord eighteen hundred and forty-nine, and the seventy-third year of the independence of the United States.

(Signed)                          " CHAS. WEYSHAM,
                                            Deputy-Clerk."

In addition to these evidences of the bigamy of Desgrange, the complainant introduced the testimony of various persons to prove the fact of the public reputation at the time, and that of a great number of witnesses, to sustain the character of Madame Despau.

The above comprehends the principal evidence offered by the complainant and appellant, in addition to that which is set forth in the opinion of the court.

### *Evidence offered by the respondents.*

1. The ecclesiastical record is transcribed in the opinion of court, and need not be repeated.

2. A record which is spoken of as the Alimony Record.

" *State of Louisiana, Third District Court of New Orleans.*

" ZULIME C. DESGRANGE ⎱　No. 178, of the docket of the late
　　　　　 *).*　　　　　　　⎰　County Court of Orleans.
JEROME DESGRANGE.

" Petition filed November 30th, 1805.

" *To the honorable James Workman, judge of the County Court of Orleans.*

" The petition of Zulime Carrière Desgrange, an inhabitant of the city of New Orleans, humbly showeth —

" That whereas it is provided by the first section of an act, entitled an act concerning alimony, and for other purposes, that the County Court shall have jurisdiction on application from wives against their husbands, for alimony, on the husband deserting his wife, for one year successively, and in cases of cruel, inhuman, and barbarous treatment; and whereas your petitioner may adduce proofs before this honorable court that she has been cruelly and barbarously treated by Jerome Desgrange, her husband, and likewise that she has been deserted by him, for three years past, to wit, from the second day of September, one thousand eight hundred and two, ever unto this day, although she has been told that the said Jerome Desgrange returned from France to New Orleans some time in the course of last month, and is now in the city of New Orleans.

" Wherefore, these are to pray that it may please your honor to order that the said Jerome Desgrange, your petitioner's husband, be condemned to pay to your petitioner a sum of five hundred dollars per annum, and that your petitioner be likewise entitled to all the other benefits and advantages belonging to her, in vir-

tue of the law of this territory in that case made and provided; and your petitioner, as in duty bound, shall ever pray.

(Signed) "ELIGIUR FROMENTIN,

"*Attorney for Plaintiff.*

"*Citation.*

"Mr. Jerome Desgrange—

"You are hereby summoned to comply with the prayer of the annexed petition, or to file your answer thereto, in writing, with the clerk of the county of Orleans, at his office at New Orleans, in eight days after the service hereof; and if you fail herein, judgment will be given against you by default.

"ZULIME C. DESGRANGE ⎰
    *v.*                  ⎱ No. 178.
JEROME DESGRANGE.     ⎰

"Witness, James Workman, judge of the said court, this 30th day of November, in the year of our Lord 1805.

(Signed) "THOS. S. KENNEDY *Clerk.*

"*Return on Citation.*

"6th December, 1805, served on the defendant.

(Signé)  "JOHN T. PROUILLARD, *D. S.*
"FROMENTIN, *Att'y.*

"ZULIMA CARRIERE DESGRANGE ⎰
    *v.*                         ⎱ No. 178.
JEROME DESGRANGE.           ⎰

"Petition filed 30th November, 1805, for alimony. Served December 6th, 1805. Judgment by default, December 19th, 1805. The court doth award final judgment for the plaintiff, December 24th, 1805.

(Signed)  "JAMES WORKMAN.

"Attorney's fees, $19 62½
"Clerk's fees,  10 87½

"Execution issued December 24th, 1805."

"*State of Louisiana, Third District Court of New Orleans.*

"I, Chas. Weysham, deputy-clerk of the third District Court of New Orleans, do hereby certify, that the above and foregoing four pages do contain a full and complete transcript of the record of the case, wherein Mrs. Zulime Carrière Desgrange is plaintiff, and Jerome Desgrange is defendant, instituted in the late County Court of Orleans, under the No. 178; and that by

operation of law the records of the said late County Court of Orleans have been transferred to this court, and are now in the custody of the clerk thereof."

3. In order to impeach the character of Madame Despau, three records were filed in evidence, the contents of which will be briefly stated under the letters A, B, C.

A. On the 10th of June, 1805, William Despau filed a petition in the Superior Court in and for the Territory of Orleans, praying for a separation from Marie Sophia Carriere, his wife. It alleged "incompatibility of humor and several other reasons, the recital of which would be too afflicting."

On the 8th of July, 1805, she answered the petition, admitting the material facts alleged.

On 11th of January, 1806, a separation from bed and board was decreed, by consent, and the plaintiff was ordered to hand in an inventory of his estate.

B. Sophia filed her petition, on the 1st of September, 1806, alleging that her husband was about to sell two plantations or tracts of land, and praying an injunction, which was granted. On the 2d of October, 1806, Despau filed his answer, consenting that one half of the proceeds of sale should be placed in bond and security; and the injunction was dissolved.

C. On the 8th of February, 1808, Despau filed his supplemental petition, with his affidavit dated 11th of November, 1807, stating that on the preceding June his wife had left New Orleans clandestinely, being the second time that she had done so, for the purpose of going to the United States. Another witness made affidavit that she had set sail for North America.

Whereupon, in May, 1808, the court passed the following order:

"Ordered by the court, that the bond referred to in the petition on file in the office of the clerk of this court be cancelled, and the security discharged; and that, as the defendant hath forfeited her right to the property acquired in the community, that the same vest in and belong to the petitioner.

*May 24th*, 1808.          (Signed)      JOSHUA LEWIS.
(Countersigned)   J. W. SMITH, *Clerk*."

4. The respondents also gave in evidence two powers of attorney; one executed by the sisters of Zulime to Desgrange, dated March 26, 1801, authorizing him to settle certain affairs in Bordeaux, in France, and the other from Desgrange to his wife, authorizing her to act for him in his absence. Also, a letter written by Desgrange to Clark from Bordeaux, and dated July, 1801. These papers are referred to or recited in the opinion of the court.

5. The respondents also gave in evidence the deposition of. Daniel W. Coxe, of Philadelphia. To this were annexed a number of letters addressed to the deponent by Clark, and numbered from 9 to 80. In addition to these a great number of letters to and from Clark were introduced into the case. These were used indiscriminately by the counsel for the appellants and appellees in their arguments, to sustain the views which they respectively took of the facts in the case. These letters showed Clark to have been twice in Philadelphia during the year 1802, once in April, and again in the latter part of July and beginning of August.

The deposition of Coxe was twice taken, and both of them were inserted in this record. It was taken once in 1841 in a suit between John Barnes and wife against Edmund P. Gaines and wife, in the First Judicial District Court, and again in 1849 in this suit. In his answer to the 17th interrogatory, in his deposition of 1841, he says :

" I repeat that the said Daniel Clark was in Philadelphia in the spring of the year 1802. The said Zulime was then there ; she arrived there before the said Daniel Clark, and, as I have already stated, brought to me a letter of introduction from him. Daniel Clark was not in Philadelphia at the birth of Caroline."

And in his answer to the 7th interrogatory, he said :

" The first time Daniel Clark visited Philadelphia after the birth of Caroline was in the year 1802 and soon after her birth. I am enabled to fix the time by referring to a power of attorney left by him with me," &c. &c.

A copy of that power is annexed to his deposition, and its date is 22d April, 1802.

In the deposition taken in 1849, he thus replied to the 14th interrogatory in chief :

" Daniel Clark did both write and speak to me about his (the said Clark's) relationship or connection with Madame Desgrange, the reputed mother of the complainant Myra. In the early part of the year 1802, the said Madame Desgrange presented herself to me, with a letter from Daniel Clark, introducing her to me, and informing me in confidence that the bearer of that letter, Madame Desgrange, was pregnant with a child by him, and requesting me, as his friend, to make suitable provision for her, and to place her under the care of a respectable physician ; requesting me at the same time to furnish her with whatever money she might want and stand in need of, during her stay in Philadelphia. As the friend of Mr. Clark, I undertook to attend to his request, and did attend to it. I employed the late William Shippen, M. D., to attend to her during her confinement, and procured for her a nurse. Soon after the birth

41 *

of the child, it was taken to the residence of its nurse. That child was called Caroline Clark, and, at the request of Mr. Clark, the child was left under my general charge and exclusive care until the year 1811. After that period, she was not so exclusively under my charge, but I had a general charge over her, which continued up to the period of her marriage with Dr. John Barnes, formerly of this city. She is now dead, as is also Dr. Shippen, before spoken of. Daniel Clark arrived in this city within a very short period after the birth of said Caroline, which was, I believe, in April, 1802, when I received from him the expression of his wishes in reference to this child. He left here shortly afterwards, as before stated by me. During Daniel Clark's subsequent visits to Philadelphia, he always visited that child, acknowledged and caressed it as his own, and continued to give me the expression of his wishes in reference to her. On the occasion of Mr. Clark's visit to Philadelphia, immediately after the birth of Caroline, in conversation with me in reference to Madame Desgrange, he confirmed what he had stated in his letter of introduction, stating to me that he was the father of this illegitimate child, Caroline, and that he wished me to take care of her, and to let the woman have what money she stood in need of until she returned to New Orleans."

6. The respondents gave in evidence the depositions of a number of witnesses for the purpose of assailing the character of Zulime for chastity.

7. The respondents also gave in evidence the deposition of Patterson, to show the collusive manner in which the case of Patterson v. Gaines was brought up to this court, as reported in 6 How. 550. The substance of this deposition is recited in the opinion of the court, and need not be repeated.

The above is a brief summary of the most important parts of the evidence in this cause, omitting what was published in 2 and 6 Howard, and what is now inserted in the opinion of the court.

On the 21st of February, 1850, the Circuit Court dismissed the complainant's bill, with costs; and thereupon the complainant appealed to this court.

It was argued by *Mr. Johnson* and *Mr. Campbell*, with whom was *Mr. Lawrence*, for the appellant, and by *Mr. Webster* and *Mr. Duncan* for the appellees.

The arguments of counsel upon points raised in the cause, but not decided by the court, will be wholly omitted; and it is extremely difficult to compress those which appertained to the only question which was decided, within reasonable limits.

The counsel for the complainant contended that the letters which were filed in the cause, conclusively proved that Clark left New Orleans for the north in November, 1801, that he was in Philadelphia in January, February, March, and April, 1802, up to the 22d of April, when his intended departure on the next day for New Orleans, in the schooner Eliza, was mentioned. They also contended that certain papers in the cause showed that Zulime was raising money in New Orleans in November, 1801, and that she was absent in January, 1802.

Leaving these questions of dates, which go to sustain the positive declarations of Madame Despau, does the plaintiff prove in any other manner that she is the legitimate child of Daniel Clark? Filiation is proven in reference to the father by presumptions. On the continent of Europe, these presumptions are generally authenticated by inquiries at the date of the birth, and entered upon public registers. These acts furnish full proof of birth and filiation. In the absence of these, the facts themselves, which raise the presumption, are resorted to. The inquiries are, who was it that prepared for the advent of the child into life, and provided nurture and care during the period of its helplessness and infancy; who maintained it, extended its relations through the family, friends, and acquaintances; who gave it education and control in youth; who sought for it advancement, repute, and station, in early manhood; who assisted its gradual expansion and growth, the enlargement of its circle of friends and connections, the additions to its fame and fortune; who provided for it by the last will and testament; who acknowledged and guarded the child from infancy to youth, and from youth to manhood; for whose did the world accept it? These characteristics will serve to determine the father of the child. Code Louisiana, 1825, tit. 7, ch. 2, sect. 2; 8 Denisart Questions, d'etat, 8; 3 D'Aguesseau, 181; Nougarede Lois des Familles, 213; Merlin, Reper., tit. Légitimité, sects. 2, 4; 1 Stark. Ev. 47; 2 Id. tit. Pedigree, 8 Ves. 428; 8 Causes Céleb. 358.

The canon law and the canonists accept these proofs as sufficient. In the chapter " *tuis de probationibus* " of the canon law, it is said: " *Satis esse ad ejus modi de natalibus quæstiones ui quis nominetur filius et publice, agnoscatur passimque habeatur et credatur apud omnes.*"

"*Præter fidem instrumentorum et asseverationem parentum tria recensentur, tractatus, testes, fama et suppleret, deficientibus probationibus certioribus, filiationem omnem tam probari, quam præsumi, si is de cujus statu agitur pro filio habitus sit, si testes et vicini idem deponent, si popularis fama idem asseveret.*" Covarruvios de Mat. part 2, ch. 2, sect. 3; Cujac. tit. 16, book C, 7 de lib.

What are the facts established in this record? 1st. Daniel

Clark cohabited with the mother of the plaintiff prior to the birth of the plaintiff. 2d. Before the birth of the plaintiff, he provided a house, in which the mother's confinement took place. 3d. Several days after the plaintiff's birth, she was placed in the family of Colonel Davis, as the child of Daniel Clark, and was received as such. 4th. She bore the surname of Clark till his death. 5th. He provided money, and servants, and playthings for the infant. 6th. He openly cherished her as his child in the presence of his friends. 7th. He spent much time with her, and manifested much anxiety and ambition for her. 8th. No other paternity was spoken of in New Orleans for her. 9th. He provided, in 1811, upon his leaving New Orleans upon a distant journey, munificently for her. 10th. In his last will, he recognized and affirmed her legitimacy, and his last thoughts and anxieties upon his death-bed were concerning her.

The mother of the plaintiff declared her to be the child of Clark. The family of Boisfontaine and wife, in whose house she was born, Mesdames Despau and Caillavet, her mother's sisters, received her into life as Clark's child.

Davis and wife, with whom she lived, Mrs. Harper, who nursed and cherished her, did so as Clark's child; De la Croix, who consented to be her tutor, Bellechasse, to hold property in trust for her, did so at the instance of Clark, and as the child of Clark.

This possession of the *status* and condition of filiation, was accompanied with declarations of legitimacy. The father spoke of her as the heiress of his fortune. He bequeathed to her his fortune. She was spoken of as his heiress in the community at large.

The mother represented her as the child of a legitimate marriage.

Merlin, reporting a case of legitimacy to the French court, says: 1. " That the commencement of proof, that Henrietta derives from her act of birth, from the letters written by her father, from the treatment received in the family, from the paternal testament, dated in 1801, to establish her quality of legitimate daughter and the *quasi* possession of this quality, completes full proof. If, however, the existence of a former husband, joined to the defect of proof of the putative marriage, could radically vitiate the title derived from her possession of *status*, the proof furnished of the reality of that marriage, and the common opinion relative to its effects, should authenticate the source. 2. That the title of the possession of the *status* of legitimacy being established, the proof of the vices with which this title may be infected, as to the interests of the child Henrietta, is entirely upon the opposers, for *qui dolo dicit factum aliquid licet in ex-*

*ceptione docere dolum . admissione debet.*" 10 Merlin, Questions, de droit, 49, 50.

"Always favorable to innocence," says D'Aguesseau, "when the same effect can be traced to two causes, the one illegal and unjust, and the other just and legitimate — the law rejects the first to adhere exclusively to the last." 3 D'Aguesseau, 180.

Cochin, pleading for Borguelat, says : " We should weaken the foundations of public tranquillity if, after a long possession and enjoyment of his *status*, we could displant a man from the family in which he has, as it were, taken root by acts and widespread recognitions." 1 Cochin, 590 ; 2 Menoche's Prac. 839, sect. 14, 15, 17, 18.

Starkie, speaking of such proof, says : " These are not be considered mere wanton assertions, upon which no reliance can be placed ; on the contrary, in the absence of any motive for committing a fraud on society, it is in the highest degree improbable that the parties should have been guilty of practising a continued system of imposition upon the rest of the world, involving a conspiracy in its nature very difficult to be executed." 3 Stark. 1101 ; W. Black. 877 ; 3 Mod. R. 182.

Finally, as a higher authority, and a better testimony of what the law is, we refer to the case reported in 6 How. 550.

The question then recurs, is the plaintiff the legitimate child of Daniel Clark? The defendants say no ; for, at the time of the putative marriage of her mother and father, the mother was the wife of another person, and that there was, in that fact, an insurmountable barrier to a legal marriage. To prove this, they plead and prove the *factum* of an earlier marriage between Desgrange and Zulime, the plaintiff's mother. They produce a deposition alleged to have been made upon a criminal prosecution of Desgrange before an ecclesiastical court, in the province of Louisiana, in 1802 ; they plead and prove a record of a suit for alimony, in 1805, in one of the civil courts of New Orleans, in which Zulime alleged that she was the deserted wife of Desgrange ; and, finally, they plead and prove a record for divorce, in 1806, from the same courts. These facts, they affirm, establish a valid and subsisting bar to a marriage between Clark and Zulime, at any time before the birth of the plaintiff.

The *factum* of the celebration of a marriage, and cohabitation under it, between Zulime and Desgrange, is not denied. The existence of a record, containing a charge against him for bigamy, is not denied. The fact of a record for an application for alimony is not denied ; nor of the record of an application for, and judgment of, the court, declaring the marriage of Zulime with Desgrange originally invalid in 1806. We affirm, that the last record furnishes conclusive proof of the invalidity

of that first marriage, and that the others do not qualify the force of that proof, or impair the case of the plaintiff.

The ecclesiastical record evidently cannot be pleaded as containing a *res judicata.* The ecclesiastical court undertakes an inquiry concerning reports of polygamous connections on the part of Desgrange, which had brought scandal upon the church; and, after taking some testimony, which does not establish their truth, suspends the proceedings until further proof could be had, and charges the defendant with the costs. The court reserves in its judgment the power to make further inquiries. 1 Phil. Ev. 340; 3 Wheat. 317; 13 Wend. 592; Mitf. Plead. 194; 1 Jac. & W. 20.

The acquittal of a party for bigamy, on a criminal prosecution, is not evidence in a civil cause involving the truth of the charge. 1 Stark. Ev. 277, 280, 281; 1 Phil. Ev. 338.

The depositions taken in the case are not evidence as such. The parties are not shown to be dead. Greenleaf, Ev. § 130; 13 Pet. 209. It is not admissible on account of the depositions of Zulime, or as a source of declarations, because the party is in life able to testify, and the transaction was one in which neither Clark nor his daughter were parties. Had the parties been the same, and the subject-matter the same, such a deposition would be incompetent. 1 Phil. Ev. 363.

The alimony record is produced for the benefit of an allegation in the petition, that Zulime was the wife of Desgrange. But averments in such papers are treated as the suggestions of counsel, and are not evidence. 1 Stark. 337; Gres. Eq. Ev. 424, 425. The judgment is not evidence, because marriage, in such a case, is only collaterally in question. Gres. Eq. Ev. 424; 1 Stark. Ev. 387. It could have been put in issue, but it was not necessarily so. In the Spanish jurisprudence, a marriage *de facto,* in favor of the party dealing in good faith, produces civil effects; and hence the only issue might be, whether there had been a marriage *de facto.* 4 Part. tit. 15, l. 2; Gregorio Lopez, 1 Motifs et Dis. 113, art. 201, 202; 1 La. Annual R. 98; 10 Merlin Questions de Droit, 32; Ricord des Donations, part 1, 374.

The record, in 1806, pleaded and produced by the defendants, the petition, and the formal judgment, which, by the practice of the court, was written upon it, has been lost. The docket-entry was kept, however, by law, and according to law, (2 Martin's Dig. 164,) and that furnishes an account of the judgment. The plea of the defendant (Desgrange) shows us it was a suit in which Desgrange was charged with having contracted a marriage with the plaintiff which was invalid, and that damages were claimed in consequence of the wrong. The issues then were, whether the marriage of the plaintiff and defendant

was invalid, and the defendant was liable for damages.  The judgment is an adjudication of the law and fact of nullity.  1 Stark. Ev. 289; 8 Mod. 182; 1 Phil. Ev. 341; 2 How. State Trials, 538; 2 Atk. 388; 2 Bligh, N. S. 446; 7 Coke, 42.

The inquiry then comes, what were the relations between Desgrange and Zulime, from the time of the ascertainment of his bigamy till the birth of the plaintiff?  The witnesses concur in the statement, that cohabitation between them had ceased.  No one witness pretends that, from the time of its publication, whenever made, was there any intercourse between them.   The evidence further shows, that the mother of the plaintiff did not assume the name of Clark, nor did she obtain from the public the repute of being the wife of Clark.  This, we contend, would not overbear the proofs of legitimacy we have adduced, even if not explained.  2 Hag. 63.   There is, however, an explanation of that fact.  Both Clark and Zulime acted on the presumption that judicial proof of the invalidity of the marriage between Desgrange and herself was important; perhaps they were advised it was necessary to the legality of their case.  The district judge, in the case before this court, ruled that, without such judicial proofs of nullity, there could be no legality in the marriage.   There is a statement in the record, coming from an eminent lawyer, formerly living in Louisiana, to the same effect.  That such an opinion should have been entertained by these parties, would, therefore, not be strange.

They might have considered this only as a rule or propriety and security from ecclesiastical censure in the province of Louisiana.  Supposing the opinion to have been honestly entertained, it resolves many of the difficulties that arise in viewing the conduct of the parties during the course of their subsequent history.   The evidence is, that Zulime and Madame Despau, her sister, went to the north of the United States, in 1801, to get authentic evidence of the first marriage of Desgrange.   Failing in that, and having no legal declaration of the fact, but satisfied of its truth, she consented to the private marriage with Clark.  'That the opinion had a favorable cause, but no foundation, is shown.   Pothier, du Mariage (part 3, chap. 2, art. 4,) 172; 9 Causes Célebres, 158; Nougarde Jurisprudence du Mariage, 294; 2 Phill. Rep. 19, 20; Von Leenmen's Dutch Law, 78; Herricourt Ecc. L. 107, sect. 36; Shelf. Mar. & Div. 275.

Before investigating the subsequent conduct of Clark and wife, let us consider the records pleaded by the defendants and see how far they sustain the conclusions of the plaintiff.  It is clear that the suit for alimony, under the Louisiana statute, did not correspond with that which Zulime ordered.  Desgrange, before that time, was gone, and alimony was not expected. The

effect, however, of such a suit, under the statute, was a divorce from bed and board, and counsel might have mistaken the. object, and instituted it as a divorce suit. The subsequent suit shows that the purpose of getting full judicial proof of the nullity of the marriage, and the marriage certificate, dated in 1806, showing a marriage between a Desgrange and the woman on whose account Desgrange was arrested, testify a purpose not satisfied by the first suit, on the part of Zulime, to comply with the demands of Clark, or with the provisions of the law.

These records, so far from showing any discredit upon the explanations of the parties, when fairly considered, afford a confirmation to them.

They show that to remove the alleged impediment to the declaration of the marriage, a judicial inquiry and sentence were supposed necessary, and that the party interested persevered in measures to secure them.

One other argument remains, and that consists in the evidence of Coxe. He undertakes to establish the fact of an illicit intercourse, and to negate the fact of marriage by proving that Clark was never in Philadelphia with Zulime, under such circumstances as to allow a marriage to take place. He says, that in about 1802, Zulime came to Philadelphia with a letter from Clark, confessing an illegitimate connection with her, and requesting him to provide for the mother during her confinement, and the child after its birth. That the mother left Philadelphia shortly after the birth of the child, and as soon as possible after her recovery from the sickness. That Clark arrived in Philadelphia after the child was born, and remained but a short time. The proof shows that Clark left New Orleans for Philadelphia before the 7th November, 1801; that he was unexpectedly detained in Havana, by an embargo, twenty-three days, but he is found in Philadelphia in January, and remained there until the latter end of April, 1802. Zulime is found in New Orleans in 1801, after Clark had left there for the north.

Is there any probability of the accuracy of the statement that Clark sent Zulime with a letter of introduction to Coxe, and requested him to superintend her accouchement?

Coxe was a married man, overbearing in his intercourse, staid in his manners. He reprimands Clark continually in their intercourse. As might have been expected, Clark, on some subjects, was reserved. At this moment he had his secrets carefully hidden from him.

Coxe, in his deposition taken in 1835, says nothing of the letter of introduction, speaks doubtfully of the age of Caroline Barnes, and professes to know nothing of the manner in which Zulime arrived in Philadelphia in 1807, and how she continued there.

The account Coxe gives of Caroline Barnes is equally the subject of remark.

Clark, from 1802 till 1806, was not in Philadelphia. In his testimony, he says, Clark's letters contained no allusions to Caroline Barnes. In his testimony, 1185 (10 and 11,) he says that Caroline Barnes went to Trenton to school in 1805. On page 998 he speaks of Clark's personal observation of her health, and personal directions for her removal; of his affectionate interest and tenderness. What knowledge could he have of these transactions? Clark, from 1808 till 1813, only visited Philadelphia a single time, and then to settle and dissolve his transactions with Coxe. The letters in the record show that Clark spent the vacation between the sessions of Congress in Louisiana. Additional observations are to be made upon Coxe himself. The letters, from Coxe, seem strongly to indicate that he is not deserving of implicit credit. This witness needs to be sustained himself; he cannot contribute to destroy the credit of another.

The testimony of the sisters, (Despau and Caillevet) has been assailed. Against the character of the latter nothing has been said. Her husband testifies in his last will to her excellence, and none have appeared to dispute her title to the commendation.

Madame Despau has been assailed. The testimony consists of the loose statements of a rout of witnesses who say that she was reputed to be a *galante femme;* that nothing good was said of her; that she was spoken of in the same terms as her sister. And the record of a proceeding had by her husband against her when she accompanied Zulime to the United States in 1807. This proceeding was *ex parte*. The evidence impugns Mad. Despau only for having abandoned Despau. I hardly need to state that none of this testimony is admissible to impeach her credit. Phil. Ev. 291, 292; 13 Johns. Rep. 504; 3 S. & R. 337; Hill & Cowen's Notes, 768.

The life of Mad. Despau from 1808 till the present time answers the calumnies upon her. She returned from the north in 1808; with her children she went to the parish of St. Landry, and there conducted a small school. The esteem and confidence of her neighbors attached to her. Her daughters were eligibly established in marriage, and under their kindness she is now sustained and supported.

Had she been Clark's mistress would she have been left penniless? Has not the exemplary life of forty years been sufficient to vindicate her fame? Has not the fact that her husband made no contribution to his family, but left his children to her, proven the falsehood of his charges upon her?

We have considered the parties up to 1808. Let us consider

the effect of the conduct in 1808. Both parties, Clark and Zu-lime, we have said, may have considered particular evidence needful for the validity of their marriage.

Their opinion does not affect the case. Lord Eldon has said on such facts : " I am exceedingly anxious to press upon your lordships' attention this is what I take to be an indisputable proposition of law, namely, that if you find there was a marriage duly celebrated, actually had, that marriage cannot be got rid of by evidence of facts and circumstances done or observed by persons afterwards thinking it proper to disentangle themselves from the connection of marriage, actuated by caprice, dislike of each other, or a base motive of inducing other persons to think that they may form matrimonial connections with the parties. When once you have got clearly to the conclusion that a marriage has been had, let the consequences be what they may with respect to third persons, that marriage must be sustained." 2 Bligh, N. S. 489.

The French jurists are equally explicit. In a court where the solemn admissions and oath of the first wife were produced to establish that she was not a wife, the advocate-general declares : " It is pretended that Margaret Doros has renounced her *status ;* but without examining if it is her, or a fictitious representative who has spoken in these acts, whether they were prepared or fabricated by her husband, or whether she consented freely, or executed them under a surprise, menace, or through fear of violence, it is sufficient to say the renunciation is vicious, and produces no effect. The *status* of a wife is such that she cannot dispose of it. All the efforts to impair or to destroy it are nugatory."

Clark's conduct to his child after the marriage of Zulime to Gardette seems to have been more anxious. " He passed much time with her," says Mrs. Davis. He expressed intense anxiety and ambition for her. He felt that he could make no public declaration without compromising himself and compromising Mrs. Gardette. We may well understand that he was beset with difficulties and vexations on the subject. We can understand that when he resolved, by an open and palpable acknowledgment, furnishing to her a charter of her rights, that it would afford him infinite relief. Such is the testimony in the record.

The will would have been a simple nullity if the plaintiff was a bastard. The father was prohibited from executing such an instrument. There was no occasion to steal it or to suppress it. The law had already pronounced on it a sentence of condemnation. The person who abstracted such a will must have believed in the legitimacy of Myra. De la Croix, who desired to find the will, Pitot and Bellechasse, whose indignation was awakened by its loss must have known its legal effect

Gaines *v.* Relf et al.

The absence of that will and the cause of its absence; the absence of all papers, letters, memoranda of Clark determining the legitimacy of his daughter; the nature of his long connection with her mother, speak trumpet-tongued. These defendants, Chew and Relf, were early put upon their guard. They could not have failed to hear of the contents of that lost will. Relf sets himself to work to conciliate De la Croix, and succeeds. He winds himself about Bellechasse, and seeks first through Coxe and then by an artful letter of his own, to induce him to betray the trust he had assumed for the plaintiff.

Suppose the act of sale spoken of had been annulled under the " pure and simple " authority that Relf sought for from Bellechasse, what would have been the condition of Bellechasse in reference to this transaction? How much would his testimony have been impaired?

All of Clark's correspondence come to the possession of Chew and Relf after the death of Clark. Whatever he wrote; whatever he received, fell under their inspection. They knew his acquaintances, his intimates. They could have afforded full information to this court of all the obscure and doubtful circumstances in this case. Give to us the contents of the black case, about which Clark was so anxious in his last sickness, and we will undertake to do so. On whom does the *odium spoliatoris* in this case rest? Who is it that has concealed a part of the testimony, and attempted to adulterate the remainder?

Another fact in the case is noticeable. Coxe affects even to the last to doubt the plaintiff's connection to Clark. At the date of the mother's, (Mrs. Clark's) will, she was living with Colonel Davis as his daughter. Why was it necessary to proclaim her illegitimacy in the will of Mary Clark, her grandmother, accompanied as it was with no substantial benefit?

If the conduct of Relf and Coxe had been deliberately directed to the suppression or the alteration of the evidences of the plaintiff's legitimacy, it would hardly have been different from what it appears on this record.

This review of the testimony of the case is surely sufficient to exhibit the truth of the plaintiff's claim. We have not forgotten the opinion heretofore given by this court upon much of the evidence in this record, nor do we diminish or undervalue the importance of that opinion by discussing anew what has been so well considered.

The counsel for the appellees made twenty-seven points. Only two parts of the argument will be given at any length, those two being connected more especially with the points upon which the decision of the court turned. The general features of the case dwelt upon were, the depositions and character of Madame

Despau; the alimony, ecclesiastical and divorce records and the conduct of Zulime in declaring herself to be the wife of Desgrange; her conduct afterwards in going in search of the certificate of her marriage when she had a living witness of it by her side, and the inconsistency of her marrying Gardette with a belief that she was the wife of Clark; the utter improbability that Clark would have offered marriage to several ladies of high character and connections if he knew that he was already married; and the testimony to depreciate the character of Zulime for chastity.

With respect to the different depositions of Madame Despau, whose evidence was taken three times, viz., in 1839, 1845, and 1849, the counsel (*Mr. Duncan,*) remarked as follows:

Having thus declared the field for a fair, full, and impartial investigation, I proceed to the examination of the case.

First. Was Daniel Clark ever married to Zulime Née Carriere, the mother of the complainant, Myra? We hold the negative of this question. Then, 1st, We say that the complainant, holding the affirmative, must make it perfectly manifest beyond all reasonable doubt. This is the more incumbent on them as it is not pretended that Daniel Clark and this woman ever gave to the public any of the usual manifestations of such a connection. Indeed, strange as it may appear, the parties here aver that there were none of those usual ordinary and appropriate evidences given by the persons whom she claims to have been her father and mother, which all individuals in all Christian lands hold out to the world as the appropriate evidence of the existence of a marital relation.

Let us now take up this first point, as a question of evidence, and see how it stands. Was Daniel Clark ever married to Zulime Née Carrière, the mother of Myra? The affirmative of this proposition is sworn to in the most unqualified manner by Madame Sophia Despau, as a fact which took place in her own presence. This is stating her testimony as fully and broadly as I can possibly do it. It is here to be remarked that it is a strange and singular thing, which can but attract attention, that but one witness can be found to testify to a marriage of such a man as was Daniel Clark! That he lived twelve years after this supposed interesting fact, and yet amidst his family and friendly letters, which are as abundant as the leaves of the forest, there can be found not the most distant reference to this most important fact.

As Madame Despau is the only witness who swears that she was present and saw the marriage, I will at once review the case as based upon her testimony.

The answer of the defendants is under oath, and this meets her testimony, unless she is sustained by other strong corres-

ponding facts and circumstances.   Whether she is so sustained
will be seen in the progress of this inquiry.

In equity the answer of the defendant is conclusive in his
favor, unless it is overcome by satisfactory testimony of two
opposing witnesses, or of one witness swearing positively, and
such other facts as are equal to the unqualified testimony of
another witness.   2 Story's Eq. 743, 744; 2 Atk. 19; Id.
140; 1 Ves. 97; 6 Ves. 40; 9 Id. 275, 283; 12 Id. 78; 18 Ves.
12–335; 9 Cranch, 160; 1 Johns. Ch. R. 459, 462; 2 Fonbl. B. 6;
Ch. 2, sect. 2, note g; 2 Ves. jr. 243; 2 Johns. Ch. R. 88, 89, 90.

The witness Despau was examined under oath in June, 1839.
Then, in answer to the second question put to her, without
hesitation or equivocation she swears as follows: " Daniel Clark
was married in Philadelphia, in 1803, by a catholic priest.   1
was present at this marriage."   She subsequently, in rather an
awkward manner, says that this marriage of Daniel Clark was
with her sister Zulime, and that of this marriage Myra was the
only issue.   On the 16th day of October, 1845, this same wit-
ness Despau is again examined.   The mind will naturally pause
here to inquire whether accounts, given at two periods of more
than six years apart, and before different magistrates, agree in
all essential particulars.   One of the most powerful instru-
ments in the investigation of truth is where several witnesses,
at different times and places, without possible collusion, agree
in all material particulars in their account of the same transac-
tion.   The best of writers on this part of the system of laws
agree that it is a high evidence of the integrity, of the witnesses
where there are small differences in their account of the same
transaction, and for the sensible reason that it shows an entire
absence of collusion.   On the other hand, where there is a strik-
ing similitude in the very language of different witnesses, it
raises a suspicion at once of collusion, and demands an expla-
nation and further circumstantial support.   By the same process
of reasoning let us look at these two statements of Madame
Despau.   They are six years separated in point of time, they
are taken before different magistrates, and yet we find the wit-
ness not only agreeing with herself in the general account—
which ought to be expected of all honest witnesses — but the
very language is used by the magistrates in taking down her
several statements on the two occasions, and in precisely the
same language, as far as it goes.   Now, then, I say that one of
two things happened — there was either collusion or a miracle
on this last occasion?   No witness can recount a transaction
thus, under such circumstances, in the fading period of life to
which she had arrived.   The thing is impossible.

There was no miracle in the business.   There was but one

42*

way of accounting for this thing. The greatest power which a court of chancery has in preventing collusion had been broken down. Publication of her first statement had been made. The seals had been broken; a copy of her first testimony was in her hand when she made her second statement, or what is worse, and more probable from her simple inspection of the face of the deposition, it was prepared for her, and she signed what had been previously prepared. The magistrate disobeyed the very letter of the commission addressed to him by the court, — that commission is very comprehensive, direct, and simple. But the "trust and confidence" of the court, in the integrity and ability of the magistrate, have been abused. The whole was a concocted affair, got up, no doubt, out of the presence of the magistrate. And this is the precious testimony upon which the court is asked to base a judgment decreeing on earth — what was never registered in heaven — that Daniel Clark had married Zulime Née Carrière.

There is in this statement, or rather statements of the witness Despau, this feature to be remembered, that the facts above referred to show deliberation, purpose, care, design, as well as preparation. She belongs to the household of this suit; it is not doing ner injustice, therefore, to suppose that her testimony has been the subject of repeated and deliberate consultations before it was delivered. Its force and effect have been well considered. This very citadel of the case has been duly and thoroughly examined, with a critic's eye. It has doubtless been considered not only in its relations and bearings upon the complainant's case, but all possible guards have been thrown around it against the approach of the adversary. There is, then, no room left for mistake. The time, the place, and the circumstances have all been detailed. The story is told; and so true is it (God save the mark!) that six years afterwards, in relating it for the second time, no words can be found so very appropriate as the exact words used before to convey this important fact. Then she is ready to stand or fall by it.

Before going into the interesting comparison of the testimony of the witness Despau, with other measures of truth, I beg leave for a moment to revert to the issue on this point as tendered by the complainant's bill, and accepted by the defendants in their answer. The original bill was filed in this court on the 28th day of July, 1836. On the 11th day of December, 1848, the last amended bill was filed. Thus the parties have themselves had twelve years and over four months to conform their averments to their facts, and after all this time and consideration, we find that on the day last mentioned an amended bill is filed, and in it we meet with the following averment on the behalf of the complainant:

"That the said Daniel Clark was lawfully married with Zulime Née Carrière, at the city of Philadelphia, in the State of Pennsylvania, in or about the latter part of the year 1802, or the early part of the year 1803, with the observance of the necessary requisitions of the laws of Pennsylvania for the solemnization of the marriage contract, and that your oratrix is the sole offspring or issue of said lawful marriage." Page 86 of the original record, restored by stipulation on file.

Now, then, we have fairly before us the averment upon the turning point of complainant's case. It is clear and distinct, though there is a considerable margin reserved in the expressions "the latter part of 1802, and the early part of 1803." Yet we shall not complain, and I propose to allow them the grace of three months in each of those years, making a field of inquiry of six months, or from the 1st of October, 1802, to the 1st of April, 1803. I believe that the court will think with me that this is a sufficient allowance to one who has taken so long a time in adjusting the time to her facts, with the aid of her mother at her side. The day of a woman's marriage is one of the most important in her life, which no time or circumstances can obliterate from her mind. She can always tell the very day, with all its attendant circumstances, and it would have been no more than right if I had exacted a positive averment of the very day and the very place of this great event: great to the mother of Myra if it had been true, because it would have changed the whole current of events in her eventful and romantic career.

The defendants take issue upon the foregoing quotation from the amended bill of the complainants, and aver that it is not true. They aver that Daniel Clark was not married to Zulime Née Carrière, in Philadelphia, in the latter part of the year 1802, or the early part of the year 1803.

I will proceed now with our examination of the testimony of complainants on this point, and then show by that of the defendants that the whole pretension is an utter fabrication.

What is the testimony of the complainant on this point? They have one witness who swears most positively that she saw the marriage, and that it took place in Philadelphia. This is the only witness (Mrs. Despau) who thus testifies. Her testimony, which I have before referred to, it must be observed, is not the testimony of the same witness now relied upon by the complainant. Far from it. They, on the contrary, began to penetrate into the storehouse of the defendants' muniments of war. They began to see, to comprehend, and to feel, the force of the evidence which was soon to overwhelm that witness and to sink her, and with her the complainant's case, into "the re-

ceptacle of things lost on earth." The case, and the witness must stand together; if one falls the other sinks,—if one is blasted the other is ruined; and a gallant struggle must now be made to rescue both one and the other. Accordingly, and for the first time, with any regard to the proprieties of any of the rules of chancery practice, in the month of February, 1849, the complainant propounds her interrogatories, and the defendants again propound their cross-interrogatories. To these questions do we hear the same old song sung again, set to the same old tune? Ah! by no means. She now swears as positively as she did before to the marriage, and to her presence at the place; but when she comes to speak of the time,— ah! there is the rub,— she begins to falter, hesitate, and doubt. We look here in vain for that bold, open, and unqualified declaration she had twice before made under oath, and in this case. She now, on the 19th of March, 1849, swears, " I was present at this marriage. This, to the best of my recollection, was in the year 1803; although there are some associations in my memory, which make me think it not improbable that the marriage may have taken place in the year 1802. My impression, however, is that the marriage took place in the year 1803. It was, I remember, a short while previous to Clark's going to Europe." R. 359.

Who ever saw a more cunningly-devised effort to save a witness than this? Her testimony is here in the record twice told, and doubly sworn to, declaring, in unqualified language, that Daniel Clark was married to her sister, in Philadelphia, in the year 1803! Who gave her the alarm? Who cried out to her that she was standing over a volcano? Who prepared the bridge for her escape, if escape she has made? Then she swore positively,—now she has it to the best of her recollection. Then she swore it was in 1803,—now she believes it to have been in 1803, " although there are some associations in my memory, which makes me think it not improbable that the marriage may have taken place in the year 1802." I think if this witness should ever happily read the testimony in this case, she will have other " associations in her memory," which will make her think that she was entirely mistaken in the whole business, and that there was no marriage whatever! If she does not, I imagine that her conceptions are formed of far different materials from that which form the minds of your Honors. Why was it that she imagined it possible that she could now be mistaken? In 1839 and in 1845 she had no such idea. She was then much nearer the scene than she was in 1849, and much more likely to have a correct recollection of the event. But why the expression now for the first time found in her testimony, in order to fix the period of Daniel Clark's marriage. that " it was,

I remember, a short while previous to Mr. Clark's going to Europe"? Who put this notion into her head? Was there any thing in the interrogatory to suggest the idea? I might as well tell the court plainly and at once that, at the time this last testimony was taken, it had been found out that Daniel Clark had been in Philadelphia in the year 1802, but not in the latter part. It was known, or ought to have been known, that we could prove by the testimony left behind him, by Daniel Clark himself, that he was not in Philadelphia at any period of the latter part of 1802, or in any part of 1803. Hence the necessity for this witness to retreat from her former position, and at the same time to do it in such a delicate manner, and with such consummate tact, as to appear to glide naturally towards the truth — to strike upon a circumstance which would appear to elucidate the truth of her statement. Poor short-sighted mortals we are; she had far better been left upon her original position, because her advisers knew not what an *ignis fatuus* was leading them into a morass from whence there could be no escape.

The parties here are to be held to their pleadings. The *onus probandi* in this case is with the complainant, according to the maxim of the civil law, " *Ei incumbet probatio qui dicit, non qui negat.*" Phillips on Ev. 194. This rule is as strict in equity courts as in courts of law. 2 Daniels, 990.

*Mr. Duncan* then went on to show from letters that Clark was not in Philadelphia during the latter part of 1802 or during any part of the year 1803.

Second Point. — I maintain that Daniel Clark could not have married Zulime Née Carrière in 1802 or 1803, because of the legal impediment then existing, and well known to both parties, that she was then a married woman. That she was married to Jerome Desgrange, with strict compliance with every requisition of law, both ecclesiastical and civil, then in force in Louisiana. See record, pp. 748–751. Indeed, this fact is admitted. It is proved and admitted, that, at the time of the alleged marriage of Daniel Clark, Jerome Desgrange was living. We interpose this impediment. We are met by the allegation that this is no impediment, because, at the time Desgrange married Zulime, he had himself a living wife. I now say that there is no proof upon this point which should be regarded for a moment. Let us examine it. First, we have a certificate of one Jacob Desgrange's marriage having taken place in New York. The name excludes the idea of its being Jerome Desgrange, unless the plaintiff had followed it up by proof of identity, and that the very person married in New York, under the name of Jacob, had married Zulime under the name of Jerome. There is not in the record even an attempt to prove it. Again, if the certifi-

cate even contained the name of Jerome Desgrange, it would have been equally obligatory upon plaintiff to have followed up the certificate by proof of identity; *non constat*, but there may have been a dozen Jerome Desgranges in New York; and we are asked to believe that the one mentioned in the certificate was the same who married Zulime, contrary to every principle of law, and in manifest violation of the best rules of justice; that his marriage with Zulime is to be taken as fair, honest, and legal. Any other rule would be the grossest injustice to the name of Desgrange, and cover his grave with dishonor, without his ever having had an opportunity to be heard, and manifesting his innocence and his integrity. This court has seen that in the only case where Desgrange was ever cited, and in which he was put to the proof of the validity of his marriage with Zulime, how triumphantly he sustained himself, and in a case, too, where, if there had been any truth in the accusation, the very witnesses produced were the very ones who would have been most likely to have stated the case most strongly, and in a vindictive spirit, against him — the pretended victims of his crimes. It should be enough that the home of that man was entered by a seducer, without now having his memory covered with infamy, without a trial or a hearing.

But there are other circumstances about this New York certificate which should degrade it. It has been argued as a singular thing, going a great way towards sustaining the genuineness of that paper, that it has on it the names of the persons, as witnesses, who had been named by Madame Soumeylliatt, as the witnesses of her marriage! Sirs, the argument is a feeble one, and gives rise to the suggestion that the very reverse is the truth. That lady's testimony was taken on the 6th of September, 1802. See Record, 711. That miserable certificate is dated on the 11th September, 1806. See Record, 382. Now the inference which I draw from it is this: that her having given the names of the witnesses to her marriage with Mr. Soumeylliatt, suggested the idea to the person who made that certificate of putting these names there as witnesses. Why was not the testimony of some one of those witnesses taken? Their death is nowhere shown or pretended. You have the oath of both Desgrange and Madame Soumeylliatt, two of the most important parties in that certificate, testifying directly against it. That certificate, too, it will be seen, is dated but a few weeks after the date of Zulime's suit for divorce in 1806. pp. 382, 758.

Now, then, this attempt to impose this certificate develops another fact which strongly militates against Madame Despau's story. She says that when they reached New York, in 1802 or

1803, to obtain proofs of Desgrange's marriage, they could find none — the registry was destroyed. But if this certificate was given in 1806, then the priest who married Desgrange was alive and there when Zulime and Madame Despau were in New York, and could easily have given his testimony or certificate to them. The certificate professes to be taken from a particular page of the record. Then there was no such thing as a burnt record in 1802, as sworn to by this witness. It will be remembered, too, that we find this certificate coming to light through the hands of Zulime in 1840. Record, 597.

But the certificate, and all of the testimony connected with it, must be suppressed on a question of law; and this puts an end to the question at once and forever. This is not a record, or a copy of a record. It does not profess to be. Then it is a statement, not under oath, of a person who may perhaps be dead. This statement was not even in the shape of a deposition. If this paper had even been in the shape of a deposition taken in a suit, it would be no testimony against these parties, they having been no parties in that proceeding. The parties are not to be condemned by the testimony of witnesses they never saw or heard of, and whom they had no opportunity to cross-examine. 1 Starkie's Ev. 260, sect. 99.

In connection with this certificate, we have moved to suppress the whole testimony taken in reference to it. See motion to suppress, under 12th head. A deposition taken without notice will be suppressed. 1 J. J. Marsh. 525; 2 Daniels, 1140. The deposition proving this certificate was taken before issue joined. The deposition was taken in 1846. The issue was joined by plaintiff filing replications to the answer, and pleas of Chew and Relf, were filed on the 5th of March, 1849. See Record, 203. The replication to Devereaux's answer was filed 26th March, 1849. See Record, 204. The replication to the answer of Municipality, No. 1, was filed May 21, 1849. The replication to Rodriguez's answer was filed about the same time, though the date is not given in the record. The court will perceive that the answers and pleas of Chew and Relf were filed on the 14th of January, 1845. There was no necessity, therefore, for taking the depositions *de bene esse* in 1846, for plaintiffs, if they had been disposed, could have taken issue when it was tendered by Chew and Relf, and taken the testimony contradictorily with them. The fact that this was not done raises a strong presumption that it was taken in the manner it was for some wrongful purpose. Be this as it may, it must be suppressed, because no effort has been made since issue joined, to take the testimony in chief. See 2 Daniels, 1111. The only instances in which testimony can be taken in chancery in a

United States Circuit Court, is provided for in the 70th rule
of the Supreme Court. It is to be done after the bill is filed,
and before the defendant has answered, on affidavit, &c., and
even then the rule requires the party to give the adverse party
due notice of the time and place of taking the testimony. No-
thing of the sort was done here. It is perfectly clear that depo-
sitions taken *de bene esse* cannot be read, and must be suppressed;
the party has forfeited all right to read them. 2 Daniels, 1119.
All the grounds mentioned in our 12th point for suppressing
testimony are fully sustained; and this deposition should be
laid aside. The testimony being stricken out, the plaintiff has
nothing left to prove any such thing as a previous marriage by
any testimony entitled to belief.

But let us go on with the legal discussion. Suppose that it
has been established that Desgrange had a former wife, did that
fact authorize Mrs. Desgrange to contract a marriage with Clark
before the former one was dissolved by competent authority. It
must not be forgotten that plaintiff's own witnesses swear that
the agreement to marry — the contract — was made in Louisiana,
the domicile of both parties. The mere ceremony to consum-
mate it is another subject, which I shall examine. Did this state
of things authorize Zulime to contract marriage? I answer,
certainly and clearly not. If she did marry Clark after marrying
Desgrange, by the laws then in force, it was adultery on her part,
and the fruits of the connection would be an adulterous bastard.
The 8th Book, title 20, Law 4, Nueva Recopilacion, being
translated, reads thus: "Should a woman, either married, or
even only publicly betrothed, before Our Holy Mother the
Church, commit adultery, although she should allege and show
that her marriage is null and void, either on account of near
relationship by consanguinity or affinity within the 4th degree,
or because one of the spouses was previously bound by another
marriage, or had made a vow of chastity, or was about entering
a religious community, or had some other reason — yet for all
this she is not to be allowed to do what is forbidden; and she
cannot prevent her husband from bringing a suit for adultery,
both against her and the adulterer, as if the marriage was not a
true one. We decree against such persons — whom we consider
as having committed adultery, (*que habemos por adulteros*,) the
law of the fuero be strictly followed, which treats about adul-
terers, and is the first law of this title." See Nueva Rec. Book
8, tit. 20, Law 4.

What can be more clear and conclusive than this? And be
it remembered that this is not an opinion of an elementary wri-
ter, but the positive provisions of the law as they were in force
at the domicil of all these parties. A previous marriage, though

it is proved to exist, cannot be treated as a nullity. The wife that ventures to do it, says the law, is guilty of adultery, and the man who intermarries with her, is an adulterer.

Again, when the law treats of who may marry a second time, enacts as follows: " Men and women may marry a second time, or oftener, after the first marriage is dissolved, either on account of some legal impediment, or by death." 4 Partida, title 11, Law 1. This could not be done in Louisiana, until the lapse of ten months after the dissolution of the previous marriage. Old Code, p. 28, art. 31. Before the code of 1808, it was one year. 4 Partida, title 11, Law 3.

Now, the first law under the same title, and same book, provides, among other things, that if the husband of the woman, thus acting, should kill both guilty pair, he shall stand justified; and that if he causes them to be put to death, by authority of justice, that the whole of the property belonging to the guilty pair should vest in the injured man. So that if Desgrange had gone in and killed Clark and Zulime, he would have stood justified, and if he had had them arrested and capital punishment inflicted upon them both, by due course of law, he would have been entitled to the property of both of them.

Mr. Justice CATRON delivered the opinion of the court.

This cause comes here by appeal from the decree of the Circuit Court of the Eastern District of Louisiana, where the bill was dismissed.

The complainant sues as the only legitimate child of the late Daniel Clark, who died in the city of New Orleans the 13th of August, 1813. No account is prayed against Daniel Clark's executors; but the complainant seeks to recover the property sold by them, consisting of lands and slaves, on the ground that her father could not deprive her, as his legitimate child, of more than one fifth part of his estate by a last will, according to the laws of Louisiana as they stood in 1813. And she maintains that the sales made by Chew and Relf, were made without any orders of court to authorize them, and that therefore they are void; the laws of Louisiana requiring such orders before a valid sale could be made.

The respondents claim under a will made by Daniel Clark in 1811, by which he devised all his property, real and personal, to his mother, Mary Clark, and appointed Richard Relf and Beverly Chew, his executors; and to whom Mary Clark made a power to sell Daniel Clark's estate for the purpose of raising money to pay his debts. Chew and Relf, acting as executors of Daniel Clark and also as attorneys of Mary Clark, did sell the property in controversy for the purpose of paying the debts of the tes-

tator. To meet this claim of title, the complainant insists, 1st, That the sales made by Chew and Relf, as executors, were made without orders from the court of probate to authorize them, and are void; 2nd, That Mary Clark had not accepted in legal form, the bequest of her son when she conveyed by her attorneys; and that therefore, her conveyances cannot be relied on by her vendees to support the plea of innocent purchaser.

On the 10th day of June, 1844, the mother of the complainant, styling herself Madame Marie Zulime Carrière, and widow of the late Daniel Clark, by her notarial act, made in the city of New Orleans, accepted, without benefit of inventory, the community of acquests and gains of one moiety, which it is alleged existed between her and her late husband Daniel Clark, according to the laws in such cases provided. And on the 2d of July, 1844, the then complainants, Gaines and wife, among other amendments to their bill, filed the following: " Your oratrix alleges that she is entitled to the one moiety of the estate of which the said Daniel Clark died possessed, by reason of a conveyance thereof made to her by M. Z. Gardette, the widow of the said Clark, and the mother of your oratrix, on the 7th day of May, 1836, and which is hereunto annexed, marked A. B. and prayed to be taken as part hereof; and the mother of your oratrix did thereafter, on the 20th June, 1844, further convey to her all her interest in said estate, as appears by her act, a copy of which is herewith exhibited, marked C.; the whole of said estate having been acquired during the coverture of said Clark and wife."

The exhibits in these particulars correspond to the allegations. It follows, therefore, that the complainant claims one half of Daniel Clark's estate by a conveyance from her mother.

The first and most important of the issues presented is that of the legitimacy of the complainant. It is raised, by the following pleadings :

She alleges that her father, Daniel Clark, was married to Zulime Née Carriere, in the city of Philadelphia, in the year 1802 or 1803; and that she is the legitimate, and the only legitimate offspring of that marriage.

The defendants deny that Daniel Clark was married to said Zulime at the time and place alleged, or at any other time or place. And they further aver, that at the time said marriage is alleged to have taken place, the said Zulime was the lawful wife of one Jerome Desgrange.

If the mother of the complainant was the lawful wife of Jerome Desgrange at the time said Zulime is alleged to have intermarried with Daniel Clark, then the marriage with Clark is merely void; and it is immaterial whether it did or did not take

place. And the first question we propose to examine is, as to the fact, whether said Zulime was Desgrange's lawful wife in 1802 or 1803.

A formal record of the marriage between Desgrange and Marie Julia Carrière, obtained from the cathedral catholic church at New Orleans, is before us. That it is a true record of said marriage is not controverted. Marie Julia is designated Zulime, by a soubriquet or nickname, which is proved to have been a common custom in Louisiana at that time. The marriage was solemnized in due form on the 2d day of December, 1794. This is admitted on part of the complainant. The parties cohabited together as man and wife for seven or eight years. This is also conceded by both sides. To rebut and overcome the established fact of this marriage, it is alleged that previous to Desgrange's marriage with Zulime he had lawfully married another woman, who was living when he married Zulime, and was still his wife; and that therefore, the second marriage was void. And this issue we are called on to try.

The marriage with Desgrange having been proved, it was established as *primâ facie* true, that Zulime was not the lawful wife of Clark, and the *onus* of proving that Desgrange had a former wife living when he married Zulime was imposed on the complainant; she was bound to prove the affirmative fact that Desgrange committed bigamy. To establish such previous marriage and the consequent bigamy by marrying a second time, much evidence was introduced and relied on by the complainant. The first witness whose testimony will be referred to was Madame Despau, sister of Zulime. Her testimony has been taken three times ; first in 1839, then in 1845, and again in 1849.

In 1839 she says, " I was well acquainted with the late Daniel Clark, of New Orleans. He was married in Philadelphia in 1803, by a catholic priest. I was present at this marriage. One child was born of that marriage, to wit: Myra Clark, who married William Wallace Whitney. I was present at her birth and knew that Mr. Clark claimed and acknowledged her to be his child. She was born in 1806. I neither knew nor had any reason to believe, that any other child, besides Myra, was born of that marriage. The circumstances of her marriage with Daniel Clark were these: Several years after her marriage with Desgrange, she heard he had a living wife; our family charged him with the crime of bigamy in marrying said Zulime ; he at first denied it, but afterwards admitted it, and fled from the country. These circumstances became public, and Mr. Clark made proposals of marriage to my sister, with the knowledge of all our family. It was considered essential first to obtain re-

cord-proof of Desgrange having a living wife at the time he married my sister; to obtain which, from the records of the catholic church in New York, (where Mr. Desgrange's prior marriage was celebrated,) we sailed for that city. On our arrival there, we found that the registry of marriages had been destroyed. Mr. Clark arrived after us. We heard that a Mr. Gardette, then living in Philadelphia, was one of the witnesses to Mr. Desgrange's prior marriage. We proceeded to that city, and found Mr. Gardette. He answered, that he was present at said prior marriage of Desgrange, and that he afterwards knew Desgrange and his wife by this marriage; that his wife had sailed for France. Mr. Clark then said, 'You have no reason longer to refuse being married to me; it will, however, be necessary to keep our marriage secret till I have obtained judicial proof of the nullity of your and Desgrange's marriage.' They, the said Clark and the said Zulime, were then married. Soon afterwards, our sister, Madame Caillavet, wrote to us from New Orleans that Desgrange's wife, whom he had married prior to marrying said Zulime, had arrived at New Orleans. We hastened our return to New Orleans. He was prosecuted for bigamy; father Antoine, of the catholic church, taking part in the proceedings against Desgrange. Mr. Desgrange was condemned for bigamy in marrying the said Zulime, and was cast into prison; from which he secretly escaped by connivance, and was taken down the Mississippi River by Mr. LeBreton D'Orgenois, where he got into a vessel, escaped from the country, and, according to the best of my knowledge and belief, never afterwards returned to Louisiana. This happened in 1803, not a great while before the close of the Spanish government in Louisiana. Mr. Clark told us that before he could promulgate his marriage with my sister, it would be necessary that there should be brought by her an action against the name of Desgrange. The anticipated change of government created delay; but at length, in 1806, Mr. James Brown and Eligius Fromentin, as the counsel of my sister, brought suit against the name of Desgrange, in the city court, I think, of New Orleans. The grounds of said suit were, that Desgrange had imposed himself upon her at a time when he had a living lawful wife. Judgment in said suit was rendered against said Desgrange. Mr. Clark still continued to defer promulgating his marriage with my sister, which very much fretted and irritated her feelings. Mr. Clark became a member of the United States Congress, in 1806. Whilst he was in Congress my sister heard he was courting Miss C., of Baltimore. She was much distressed, though she could not believe the report, knowing herself to be his wife. Still, his strange conduct in deferring to promulgate his marriage with her had

alarmed her. She and I sailed for Philadelphia to get proof of his marriage with my sister. We could find no record, and were told that the priest who married her and Mr. Clark had gone to Ireland. My sister then sent for Daniel W. Coxe; mentioned to him the rumor; he answered that he knew it to be true that he (Clark,) was engaged to her, (Miss C.) My sister replied that it could not be so. He then told her that she would not be able to establish her marriage with Clark if he were disposed to contest it. He advised her to take counsel, and said he would send one. A Mr. Smyth came and told my sister that she could not legally establish her marriage with Clark, and pretended to read to her a letter in English, (a language then unknown to my sister,) from Mr. Clark to Mr. Coxe, stating he was about to marry Miss C. In consequence of this information, my sister Zulime came to the resolution of having no further connection or intercourse with Mr. Clark, and soon afterwards married Mr. Gardette, of Philadelphia. The witness further states that she became acquainted with Desgrange in 1793. He was a nobleman by birth, and married Zulime when she was thirteen years old. Zulime had two children by him, a boy and a girl; the boy died, the girl is living, (1839;) her name is Caroline, and married to Dr. Barnes. Witness was present at the birth of these children. The marriage of Zulime was a private one. Besides the witness, Mr. Dorsier, of New Orleans, and an Irish gentleman, a friend of Mr. Clark, from New York, were present at the marriage. A catholic priest performed the ceremony.

In regard to the children, born of the marriage of Zulime and Desgrange, this witness further states in another deposition, that before the detection of Desgrange's bigamy, said Zulime had a son, who died, and a daughter called Caroline, which bore his name. Since the death of Mr. Daniel Clark, Mr. Daniel W. Coxe and Mr. Hulings, of Philadelphia, gave her the name of Caroline Clark, and took her to Mr. Clark's mother, and introduced her as the daughter of her son. She of course believed their story, which induced her in her will to leave a portion of her property to Caroline. Caroline was born in 1801.

I never heard Mr. Clark acknowledge his having any natural children; but have only heard him acknowledge one child, and that a lawful one, to wit, said Myra.

Her other depositions substantially correspond with the foregoing statement so far as they bear on the question of Desgrange's bigamy.

The next most important witness is Madame Caillavet, another sister of Zulime. She was also three times examined. Her first deposition was taken at New Orleans, in May, 1835, in which she states: That sometime after the marriage of her sis-

ter with Mr. Desgrange, her sister discovered that Mr. Desgrange had been previously married: that in order to ascertain this fact, she went to Philadelphia, in the absence of her husband who was in France; that whilst at Philadelphia, Desgrange returned from France to New Orleans, and at the same time, or a very short time after, his first wife made her appearance in New Orleans. Upon this, witness immediately apprised her sister of this fact and she returned immediately to New Orleans. On the arrival of the said first wife of Desgrange, she complained to the governor, who caused Desgrange to be arrested; (it was under the Spanish government;) after some time, he obtained his release and left the country. Before his departure, he confessed that he had been previously married. Witness understood afterwards from her sister by letters which she received from her secretly, that she was married with Mr. Daniel Clark; the preliminaries of the contemplated marriage were settled by the husband of witness, at his house in the year 1802 or 1803, in the presence of witness.

In the next deposition she states:

" I have already stated all I knew about Mr. Clark's marriage with Zulime, and of her marriage with Mr. Desgrange. By this marriage she had two children, a boy and a girl; the boy is dead, the girl is still living; her name is Caroline, and is married to Dr. Barnes."

The second and third depositions of Madame Caillavet correspond, but as the third one is more full, it is given. In this one she states as follows:

" I did reside in the city of New Orleans, about the year 1800, and for many years previous; my residence continued there until I went to France, about the year 1807.

" I was acquainted with Daniel Clark, late of the city of New Orleans, deceased; my acquaintance with him commenced about the year seventeen hundred and ninety-seven; my intimacy with him, growing out of his marriage with my sister, continued during my residence in New Orleans.

" I was not present at the marriage of Zulime Nèe Carrière (who is my sister,) with Mr. Clark; but it is within my knowledge, both from information derived from my sisters at the time, and from the statements of Mr. Clark, made to me during his lifetime, that a marriage was solemnized between them. It is to my personal knowledge that Mr. Clark, about the year eighteen hundred and two, or three, made proposals of marriage with my sister Zulime, with the knowledge of all our family. These proposals were discussed, and the preliminaries of the marriage arranged by my husband, at his house, in my presence. But my

sister, having been previously married to one Jerome Desgrange, who was found to have had a lawful wife living, at the time of his (Desgrange's) marriage with her, the marriage with Mr. Clark could not take place until proofs of the invalidity of her marriage with Desgrange were obtained. To procure these proofs from public records, my sisters Zulime, and Madame Despau, went to the north of the United States, where Desgrange's prior marriage was said to have taken place. While there, my sister Zulime wrote to me that she and Mr. Clark were married. There was born of this marriage one, and only one child, a female, named Myra, who was put by Mr. Clark, while an infant, under the charge of Mrs. Samuel B. Davis, in whose family she was brought up and educated. Having suffered from hired nurses, she was nursed, through kindness, for some time after her birth, by Mrs. Harriet Harper, wife of William Harper, the nephew of Col. Samuel B. Davis. Mr. Clark stated to me, frequently, that Myra was his lawful and only child. This child is the same person who was married to William Wallace Whitney; and who is now, the wife of General Edmund P. Gaines, of the United States army. I have always understood that the marriage between my sister and Mr. Clark was a private one, and that it was not promulgated by Mr. Clark, in his lifetime, unless he did so in a last will, made a short time previous to his death. I have heard that such a last will was made, but it was believed to have been suppressed or destroyed after his death.

"I was acquainted with Mr. Jerome Desgrange, for the first time, in New Orleans, about the year seventeen hundred and ninety-five. He passed for an unmarried man, and as such imposed himself on my sister Zulime. Some years after this marriage, it became known in New Orleans, that he had a prior lawful wife living. My sister immediately separated from him, and came to reside with her family. At a later period, Mr. Desgrange was prosecuted, found guilty of bigamy, in having married my sister Zulime, and cast into prison. He escaped from prison, as it was reported at the time, by the Spanish governor's connivance. I understood that Mr. LeBreton D'Orgenois aided him to escape from the country. This happened some time before the transfer of the government of Louisiana to the Americans. The flight of Desgrange from New Orleans is the last I know of him. I did not myself know the first wife of Desgrange, but it is within my knowledge that she came to New Orleans, and while there, fully established her pretensions as his lawful wife."

Another deposition of this witness is found in the record, taken October 16, 1849; but as it does not differ from the foregoing depositions on the question of bigamy, it is not further noticed.

Objections were made on the argument, that the different depositions of these witnesses are contradictory in several respects: but we have not found them to be so in any material degree. Madame Despau's, so far as they relate to the question under examination, are very nearly literal copies of each other; and Madame Caillavet's are nearly similar to each other.

Joseph D. D. Bellechasse, in his deposition, taken in 1834, states:

" I think it my duty now to declare, what I know to be a fact, that said Desgrange was condemned for bigamy in marrying Miss Carrière (subsequently the mother of Myra,) several years prior to the birth of said Myra. The prosecution and condemnation of said Desgrange for said crime of bigamy, took place at New Orleans towards the close of the Spanish domination in Louisiana; his first and lawful wife, whom he had married previous to his coming to Louisiana, (as it was proved,) coming to New Orleans in pursuit of him. When said Desgrange practised the infamous deception of marrying Miss Carrière, it was the current opinion in New Orleans, that he was a bachelor, or a single man."

Madame Bengueril, in her deposition taken in 1836, makes the following statement:

" Mr. Jerome Desgrange married the said Zulime, which proved on his part bigamy, for, after his marriage with the said Zulime, the lawful wife of said Desgrange, whom he had married previous to his marrying the said Zulime, came to New Orleans, and he was thrown into prison, from which he escaped, and fled from Louisiana; this was in the year 1802 or 1803; since that period I have never seen the said Desgrange, and do not believe that he ever returned to Louisiana.

" The said lawful wife of the said Desgrange brought with her to New Orleans proofs of her marriage with the said Desgrange. The exposure, at that time, of the said Desgrange's bigamy in marrying the said Zulime, was notoriously known in New Orleans.

" My husband and myself were very intimate with the said Desgrange, and when we reproached him for his baseness in imposing upon the said Zulime, he endeavored to excuse himself by saying that, at the time of his marrying the said Zulime, he had abandoned his said lawful wife, and never intended to see her again."

This is the material evidence on which the complainant relies to prove Desgrange's bigamy, when he married Zulime Née Carrière. What other evidence we may incidentally refer to, will be stated by the reporter.

To meet and rebut this evidence, the defendants introduced

from the records of the cathedral church of the diocese, to which the city of New Orleans belonged at that period, an ecclesiastical proceeding against Desgrange for bigamy; and which proceeding, as respondents insist, is the same to which complainant's witnesses refer. The following are the material parts of that proceeding:

## " THE YEAR 1802.

" T. M. T.

" No. 141.

" Criminal proceedings instituted against Geronimo Desgrange for bigamy.

. " The vicar-general and governor of the bishoprick, judge.

" Fran'co Bermudez, *Notary.*"

" DECREE. In the city of New Orleans, the 4th day of September, 1802, Thomas Hasset, canonical presbytary of this holy cathedral church, provisor, vicar-general, and governor of the bishoprick of this province:

" Says, that it has been publicly stated in this city, that Geronimo Desgrange, who was married in the year 1794, to Maria Julia Carrière, was at that time married, and is so even now, before the church, to Barbara Jeanbelle, who has just arrived; and also that the said Desgrange, having arrived from France a few months since, he caused another woman to come here, whose name will be obtained. It is reported in all the city, publicly and notoriously, that the said Geronimo Desgrange has three wives, and not being able to keep secret such an act, as scandalous as it is opposed to the precepts of our holy mother church, his excellency has ordered, that in order to proceed in the investigation, and to the corresponding penalty, testimony be produced to substantiate his being a single man, which the said Desgrange presented, in order to consummate his marriage with said Carrière; that all persons shall appear who can give any information in this matter, and also Desgrange, with Celestin Lavergne and Antonio Fromantin, interpreters; they, the interpreters, first accepting the nomination, and swearing to act as such faithfully. And also, as it has been ascertained that the said Desgrange is about to leave with the last of these three wives, let him be placed in the public prison, during these proceedings, with the aid of one of the alcades; this decree serving as an order, which his excellency has approved, and as such it is signed by me, notary.

" Signed, Thomas Hassett, Before me,

" Fran'co Bermudez."

" New Orleans, in the same day it was passed to the Capitular

House, and audience hall of Don Fran'co Caisergues, alcade of this city, and in his jurisdiction, and I notified to his worship the preceding decree, and of which I have taken note.

" Signed, Fran'co Bermudez."

" <i>New Orleans</i>, 4th <i>September</i>, 1802.

" Let the request of the governor of the bishoprick be complied with.        Signed, Fran'co Caisergues.    Before me,

" Signed, Fran'co Bermudez.

" In New Orleans on the same day, I, the notary, notified Celestin Lavergne of his appointment as interpreter, and he said that he accepted it; and swore by God and the Cross, that he would act well and faithfully in the premises, and he herewith signs his name.

" Signed, C'tino Lavergne.    Fran'co Bermudez.

" On the same day I notified Antonio Fromantin of his appointment as interpreter, who accepted of it, and who swore by God and the Cross, that he would act well and faithfully in the premises, and he herewith signs his name.

" Signed, Antonio Fromantin.    Fran'co Bermudez."

Next comes the church record filed as evidence in the cause establishing the marriage of Desgrange to Maria Julia Née Carrière, which need not be further stated.

The material parts of the subsequent proceeding, are the following:

" CITATION.   In New Orleans, on the same day, I, the undersigned notary, inquired at sundry places for the residence of Dona Barbara Jeanbelle, and I was informed she lived in Mr. Bernard Marigny's house, where I then went, and there gave notice that, on Monday, the 6th instant, at seven o'clock in the morning, she must present herself before the tribunal, as per order of his excellency.

" Signed, Bermudez.

" On the same day, I notified the minister of justice, Jose Campos, of the preceding decree.

" Signed, Bermudez."

" TESTIMONY.   Testimony of Dona Barbara Jeanbelle.   In the city of New Orleans, on the 6th of September, 1802, appeared before Mr. Thomas Hassett, presbytary canon of this holy cathedral church, provisor, vicar-general, and governor of the bishoprick of this province and the Floridas, Dona Barbara Margarita Jeanbelle de Orsy, who was sworn to tell the truth, and the following questions were then propounded to her:

1st. If she knows Geronimo Desgrange; how long, and where did she know him?

Answers: That she has known him for sixteen years, and that she was acquainted with him in New York.

2d. Being asked whether it is true that she was married to the aforesaid Desgrange, in what place, in what church, how long ago, in what parish, by what clergyman, and who were the witnesses?

Answers: No, although it was her intention to marry the aforesaid Desgrange; but as the latter was going away, she changed her mind; nevertheless, she obtained the permission of her father to go to Philadelphia for that purpose, and that while there Desgrange begged of her to come to this city to consummate the marriage, to which she did not consent; this took place about eleven years and a half ago.

Being asked whether she was acquainted with Desgrange in France, after the period above stated, and if she has ever spoken to him on the subject?

Answers: That last year she saw him in Bordeaux, and that she did not again speak to him of the marriage, because they were both of them married.

Being asked that, if she says she is married, with whom is she married, how long since, in what place, by what clergyman, and who were the witnesses?

Answers: That she is married to Don Juan Santiago Soumeylliat, about ten years ago, in the city of Philadelphia, by a catholic priest, and that Mr. Bernardy and his wife were witnesses.

Being asked if she has any document to prove it?

Answers: That she has no document to prove it.

Being asked if she has not heard it said that Desgrange is married to three wives, say to whom, and if it is not public and notorious?

Answers: That she never heard any thing of what is asked her until last night, when she was told that it was said she was one of his wives, and she says that what she has declared is the truth; and the testimony having been read to her, which was interpreted by Don Celestino Lavergne, and Don Antonio Fromantin, she declared it was what she had said, and she now ratifies it; that she is thirty-four years old.

"Signed, B. M. Zambell De Orsi, Hasset,

"C'tino Lavergne, Antonio Fromentin.

"Before me, Fran'co Bermudez."

"Testimony of Maria Yllar. In the city of New Orleans, on the same day, month, and year, appeared before his excel-

lency, Maria Yllar, who, being sworn to tell the truth, the following questions were propounded to her:

Being asked whether she is married or not, how long it is since she arrived in this city, and with what object:

Answers: That she is the widow of Juan Dupor, alias Poulé, who died two years ago, to whom she was married about——years; that she has never had any other husband, neither before nor since; that she arrived here two days ago, and that her object was to gain a livelihood, having been informed it was a good country for seamstresses.

Being asked if she knows Geronimo Desgrange, how long, and if she was invited or told by him to come to this city, and with what object:

Answers: That she knew Geronimo Desgrange in France about eight months ago, and it was he who told her to come to this city, where she could gain a better livelihood than in her own country.

Being asked whether she was promised marriage to the said Geronimo Desgrange, or if she has entered into any private contract with reference to matrimony, or any other contract with him:

Answers: That she has not had any contract of the kind with the said Desgrange, because she knew, before her departure from France, that he was married in Louisiana; and that her coming here was only with the object that she has already stated.

Being asked [if] she had promised the said Desgrange to accompany him in the voyage he is going to make to France:

Answers: That far from accompanying Desgrange during his voyage, she thinks of remaining in the house of Cornelius Ploy, alias Flamand, to whom she has been recommended by the said Desgrange, for the purpose of gaining her livelihood by sewing, as the said Flamand is a tailor by trade.

Being asked if she has heard it publicly said that Desgrange has been married to two women before or since her arrival in this city.

Answers: That before her arrival she had heard nothing of the matter; but since she has been here she has heard it said publicly that Desgrange has been married three times; she swears that what she has said is the truth, and that she is twenty-five years old; she does not sign, not knowing how to write.

" Signed, Hasset, Antonio Fromentin, C'tino Lavergne.
                        " Before me, Franco. Bermudez."

" TESTIMONY OF MARIA JULIA CARRIERE.   Then appeared be-

Gaines v. Relf et al.

fore his excellency Maria Julia Carrière, who, through the interpreters, was duly sworn to tell the truth, and the following questions were propounded to her.

Being asked whether she was married or single:

Answers: That she is married to Geronimo Desgrange, since the 4th of December, 1794.

Being asked whether she heard, before or since her marriage, that her said husband was married to another woman:

Answers: That about a year since she heard it stated, in this city, that her husband was married in the north, and, in consequence, she wished to ascertain whether it was true or not, and she left this city for Philadelphia and New York, where she used every exertion to ascertain the truth of the report, and she learned only that he had courted a woman, whose father not consenting to the match, it did not take place, and she married another man shortly afterwards.

Being asked whether she had recently heard that her husband was married to three women, if she believed it, or does believe it, or has any doubt about the matter which renders her unquiet or unhappy:

Answers: That although she has heard so in public, she has not believed it, and the report has caused her no uneasiness, as she is satisfied that it is not true; she also swears that she is twenty-two years old.

Signed, Marie Zulime Carrière Desgrange, Hasset, his mark, C'tino Lavergne, Antonio Fromentin.

Before me, Franco. Bermudez."

" TESTIMONY OF GERONIMO DESGRANGE. In the city of New Orleans, on the 7th day of September, 1802, Thomas Hasset, presbyter canon of this holy cathedral church, provisor vicar-general, and governor of this bishoprick of this province, caused to come before him and in presence of the interpreters, Geronimo Desgrange, who was duly sworn to tell the truth, replied to the following interrogatories:

Being asked whether he knows Barbara Tanbel de Orsi, how long, and in what place:

Answers: That he first knew her in New York, about eleven years ago, and afterwards in Philadelphia.

Being asked that, if he was married to her, to state in what place, before what clergyman, how long ago, and who were the witnesses:

Answers: That he never was married to her, although he wished to do so, and had asked the consent of her father, but he refused it, as deponent was poor.

VOL. XII. 44

Being asked whether, after leaving her in Philadelphia, he has known her in any other place, and with what intentions:

Answers: That he has seen the said Dona Barbara in Bordeaux by mere accident; for deponent being sick, Mr. Soumeylatt, her husband, was sent for, and after he got well the said Soumeyllat invited him to dine with him at his house, where he saw her, and was much astonished; and he afterwards continued visiting the house, with no other feeling than that of friendship, and with the knowledge of her husband.

Being asked if he knows Maria Yllar, to state how long he has known her, in what place, and with what motives:

Answers: That in the month of December, of last year, he knew her when she was in a boarding-house where she was employed as a servant, in Bordeaux, where the respondent lived.

Being asked if he made any arrangements with the aforesaid to accompany him to this city, to state what that arrangement was, and what object she had in coming here:

Answers: That he made no arrangement nor agreement with the aforesaid; and the reason she is here is, that having asked him whether this country held out better inducements than Bordeaux, in order to gain a livelihood by sewing, he advised her to come, as it would prove more advantageous to her.

Being asked whether his intention is to take her with him on the voyage he intends making, and if he has asked her to do so:

Answers: That he has not thought of it, as she came here to gain her livelihood, and for no other purpose.

Being asked why Maria Julia Carrière, his wife, went to the north last year.

Answers: That the principal reason was, that a report had circulated in this city that he was married to another woman; she wished to ascertain whether it was true, and she went.

Being asked if he has ever been examined by any ecclesiastical judge in relation to this affair:

Answers: No

Being asked whether it is true, that in order to satisfy his wife and the public, he offered to bring with him or to procure documents to prove his innocence in this matter, and that if he have them, to show them:

Answers: That taking it for granted that this charge would naturally fall, his wife being satisfied of his innocence, and no judge having required the shewing of such documents, he has used no exertions to obtain them; and that he is forty-two years old.

Signed, J. Desgrange, Hasset, his mark, Antonio Fromentin, C'tnio Lavergne.

Before me, Francisco Bermudez."

" Decree. Not being able to prove the public report, which is contained in the original decree of these proceedings, and having no more proofs for the present, let all proceedings be suspended, with power to prosecute them hereafter, if necessary, and let the person of Geronimo Desgrange be set at liberty, he paying the costs.

Signed, Thomas Hasset. ·

Don Thomas Hasset, presbyter canon of this holy cathedral church, vicar-general and governor of the bishoprick of this province of Louisiana and the two Floridas, has approved and signed the preceding decree, in New Orleans, this 7th September, 1802.

Signed, Francisco Bermudez.

In New Orleans, on the same day, notified Geronimo Des grange of the preceding decree, and visited him in prison for that purpose.

Signed, Bermudez.

On the same day, notified said decree to Joseph Puche, the keeper of the prison.

Signed, Bermudez."

Bishop Blanc proves that the records of the catholic bishop-rick of Louisiana are in his charge; that he searched for the record of prosecution against Desgrange for bigamy, and found it; that it is a complete record of the whole proceeding; and that, Thomas Hasset, being first canon of the diocese, represented the bishop, and acted as vicar-general, the see being vacant at that time. Isodore A. Quemper also proves that he is the official keeper of the records of the cathedral church of St. Louis, at New Orleans, and the paper is an exact and literal copy of the original.

The signatures of Lavergne and Fromentin, who took the depositions, and that of Bermudez, the notary, are proved by witnesses who had seen them write; and the signature of Des grange and Zulime were proved by experts, on comparison of hands with authentic signatures of theirs. Such proof is allowable in Louisiana, according to the civil code and the code of practice; and this mode of proof has not been objected to in this case.

Respondents also introduced the following evidence:

On the 26th of March, 1801, Madame Caillavet, Madame Lasabe, and Madame Despau joined in a power of attorney, authorizing Jerome Desgrange, their brother in law, to proceed

to Bordeaux, in France, and there recover any estate or property belonging to them, as co-heiresses of their father and mother.

And, at the same time, Desgrange made a general power of attorney to his wife, Donna Marie Zulime, to act for him in all his affairs in his absence. She acted under the power, and sold several slaves, and did other acts, which appear in notarial records. In each of these acts she styles herself "the legitimate wife and general attorney of Don Geronimo Desgrange."

In July, 1801, Desgrange wrote to Clark the following letter:

*"Bordeaux, July,* 1801.

"MY DEAR SIR AND FRIEND,— Although uncertain whether you are at New Orleans, I hasten to seize the opportunity of the sailing of the Natchez to furnish you with some news. I hope my letter will find you in good health. When one has such a friend as you, we cannot feel too deep an interest in him.

"I have received here a great deal of politeness from Mr. John Bernard, merchant, a friend of Mr. Chew, who is doing a very great business now. He spoke a great deal of Mr. Chew to me, and his politeness to him while at Bordeaux. He was introduced to me by Mr. Cox.

"There has been many arrivals of American vessels in this port since I was here last. Colonial goods are selling very well. I think if your friend from Philadelphia were to make a visit here he could make a profitable speculation on his return voyage.

"Do me the kindness, my dear sir, to write to me. It will afford me much pleasure to hear from you. Several American vessels are about to leave, to come directly here.

"Present my compliments to Mr. Chew, and beg him, whenever he writes to Mr. Bernard, to speak of me. I have taken the liberty to inclose under your cover a package for my wife, which I beg you to remit to her. Permit me, my dear friend to reiterate my acceptance of the kind offer you made me before I left, and should my wife find herself embarrassed in any respect, you will truly oblige me by aiding her with your kind advice. I expect to leave in a few days, to join my family. I hope to return to Bordeaux in two or three months, to terminate my affairs here, and to make preparations to meet you. I have been some days engaged in a lawsuit, for the purpose of recovering an estate belonging to my wife's family. I shall place this affair in Mr. Chicou St. Brie's care during my absence. I fear that I shall have to expend a great deal in this affair. I

have charged Mr. Bernard with the care of other business. I have not yet heard from my wife, which renders me very uneasy as to going to Provence before I hear from her. It is said that peace will be declared by the end of the year; but I have my fears whether we shall enjoy that happiness. Hoping to have the pleasure of hearing from you soon,

"I am, most truly, your friend,

"DESGRANGE.

"Write me to the care of Mr. Jean Bernard, merchant, at Chartron, Bordeaux."

The respondents introduced the deposition of Daniel W. Coxe, of Philadelphia. He had been the partner in trade of Daniel Clark, in their New Orleans house, from the time Clark set out as a commission and shipping merchant. They were nearly of the same age; both proud, intelligent, and ambitious of success; equals in rank, and intimate in their social relations, as a common interest and constant intercourse could make them. This abundantly appears by their correspondence, introduced in the record before us. Coxe states that, in 1802, Madame Desgrange presented herself to him in Philadelphia, with a confidential letter of introduction to him from Daniel Clark, which stated that the bearer was pregnant, and would soon be delivered of a child; and that he, Clark, was the father of it; and the letter requested Coxe to put her under the care of a respectable physician, and to furnish her with money during her confinement and stay in Philadelphia. That Coxe, accordingly, employed the late Doctor William Shippen to attend her at her accouchment. That he, Coxe, procured a nurse for her; and removed the child, on the day of its birth, to the residence of the nurse; that this child was Caroline Barnes, who, before her marriage, always went by the name of Caroline Clark. The first nurse was Mrs. Stevens; afterwards, the child was placed, at Clark's request, with Mr. and Mrs. James Alexander, of Trenton, New Jersey, and continued there until 1814 or 1815. After this, (her father being dead,) she was placed at Mrs. Baisley's school in Philadelphia. She remained with Mrs. Baisley several years, and acted during part of the time as a teacher, and, Coxe thinks, continued there until she was married. She was under Coxe's supervision all the time, from her birth until her marriage; and was supported at the expense of Clark until his death. She was at all times, during his life, recognized by Clark as his child, and caressed as such when he was at Philadelphia.

Coxe further states that Madame Desgrange left Philadelphia for New Orleans as soon as it was prudent for her to travel,

after her confinement; and that this happened, he thinks, in April of 1802: he says in another deposition that it was some time in 1802. Coxe was three times examined. Dates of letters from Clark to Coxe, and other evidence, show that the child was born as late as July, 1802: to wit, Clark reached Philadelphia about the 27th of July, 1802, as from his letter to Coxe appears; he hurried his business at Philadelphia and went to New York, where he wrote to Coxe, Aug. 13, 1802, that he would sail for Europe on the next Tuesday; and he did sail, and returned early in 1803 to New Orleans, and was not at Philadelphia in 1803. Madame Despau and Coxe both prove that Clark was on his way to Europe, when Madame Desgrange and Madame Despau met him. Coxe deposes that the child had been lately born when Clark reached Philadelphia, and, when he went to New York the two women very shortly after left for New Orleans,— that is to say, so soon as Madame Desgrange was able to travel.

A record of a suit brought by Zulime C. Desgrange against her husband, Jerome Desgrange, in November, 1805, for alimony, was also introduced by respondents. It will be further noticed hereafter.

This is substantially the evidence on both sides, on which the question depends, whether Desgrange was, or was not, guilty of bigamy in marrying Maria Julia Née Carrière, in 1794.

Objections are taken to several portions of this evidence ; and especially as respects the record of the suit against Desgrange for bigamy in the ecclesiastical court.

First, it is objected that the record is not duly proved, the signatures of the witnesses not being established as having been signed to their depositions.

The answer to this objection rests on well-settled principles. All that is required in cases of this kind, is to produce a sworn copy of the record, the witnesses also proving that it was taken at the proper office, and produced by the lawful keeper of the records. In Phillips on Ev. by Cowen (vol. 1, 432, vol. 2, 133, 134) will be found the cases in support of this mode of proof.

Here the official keeper of the records and the bishop of the diocese, under whose charge they were, produced both the original and the copy; the copy was filed in this cause by stipulation of the parties; and each of the witnesses proved all the law requires to make it *primâ facie* evidence.

On the argument at the bar, and especially in the printed one presented to us as coming from New Orleans, it is earnestly insisted that the origin of this record is recent, and that it had been fabricated for the purposes of this cause. We do not perceive any ground for entertaining such an apprehension.

1st. The complainant's witnesses refer to such a proceeding. 2d. The record of it was searched for by the complainant, and not found; and for this reason its substantial contents, as it was supposed, were proved in Patterson's case. 3d. The signatures of the officers of the court are proved as being genuine. 4th. Bishop Blanc deposes that he had charge of the records of the bishopric, among which he found this one.

If the allegation of fraud and forgery insisted on had any foundation, Bishop Blanc must of necessity be directly involved in that charge; and, furthermore, of swearing to that which he must have known to be false. This assumption is not only gratuitous, but the witness is fully supported by the facts above stated; and the further fact, that, neither in his cross-examination, nor by any other evidence, is his integrity assailed by the complainant.

The next objection is, that the record decided nothing, there being no sentence concluding any one; and if there had been such sentence, it would be of no value, as it was a proceeding against Desgrange, to which neither Clark nor Zulime was a party, and therefore the record was incompetent to affect the rights of those claiming under them.

*The competency of this evidence depends on other considerations.*

For the purpose of establishing the bigamy of Desgrange, the complainant proved by her witnesses that he was arrested on a charge of bigamy, at the instance of his first wife; "that the said lawful wife of the said Desgrange brought with her to New Orleans proofs of her marriage with said Desgrange;" that the first wife appeared as a witness, and proved the bigamy; that Desgrange had confessed it; that he was convicted on his trial; and that he was imprisoned, and in execution, under sentence of the court; that this occurred in 1802 or 1803; that Desgrange escaped from prison by connivance of the public officers, or some of them, and fled the country, and never returned.

On this evidence, standing unopposed and uncontradicted, the complainant had a decree in her favor in the Circuit Court at New Orleans, establishing the bigamy of Desgrange; and in this court, in the case of Patterson *v*. Gaines, decided in 1848.

For the purpose of letting in this secondary evidence, the complainant introduced the deposition of C. W. Dreschler, made April 24, 1840, which is as follows:

"That at the request of General Edmund P. Gaines, I have been engaged for several days, assisted by a gentleman who understands the Spanish and French languages well, in making very extensive and most diligent search at all offices, &c., in the different parts of this city, where records are kept and could be

looked for, for the purpose of obtaining a copy of a prosecution against one Jerome Desgrange, convicted for the crime of bigamy, in the year 1802 or 1803, when Louisiana was under the Spanish government, and Cassaacalvo, the governor, by whose order the said Desgrange was arrested, imprisoned, &c., in this city; but that I have not been able to find the Spanish records of the aforesaid criminal proceedings, because almost all the Spanish documents, up to the 20th December, 1803, when Governor Claiborne issued his first proclamation, were taken away by the Spanish authorities, sent to Spain, and to the island of Cuba; and the few papers left in this city are in a loose or bad condition; as also, because many books and papers having been destroyed by fire, and lost by removing them on account of fire, during two occurrences of that kind.

" I am informed that Governor Claiborne made several ineffectual applications to the Spanish government to return the papers taken away, to New Orleans; that persons have had to go to Havana for documents, titles to land, &c."

On this, and other proof that no record of the proceeding could be found, parol evidence of what occurred on the trial against Desgrange was let in, and the bigamv found on the secondary evidence in Patterson's case.

Here the same proof that the record of the proceedings was lost, was introduced; and what took place on that trial of Desgrange was again proved by depositions, which were filed in the Circuit Court before the record of Desgrange's trial was filed by the respondents. The object of its introduction by the respondents was, to rebut, contradict, and overthrow the evidence of the complainant's witnesses, by showing,

1st. That no previous wife appeared against Desgrange on his prosecution.

2d. That no documents of a former marriage were produced against him.

3d. That his wife Zulime did not then charge him with being guilty of bigamy, denied all belief in the charge, and gave her reasons for it; which correspond with the statement made by the supposed first wife, Barbara Jeanbelle, and with Desgrange's own statement made on oath.

4th. That Desgrange was not convicted, but discharged by order of the court.

5th. That he did not flee the country, nor had any occasion to do so. And,

6th. That so far from admitting his bigamy, he denied it on oath, lawfully administered; thus solemnly declaring that he never had been married previous to his marriage with said Zulime. Whereas, complainant's witnesses swear he made such confessions.

The complainant's principal witnesses are Madame Despau and Madame Caillavet. Madame Despau swears that in 1802 or in 1803, Madame Desgrange and herself went to New York for the purpose of ascertaining whether Jerome Desgrange had been previously married, where Clark overtook them; that no church record of the marriage could be found in the catholic chapel at New York; but hearing that Mr. Gardette, of Philadelphia, knew something of the matter, - they went there, and Gardette informed them that he was present at the first marriage; and that Clark and Zulime were then married. And that soon afterwards, they received a letter from Madame Caillavet, informing them that Desgrange's first wife had come to New Orleans, and they immediately returned there; where Desgrange was prosecuted by his first wife, convicted and imprisoned; and that he fled the country, and never returned to it.

Madame Caillavet says Desgrange and Barbara Jeanbelle came together, or that Jeanbelle came immediately after him; and that she immediately wrote to her sisters to return.

It appears that in the spring of 1801, Desgrange went to France, to recover property coming by succession to his wife Zulime, and her sisters, from their-parents, and lying at Bordeaux, or in that neighborhood; and that he had not returned when Zulime and Madame Despau left New Orleans for New York.

The ecclesiastical record states that he had been at home about two months before he was arrested; which was September 4, 1802. He was therefore absent from his wife Zulime about fifteen months.

Daniel W. Coxe proves, that Madame Desgrange brought him a letter of introduction from Clark, stating, that she was then far gone in pregnancy, and requesting Coxe's attention to her wants; that he furnished a house and money, and employed a nurse, and Dr. Shippen to attend her accouchement; that Clark's letter stated the child was his; and we must assume that the mother by delivering the letter, impliedly admitted the fact. She was delivered; and Coxe had the child, on the same day, put with Mrs. Stevens to nurse. All this time, Madame Despau was with Madame Desgrange. Coxe superintended the child's nurture and education, in and near to Philadelphia, until Clark's death in 1813, and afterwards. This was Caroline, who when grown up married Dr. Barnes; and who these witnesses swear without hesitation was the child of Desgrange; and who, Madame Despau swears, was born in 1801. Nor does either witness intimate that she was born in Philadelphia; or that their sister went there to conceal her adultery, and hide its offspring.

They left Philadelphia for New Orleans, as soon as Madame Desgrange was able to travel; and reported to the deluded husband on their return, that they had been north, seeking proof against him for bigamy, but had found none. This is the substance of what Desgrange himself stated on his examination in the criminal proceeding as derived from others. Zulime swore on the trial, that she had heard the report of Desgrange having another wife about a year before; that is, about the first of September, 1801. Then, Desgrange was in France.

It is true beyond question that these witnesses did know that their sister Desgrange went north to hide her adultery; that she did delude her absent husband, that she did impose on him the mendacious tale that her sole business north was to clear up doubts that disturbed her mind, about his having another wife. These facts they carefully conceal in their depositions; and on the contrary swear that she went north to get evidence of her husband's bigamy and imposition on her.

When they swore positively that Caroline was the child of Desgrange, they did know that he had been in France, and his wife in New Orleans, and they had not seen each other for more than a year before the child was born; and Madame Despau could not be ignorant that Clark claimed it as his, and that the mother admitted the fact to Coxe.

These witnesses swear that Zulime had separated from Desgrange on discovering his bigamy, and gone to her own family. That this occurred before the family arrangement was made that Clark should marry her, and before Madame Desgrange and Madame Despau went north, to ascertain the bigamy. They also swear that Zulime returned to New Orleans about the time Desgrange was arrested and imprisoned in September, 1802, and was then the wife of Clark. There is no proof in this record tending to show that before Desgrange went to France he was suspected of bigamy, nor that his wife had separated from him; but there is evidence to the contrary.

When Desgrange went to France in the spring of 1801, he appointed his wife attorney in fact by notarial act, with full power to transact all his business in his absence. Under this power she acted and sold his property, paid debts, &c., and declared herself his lawful wife in every transaction.

Desgrange went to France with a full power to transact business for his wife and her three sisters, in which the latter style him their brother-in-law. This was his sole business in France so far as this record shows; and when there, he wrote to Clark, in July, 1801, to assist his, Desgrange's wife; expressing his sympathies, forwarding a package for her, and regretting that he had not heard from her. He also expressed the sincerest gratitude

for Clark's proffered kindness in providing for and aiding Zulime
in his absence.    From these facts it is clear, as we think, that at
the time Desgrange left for Europe, he and his wife were on terms
of intercourse and ordinary affection, and certainly not separat-
ed; and that the cause of their separation is found in the con-
nection formed by Clark and Zulime in Desgrange's absence.

In support of the consistency of these witnesses, stress is laid
on the fact that so strong was the rumor of Desgrange's having
two other wives besides Zulime, that he was arrested, imprisoned,
and tried on the rumor.  This is certainly true; the record of
his prosecution establishes the fact: But what circumstances are
brought forth to show that there was any plausible ground for
such rumor and such prosecution? Desgrange was a man some-
what advanced in life.; he kept an humble shop for selling
liquors and confectionary; this seems to have been his sole busi-
ness. His wife Zulime, was about twenty-two years old, and
uncommonly handsome.    He seems to have been a lone man in
New Orleans, and his friends were his wife and her relations.
In the face of these facts it is assumed that he brought from
France with him an additional wife, and that another followed
him; with both of whom, and his third wife, Zulime, he was
confronted before the authorities of the church.

The early times, and the unintelligent condition of much of
the population of New Orleans at that day, must account for
this absurd public opinion, and the proceedings founded on it.

It is palpable that the witnesses Despau and Caillavet, swear
to a plausible tale of fiction, leaving out the circumstances of
gross reality.    These originated, beyond question, in profligacy
of a highly dangerous and criminal character; that of a wife
having committed adultery, and been delivered of an illegitimate
child, in the absence of her husband; not only on his lawful
business, but on her's, and at her instance.

This child, with the knowledge of both of these witnesses,
and certainly with the aid of one of them, if not both, was
concealed in a foreign country, where the mother went and was
delivered; and then she returned home to New Orleans and pre-
sented herself to society as an innocent and injured woman, and
public indignation was turned on her husband for a supposed
crime committed against her.   This is the reality these witnesses
conceal; roundly swearing that they knew this child to be Des-
grange's.

They also swear that Clark arranged with Zulime's family
before he went to Philadelphia, and had the assent of her family
to marry her; they having previously discovered Desgrange's
bigamy.   But, according to their account, so scrupulous and
delicate was this injured woman, that she refused to marry

Clark until she went to New York and there ascertained for herself the fact, that Desgrange had another wife: that Clark soon followed Madame Desgrange and Madame Despau, as previously agreed on; and even then, Madame Despau swears, when Gardette had informed them that he was present, and witnessed Desgrange's first marriage, her sister's sense of propriety and delicacy was so great, that earnest persuasions had to be used by Clark to overcome her scruples. We cannot shut our eyes on the truth, and accord our belief to this fiction.

We have thus far spoken of the witnesses Despau and Caillavet in connection, because they acted in concert with their sister Desgrange and Clark, in secreting their intercourse, and in hiding the child that came of that intercourse: all the secrets involved were obviously known to the three sisters, whose confidential relation in the matter could hardly have been more close, as appears by their statements throughout.

Madame Despau is further discredited by Daniel W. Coxe's evidence. She swears as follows:

" Mr. Clark became a member of the United States Congress in eighteen hundred and six. While he was in Congress, my sister heard that he was courting a Miss C., of Baltimore. She was distressed, though she could not believe the report, knowing herself to be his wife. Still, his strange conduct in deferring to promulgate his marriage with her had alarmed her, and she and I sailed to Philadelphia to get the proof of his marriage with my sister. We could find no record of the marriage, and were told that the priest who married her and Mr. Clark was gone to Ireland. My sister then sent for Mr. Daniel W. Coxe, and mentioned to him the rumor above stated. He answered that he knew it to be true that Mr. Clark was engaged to the lady in question. My sister replied that it could not be so. He then told her that she would not be able to establish her marriage with Mr. Clark, if he were disposed to contest it. He advised her to take the advice of legal counsel, and said he would send one. A Mr. Smith came, and, after telling my sister that she could not legally establish her marriage with Mr. Clark, pretended to read to her a letter in English, (a language then unknown to my sister,) from Mr. Clark to Mr. Coxe, stating that he was about to marry Miss C. And afterwards, she married Mr. Gardette."

The following is Coxe's account of the interview:

" I also think it proper to state, that in the year 1808, after Madame Desgrange had returned to Philadelphia from New Orleans, and when lodging in Walnut street, she sent for me, and during a private interview with her, at Mrs. Rowan's, where she lodged, she stated that she had heard Mr. Clark was going to be

married to Miss C., of Baltimore, which, she said, was a violation of his promise to marry her, and added that she now considered herself at liberty to connect herself in marriage with another person; alluding, doubtless, to Dr. Gardette, who, at the moment of this disclosure, entered the room, when after a few words of general conversation I withdrew, and her marriage to Mr. Gardette was announced a few days after."

These contradictory statements raise a question of integrity between the witnesses. If they were equally entitled to credit, still Coxe's statement has several advantages. First; Madame Desgrange disavowed in the strongest terms that she was the wife of Clark by marrying Gardette. Secondly; so important a communication as Madame Despau declares her sister made to Mr. Coxe; so ruinous to Clark's matrimonial prospects, and so deeply disgraceful to him, must have been remembered by Coxe if such communication had been made.

Thirdly; Madame Despau swears that she and her sister Desgrange went to Philadelphia to obtain evidence of Clark's marriage with Zulime; that they could find no record of the marriage, and were told the priest who performed the ceremony had gone to Ireland. What occasion could there be for further proof? Madame Despau swears that Clark had proposed, and family arrangements had been made with him at New Orleans, to marry Zulime; that these proposals were made with the full knowledge of all Zulime's family; that Clark followed the witness and Zulime north to fulfil the engagement; that he met them, and the marriage took place; that she, Madame Despau, was present; that Mr. Dozier, a wealthy planter of New Orleans, and an Irish gentleman of New York, were also present.

Zulime's family consisted of three sisters and their husbands. Madame Cavaillet swears that Clark conversed with her as his sister-in-law, and admitted the marriage openly to her. Than this, no further proof of it could be required, if true.

The next evidence bearing on the question of Desgrange's bigamy is the record of a suit, brought by Madame Desgrange against her husband in 1805, for alimony, already referred to; and the deposition of Zulime found in the record of the ecclesiastical proceeding, taken in connection with the first named record. In her deposition Zulime spoke of Desgrange in language admitting of no doubt that she then recognized him as her husband; and that no evidence of his bigamy existed so far as she knew or believed.

The deposition is objected to as not being evidence against the complainant. We have already declared that what appeared of record in the proceeding against Desgrange, was competent to rebut evidence introduced by the complainant tending to

show what occurred on the prosecution; this being in effect and
fact proof of what the record contained. The deposition is now
relied on as evidence in itself, tending to show that Desgrange
was Zulime's lawful husband, according to her own confessions
and showing at the time she deposed.

The competency of this deposition, taken as a confession, is
objected to, on the ground that her signature to it was not
legally proved, as this was done by comparison of hands, accord-
ing to the statute law of Louisiana. The steps taken in the
Circuit Court are conclusive of the objection.

On the 16th of January, 1850, the complainant's counsel gave
notice to those of the respondents, that on Monday, the 21st, a
motion would be made to suppress certain pieces of evidence;
and among them the exhibit, obtained at the cathedral church
of St. Louis, known as the " Ecclesiastical Record." The cause
came on for hearing January 22d, and was heard on that and
the seventeen succeeding days; but no motion to suppress evi-
dence was made; and if there had been, this exhibit could have
been proved at the hearing, by Zulime herself, if no one else had
been found to do so; as the record shows that complainant's
counsel admitted that Zulime was within the jurisdiction of the
court, on the day the trial commenced. No objection having
been made on the hearing below to this deposition, none can be
raised here. To what extent it can be used, will appear from
the following facts.

By an amendment to her bill, July 2d, 1844, the complainant
states:

" Your oratrix alleges that she is entitled to the one moiety of
the estate, of which the said Daniel Clark died possessed, by
reason of a conveyance thereof, made to her by M. Z. Gardette,
the widow of the said Clark, and the mother of your oratrix, on
the 7th day of May, 1836, and which is hereunto annexed,
marked A. B., and prayed to be taken as part hereof; and the
mother of your oratrix did thereafter, on the 20th June, 1844,
further convey to her all her interest in said estate, as appears
by her act, a copy of which is herewith exhibited, marked C.; the
whole of said estate having been acquired during the coverture
of said Clark and wife.

The evidence corresponds with this allegation, and on it the
complainant asks to have a decree for one half of the estate of
Daniel Clark, as derived from her mother. Madame Despau
and Madame Caillavet depose, that Clark married Zulime shortly
before her return to New Orleans, from Philadelphia, and before
the trial of Desgrange took place, and when she must have been
the wife of Clark, if ever she was. If Zulime was now before
the court claiming her marital interest in Clark's estate, her de-

clarations made during the alleged coverture tending to show that she was not the wife of Clark, but of Desgrange, would be admissible against her, and if so, they are also admissible against any one who asserts the same title derived from her, after these declarations were made. Such a case is an established exception to the rule of evidence, excluding declarations of third persons not parties to the record. A declaration emanating from the claimant of any right or estate, which afterwards comes to the parties on the record by descent, or purchase, affecting adversely the estate acquired, may be given in evidence against the party to the record who claims the estate. The authorities are numerous to this effect, and will be found in 1 Phillips, on Ev. 301, and in the notes by Cowen, 265. And the same rule applies to the record of the suit for alimony. That record would be evidence against the complainant's mother if she were a party to this suit; and it is equally evidence against the complainant as purchaser or donee from her mother; it shows the acts and conduct of the mother, on the question bearing on Desgrange's bigamy.

In the suit of 1805, the petitioner alleges that the County Court of Orleans has jurisdiction on application of wives against their husbands, to grant alimony on the husband deserting his wife for one year, and in cases of cruel treatment; and the petitioner declares that her husband, Jerome Desgrange, had cruelly treated her; and likewise, that she had been deserted by him from the 2d day of September, 1802, until that time; that he had returned to New Orleans, from France, in the previous month of October, and was then in the city; and she prays, "that said Jerome Desgrange, your petitioner's husband, be condemned to pay her a sum of five hundred dollars per annum," &c. Desgrange was served with notice December 6, 1805, and final judgment entered against him, as prayed for by his wife, December 24, 1805.

We are called on here to try an issue on facts, as a jury would be bound to do, and find on them the issue between Clark's devisee and executors, and the purchasers claiming under them, on the one side; and the complainant claiming under her mother on the other, whether that mother was the lawful widow of Daniel Clark when she conveyed to the complainant.

This alleged widow swore before the authorities of the church in September, 1802, that she was the wife of Desgrange, and there spoke of him as her lawful husband; nothing to the contrary was then pretended. The presence before which she deposed, and the solemn manner in which it was done, give additional weight, in our judgment, to what she so deliberately declared on that occasion.

In 1805, she again alleged in a legal proceeding, deeply affecting her and Desgrange, that she was his lawful wife, and that he was her husband. The court sanctioned her statement by founding its judgment on it; and as a wife, she recovered the amount claimed as alimony.

With the full knowledge this woman had of all the circumstances connected with the charge of bigamy against Desgrange, our judgment is convinced that she stated what was true, and that she was Desgrange's lawful wife at the time it is alleged she married Clark.

The claim, therefore, of the complainant, derived from her mother, must be rejected, as it stands condemned by the statements and acts of that mother herself.

The complicated and curious circumstances that surrounded this charge of bigamy against Desgrange in the Patterson case, and which were then so difficult to deal with, are easily enough understood now. A clew is furnished to unravel the mystery, why it was, that an humble shopkeeper should be of sufficient consequence to excite public indignation, be the object of general and gross reproach, and for his name afterwards to appear in the columns of the only newspaper then published in New Orleans, an extract from which the complainant has given in evidence. There an account was given of Desgrange's alleged crime of bigamy, and the enormity of his conduct in marrying Zulime Née Carrière, whose artless innocence he so basely imposed upon. The mystery is explained by the fact now presented, that in Desgrange's absence to France, his wife formed a connection with Clark, and the child Caroline came of that illicit connection. On Desgrange's return home, Madam Caillavet notified her sisters to return in haste, as Desgrange's first wife was at New Orleans. Mesdames Despau and Desgrange forthwith returned, and at this time it was that Desgrange was so fiercely assailed by public opinion, and very soon after arrested on general rumor and tried for bigamy. The reports, to which these witnesses swear, obviously originated with, and were relied on by Madame Desgrange, her sisters and friends, to harass and drive Desgrange from the country, so that his wife might indulge herself in the society of Clark, unincumbered and unannoyed by the presence of an humble and deserted husband. And this was in fact accomplished, for Desgrange did leave the country soon after he was tried for bigamy, and Clark did set up Desgrange's wife in a handsome establishment, where their intercourse was unrestrained.

In 1805, when Desgrange again came to New Orleans, his wife immediately sued him for alimony, as above stated; speedily got judgment against him for five hundred dollars per

annum; on the same day, issued execution, and again drove him away.

Bellechasse and Madame Benguerel swear that Desgrange married Zulime, and that he was afterwards condemned for the crime of bigamy; his first and lawful wife coming in pursuit of him to Louisiana, and appearing against him, and producing the documents of her marriage. That this happened in 1802 or 1803, and that Desgrange fled. Their statements are substantially the same in this respect.

They are so obviously founded on common report, as to be of no value in themselves; certainly no decree could be founded on them. But when contrasted with the record of Desgrange's prosecution, they turn out to be entirely contrary to the truth; as no first wife appeared against Desgrange; no documents of a former marriage were produced; and no conviction took place; nor did he flee from the country. These aged persons swore as to what common rumor and public clamor were forty years before, and nothing more.

Madame Benguerel also swears, that she and her husband were intimate with Desgrange, and when they reproached him for his baseness in marrying Zulime, he endeavored to excuse himself by saying "that, at the time of his marrying said Zulime, he had abandoned his said lawful wife, and never intended to see her again." As already stated, this must have happened after Desgrange returned from France, for there is no evidence that before he went there any such report existed. Zulime proved, on the prosecution for bigamy, that she had first heard the report about a year before she was examined.

We deem it extremely improbable, that a man should openly confess to the friends of Zulime, who reproached him with having committed a foul and high crime, that he was guilty; and this, too, on the eve of his apprehension and examination, on which he was compelled to give evidence against himself, when he swore that there was no truth whatever in the charge, and in which he was supported by this supposed first wife, who was then examined, and also by Zulime herself.

On the admissibility of Desgrange's confession, that he committed bigamy when he married Zulime, the question arises whether this confession (if made) could be given in evidence against the defendants? They do not claim under Desgrange; he was not interested in this controversy when it originated, and was competent to give evidence in this cause at any time, if living, to prove, or disprove, that a previous marriage took place, and was in full force, when he married Zulime. Phillips, in his Treatise on Evidence, (vol. 3, 287, Cowen's ed.) lays down the rule with accuracy, and cites the authorities in its

45 *

support; which rule is, that " either of the married parties, provided they are not interested in the suit, will be competent to prove the marriage; and either of them will also be competent to disprove the supposed marriage; and they may give evidence as to the fact whether their child was born before or after marriage."

If Desgrange could overthrow his marriage with Zulime by confessions, at one time, so he could at any other time; and on this assumption, his confession of a previous marriage could have been admitted at any time, before the trial, or at the trial, when he stood by, and might be examined as a witness.

The great basis of human society throughout the civilized world is founded on marriages and legitimate offspring; and to hold that either of the parties could, by a mere declaration, establish the fact that a marriage was void, would be an alarming doctrine.

This admission was not one tending to establish pedigree, where hearsay of parents and others is admissible; it went to the specific fact of bigamy; and, according to the language of the Supreme Court of Louisiana, in Harmar v. McLeland, (16 Louis. Rep. 28,) " in such serious matters, the law requires more than the simple confession of one of the parties to dissolve forever the bonds of matrimony between them." That was a case seeking a divorce on a written confession of the husband, who had married a second wife; but the principle declared in that case, and the one governing the present, is the same. It upholds a great policy, on which society is founded.

The letter of Desgrange to Clark, of July, 1801, from Bordeaux, is objected to, as incompetent. We think it is competent to prove the state of feeling, affection, and sympathy of Desgrange towards his wife, when he wrote the letter; and also, the date is evidence to prove where the writer was, and the time when he wrote. There is no ground to suppose that the letter was written collusively. It appears to have been ingenuous, and honestly intended. The doctrine, why such a letter is admitted, is laid down accurately in 1 Phillips's Ev. by Cowen, 189, 190.

In addition to the foregoing evidence to prove the bigamy of Desgrange, a certificate in the Latin language was introduced, on part of the complainant, purporting to be that of William V. O'Brien, dated September 11, 1806, declaring that he had, (July 6, 1790,) as pastor of St. Peter's church, in the city of New York, married, in that church, Jacobus Desgrange, to Barbara M. Orsi.

It is proved that this priest had charge of St. Peter's church in 1790, and in 1806; that the certificate was in his handwrit-

ing, and in due and ordinary form; that the priest died about 1814, then still being in charge of the same church; and that no record of the marriage was found in the records of the church in 1849, when the witnesses deposed to the handwriting of the priest. It is also proved that this certificate was found among the papers of Gardette, who married the complainant's mother in 1808; that the paper was found after the suit against Patterson was decided, and delivered to the complainant by her mother.

The true name of Desgrange is not in the certificate. It was Geronimo, not Jacobus. Nor was the woman's name given so as to correspond with that of the alleged first wife of Desgrange. Her name was Barbara Jeanbelle. De Orsi is an affix, describing a place to which the party belongs, or has belonged. The woman's name is given as Barbara M. Orsi, and we suppose no catholic priest thus describes a person he has married, in his marriage register. No identity of person is proved. No cohabitation as man and wife, between Desgrange and Barbara Jeanbelle, is proved.

But waiving all these objections, and still we think this certificate mere hearsay evidence, and that of a very dangerous character, and this for several reasons. It was given sixteen years after the marriage purports to have taken place, and might just as well have been given, had the priest been alive, forty years after the marriage, and on the eve of the trial.

In England, by the statute law, copies from parish registers are received to prove marriages; but the paper produced must be a sworn copy of the parish register, and not a certificate of the officiating clergyman; nor will a copy of a foreign register be received in evidence, on proof that it is a true copy.

If it were allowable in this country to give such certificate in evidence, where every clergyman of all denominations can perform the ceremony of marriage, and where it is performed by justices of the peace in many of the States, it would open a door to frauds that could not be guarded against.

And then again, certificates of marriage might be produced by those coming to this country from Europe: For no reason exists why a priest in any part of the world should not have accorded to his certificate all the credence that ought to be given to the one here produced, as Louisiana and New York were foreign to each other in 1790.

The respondents introduced the copy of a mutilated record, to which objection was made on behalf of complainant, but which comes up in this record, and is now relied on, for the complainant, to prove the bigamy of Desgrange. It purports to be a suit of Zulime Carrière against Jerome Desgrange, commenced in 1806,

in the former County Court of Orleans. A curator was appointed for Desgrange, who was absent; and the curator, Ellery, was summoned to answer the petition; but no petition is produced. Ellery demurred, and stated, as cause of demurrer, that the County Court had no jurisdiction of cases of divorce, nor the court power to pronounce therein; and that the damages, prayed for in said petition, cannot be inquired into or assessed until after judgment of the court touching the validity of the marriage shall be first declared; and he therefore demurred. The demurrer was joined. Afterwards the curator filed the general issue.

All we find further, is a copy of the docket entries which the clerk was bound to keep by the act of April 10, 1805, sec. 11, for the inspection of the public. The docket entry is as follows: "Petition filed June 24, 1806. Debt or damages $100. Plea filed July 1, 1806. Answer filed July 24, 1806. Set for trial 24 July." The witnesses are stated and the costs given; and then follows: "Judgment for plaintiff, damages $100, July 24, 1806."

This proceeding is relied on as in itself establishing the fact, that the marriage between Jerome Desgrange and Marie Julia Née Carrière, was thereby declared null.

To give the record this effect, it must appear that the plaintiff did set out in her petition the fact that said marriage was null by reason of the bigamy of Desgrange, and that she prayed to have its nullity adjudged by a judicial decree, and that such decree was made on the issue. Nothing of the kind appears here. We have no evidence what the cause of action was, nor can any inference be drawn from the memoranda made by the clerk that the suit was to establish the bigamy. All that appears from these memoranda is, that debt or damages to the amount of $100 was claimed by the plaintiff, and that $100 in damages was recovered. Nor does the demurrer contradict this assumption. This mutilated record, therefore, proves nothing in this cause.

In regard to this record, the answer of Beverly Chew and Richard Relf avers, "that on or about the 24th of June, 1806, the aforesaid Zulime Née Carrière, wife of the said Jerome Desgrange, did present another petition to the competent judicial tribunal of the city of New Orleans, therein representing herself as the lawful wife of, and having intermarried with the said Jerome Desgrange, and praying for a divorce and a dissolution of the bonds of matrimony existing between her and the said Jerome Desgrange, and which was subsequently decreed: to wit, subsequent to the birth of said Myra." If it was true, that as lawful wife, Zulime Née Carrière sued, and did admit by this proceeding that she was the lawful wife of Desgrange; yet it could

only affect the interest the complainant sets up under her mother. But as the record does not show what the cause of action was, it is of no value for either side.

On the 20th January, 1849, Gaines and wife filed their supplemental bill against all of the defendants, and among other matters set forth the decree made in their behalf by this court, in the case of C. Patterson *v*. Gaines and wife, at December term, 1847; and complainants set up that decree as having adjudged and decided against all the defendants to this suit, that Myra Clark Gaines was the legitimate child and forced heiress of Daniel Clark, and that she was legally and equitably entitled to receive of Relf and Chew, and all persons holding under them, all and singular the estates and property claimed by the original bill; and that although neither of them were nominal parties to said decree, yet each of them is bound and concluded thereby; they and each of them holding the same relation to your oratrix as the said Charles Patterson did, and they and each of them having joined in the interrogatories propounded to the witnesses upon whose testimony said decree was rendered, and propounded cross-interrogatories to said witnesses.

The defendants admit that such a decree was rendered, but deny that it is conclusive on them, or that it ought to affect their right; and that if the decree could do so, yet it ought not to have this effect in the present instance, because they aver and set forth and plead the same as a matter of defence; that said decree was brought about, and procured by imposition, combination, and fraud, between said complainants and Charles Patterson, and that therefore, it should not be regarded in a court of justice for any purpose whatever: That said decree was designed as no honest exposition of the merits of the case; but was brought about, allowed and consented to, for the purpose of pleading the same as *res judicata* upon points in litigation not honestly contested.

Charles Patterson was called on by respondents to give evidence on their behalf, to establish the fact, that his suit with Gaines and wife was not honestly defended by him; and he was required by interrogatories to depose whether he had lost any thing by the decree against him. He answered that he caused the proofs from the court of probate in New Orleans to be given in evidence in the cause; that this was done by consent of General and Mrs. Gaines, who told him to get all the evidence possible, the stronger the better; that it would be more glorious to have it as strong as possible.

He furthermore deposed that General Gaines and his wife gave him a writing under their hands that they would not take any property from him, and that they would make his title

good. He also stated that General and Mrs. Gaines were to pay the costs if the suit was decided against him, Patterson; that he paid most of them, and that General and Mrs. Gaines refunded the money to him; that he also paid the counsel who appeared for him at Washington, but the money was refunded by General and Mrs. Gaines.

He further stated that he was particularly requested by General and Mrs. Gaines, to use his best exertions, with the aid of the best counsel he could employ to make every defence in his power to the suit, and of which it was susceptible, and that he did so.

The suit was for Patterson's residence in New Orleans, and he admits that he has never been disturbed in his possession, by the decree against him, nor does he expect that he ever will be.

That this proceeding on the part of Patterson and General and Mrs. Gaines was amicable, and that no earnest litigation was had is too manifest for controversy. They agreed to go to trial at once on the depositions found in the probate court; and as Patterson was to lose nothing by the event, he was of course indifferent as to what evidence might be introduced on the hearing.

It also appears by his evidence that when a decree was obtained in the Circuit Court against him, his name was used to carry up an appeal to this court; but it was in fact brought up by General and Mrs. Gaines. Patterson employed counsel here, who of course had to take the record as they found it, and make the best of it they could; and it is conceded on all hands, they did so; and made the best exertions for Patterson they could do on the record brought up by him, as they supposed. Nevertheless, an affirmance of the decree was had in this court. It could hardly be otherwise in a case managed as this was; the object of the complainants below, being to obtain a favorable opinion and decree, on the law and facts of a case, made up at their own discretion.

But the cause before us presents an aspect altogether different; the proceeding against Desgrange before the vicar-general, introduced here by the respondents, from the archives of the cathedral church of St. Louis, at New Orleans, is in our opinion sufficient in itself to produce a different decree from that given in Patterson's case.

That record; the power of attorney from Desgrange to his wife; and the one from his wife and her sisters to him, to pursue and recover their property in France; his letter to Clark of July, 1801; the proof of his absence from his wife for more than a year, before Caroline was born; the record of the suit for ali-

mony, prosecuted in 1805, by his wife against Desgrange, together with Daniel W. Coxe's evidence, as it now stands, fortified as it is, by letters showing dates, consistency, and accuracy, are all new; and make up a defence altogether conclusive.'

The following is the result of our conclusions:

1st. That the complainant's two principal witnesses, Madame Despau and Madame Caillavet, are not worthy of credit.

2d. That the depositions of Bellechasse and Madame Benguerel obviously state hearsay and rumor, and are worth nothing, in so far as mere hearsay and rumor is detailed by them.

3d. That the naked confession of Desgrange, that he had been guilty of bigamy, made to Madame Benguerele and her husband, is incompetent evidence, and inadmissible as against these respondents; even admitting that such confession had been made, as stated by the witness.

4th. That the certificate of William V. O'Brien is inadmissible, and must be disregarded.

5th. That the record of the suit of Zulime Carrière against Jerome Desgrange, prosecuted in 1806 in the County Court of Orleans, proves nothing, and is incompetent.

6th. That the decree of this court in Charles Patterson's case does not affect these defendants for two reasons: 1st. Because they were no parties to it; and 2d. Because it was no earnest controversy; And

7th. That the record of Desgrange's prosecution for bigamy, overthrows the feeble, and the discredited evidence, introduced by complainant to prove the bigamy of Desgrange, by marrying Marie Julia Née Carriere in 1794; and establishes the fact that Desgrange was her lawful husband, in 1802 or 1803, when complainant alleges Daniel Clark married her mother; and that therefore, complainant is not the lawful heir of Daniel Clark, and can inherit nothing from him: And consequently that the complainant can take no interest under her mother, by the conveyance set forth in the amended bill, she not being the widow of Daniel Clark.

The question decided, concludes this controversy; nor shall we go further into it.

The harshness of judicial duty requires that we should deal with witnesses and evidences, and with men's rights, as we find them; and it is done so here. But we sincerely regret that it could not be satisfactorily done, without making exposures that would most willingly have been avoided.

It is ordered that the decree of the Circuit Court be affirmed, and the bill dismissed.

No. 150 of Myra Clark Gaines v. F. D. de la Croix, Richard Relf and Beverly Chew; and No. 151 of the same complainant

*v.* D. F. Kermer, J. S. Minor, Relf Chew et al., depend on the same facts as the foregoing case. In these also the decrees below will be affirmed, and the bills dismissed.

Mr. Justice WAYNE and Mr. Justice DANIEL dissented.

Mr. Justice WAYNE delivered the following dissenting opinion.

I dissent from the judgment just given, and will give my reasons for doing so as briefly as I can. But it will necessarily occupy some time.

I believe that the case of the complainant has been proved beyond a reasonable doubt, as the law requires it to be done; I say, as the law requires it to be done, without meaning to imply any doubt of the fact, but that the fact has been proved according to those rules which experience has shown to be necessary and sufficient, to guard conjugal and other-domestic relations from capricious and unregulated judgments. Those rules are to be found in adjudicated cases of our own and of the English courts, and in the conclusions of the civil and canon law applicable to cases of this kind.

I think it has been proved, that Myra Clark Gaines is the only child of her father, Daniel Clark, by his marriage with her mother, Zulime Carrière. That when the marriage took place, the parties were willing to contract, able to contract, and that they did contract marriage in Pennsylvania according to the laws of that State, in the year eighteen hundred and two. I also think that there was nothing then or now in the laws of Louisiana which lessens in any way the validity of that marriage. The proofs of these declarations, shall hereafter be pointed out, with the law in support of them.

My first object is to state the evidence relied upon by the parties to this suit, and in what way it should have been examined and appreciated by this court, before its judgment was given. In other words, I mean to say, that a judgment has been given against the complainant upon testimony introduced into the record of the case against the protest of her counsel, which is altogether inadmissible under the rules for the admission of testimony in courts of justice, and which have hitherto been observed and enjoined by this court in its judgments. And further, that admissions and averments in the answer of the defendants in respect to certain portions of testimony offered by them, have been overlooked, by which the complainant has been deprived of proofs, which time out of mind in chancery have been considered conclusive of the fact affirmed in an answer, whether or not the same makes against a defendant or for a complainant.

Secondly, I will show that all of the testimony of a documentary kind introduced by the defendants, except one of them, ought not to have been received by this court as evidence, on account of some of them not being properly authenticated as records of a judicial character, and because others being *res inter alios acta, aliis nec prodest nec nocet.* And that such documents or papers for the causes just stated have always been rejected by the courts of common law and by courts of chancery, and further that they would not have been received in the courts of Louisiana if this case had been in one of its tribunals.

The defendants deny the marriage between the complainant's father and mother; and if there was a marriage, they contest its validity on account of her mother having then another husband alive. It is admitted that a marriage had been solemnized between her and Jerome Desgrange, but the complainant shows by competent testimony sufficient to establish the fact that Desgrange was a married man, with a wife alive when he married her mother. That such being the fact, their marriage was void *ab initio,* and that she was at liberty to marry with another as if no such connection had ever existed between Desgrange and herself. In other words, that such a connection, though entered into according to the forms of marriage, makes no impediment by the civil, the canon, or common law, in the way of a second marriage by the party imposed upon. The defendants rejoin, saying, even though the marriage with Desgrange was void on account of his bigamy, that she could not contract marriage again, before she had obtained a sentence of nullity of her marriage with Desgrange. It is also urged by the defendants, if there was a marriage between the father and mother of the complainant, that it was void on account of what the canon law terms its *clandestinity.* That according to that law, as it then prevailed in Louisiana, the issue of such a marriage was illegitimate and that it has no civil effect to give rights of property or inheritance to the issue of such a marriage. To this the complainant replies that the marriage of her father and mother was solemnized in the State of Pennsylvania according to the law of that State. That the *lex loci contractus* gives to the issue the status of legitimacy for all purposes in Louisiana and elsewhere, whether the issue was born there or out of its jurisdiction; and further, that marriages which have been clandestinely solemnized, that is, by not observing the solemnities of the church, though they are condemned by the canon law, as it existed in Louisiana, are not made void — cap. *quod nobes. tit, que filii sunt legis.* To the objection that there had not been a sentence of the nullity of the marriage with Desgrange, the complainant answers, that when a marriage by the canon law and

as it then was in Louisiana, is *ipso facto*, null and void, that no declaratory sentence of nullity is absolutely necessary, though it may be expedient to have one, to reinstate the parties in their original unconnected condition. That this is especially so, when one of the parties at the time of marriage had been previously married and that marriage had not been dissolved by death or by operation of law. That a sentence of nullity is only absolutely necessary to restore the ability of persons to marry, when it is sought to have a marriage declared *de facto* void on account of non-compliance with the law directing the mode for solemnizing marriage, or when one of the parties seeks a dissolution on account of fear, — such as the fear of death or imprisonment having been used to compel a party to marry, — or where the marriage is voidable for incest or impotence, or if the woman is *nimis arcta*, for which an ecclesiastical court will pronounce it null and void in the lifetime of the parties, which when done restores the parties, except in the third case mentioned, to their former ability to contract espousals and marriage with others as if they had not been in that connection with each other.

The defendants, to maintain their denial of the marriage between the father and mother of the complainant, attempt to discredit her witnesses who were examined to prove it. For that purpose they examined persons as to the character of the witnesses. They attempt to show contradictions in the testimony of two of them taken at different times, and allege concealment of facts which it is said they were bound to disclose in their examination; and they were also permitted to put in evidence certain papers relating to the marriage with Desgrange, and its continuance after the alleged marriage of Zulime with Clark. Those papers are, 1st, one termed an ecclesiastical prosecution of Desgrange for bigamy in 1802; 2d, The proceedings of a court in Louisiana in 1805 at the instance of Zulime against Desgrange. for alimony; 3d, Another for a like purpose at the instance of Mr. Davis, to whose care the complainant was confided by her father in her infancy, in which she is called a natu-. ral child of her father; 4, An imperfect record of a suit brought by the complainant's mother in 1806 in her maiden name against the name of Desgrange, for a divorce or a sentence of nullity of their marriage, in which there was a judgment against him, or in her favor.

The last record stands in this suit upon a different footing from the ecclesiastical proceedings, inasmuch as it is properly authenticated to make it evidence as a judicial record, and the other is not so. Also, because the defendants introduce it and declare it in their answers to be a petition by the complainant's

mother, Zulime Née Carrière, wife of the said Desgrange, to a competent judicial tribunal in New Orleans, therein representing herself as the wife of Desgrange, and praying for a divorce and dissolution of the bonds of matrimony existing between her and Desgrange, which was subsequently decreed, after the birth of the complainant. And they further aver in their answers, that, having obtained a divorce and having resumed her maiden name, she afterwards, in 1808, intermarried with one James Gardette. The defendants also rely upon the conduct of Clark and Zulime, before and after it is said they were married, to disprove their marriage and to establish that they were illicitly connected, before and until after the birth of the complainant. She resists this by proofs which will hereafter be more particularly noticed, and further urges that the defendants having alleged in their answers a divorce between Desgrange and her mother by a competent tribunal, they cannot now be permitted to disclaim it, for, though the petition in that case has not been returned with the rest of the record, on account of its loss, that its object and purpose are made out both by external and internal proofs in what remains, as the law requires the loss of the whole or of a part of a judicial record to be supplied, and in that way it is shown to have been a petition for a sentence of nullity of her marriage with Desgrange on account of its original invalidity.

Having stated the positions taken by the parties in respect to the marriage between Clark and Zulime, between her and Desgrange, and her subsequent connection with Gardette without a divorce from Clark, when he had abandoned her, and the legal points raised and replied to by both parties, I will now proceed to state the kind of testimony upon which they respectively rely, the use which has been made of it, indicating at the same time what I believe to be the law upon each point of the complainant's case, and also upon all of those made by the defendants.

1st. As to the marriage between the father and mother of Mrs. Gaines: It is proved by one witness, Madame Despau, her aunt, who was present at the marriage when it took place in Philadelphia. By another witness, Madame Caillavet, also her aunt, who swears that Clark made proposals of marriage for Zulime to her family, after her withdrawal from Desgrange, which was caused by her having heard that he was the husband of another woman then alive. She also swears that Clark, after his marriage with Zulime, admitted it to her, and that so did Zulime. They also rely upon Clark's acknowledgment of his marriage to three other witnesses, Mrs. Harper, Bellechasse, and Boisfontaine, to each of whom he repeatedly said that Myra

was his legitimate child, also upon his treatment of her and declarations concerning her, from her birth to within two hours of his death, when he declared that Myra was his legitimate child. One of these witnesses, Mrs. Harper, is the lady who suckled Myra with her own child; not as a hireling for that office, but as the friend of Clark. To this witness he made at different times frequent declarations of the child's legitimacy, and of his marriage with her mother; and to another of the witnesses, Boisfontaine, Clark said that he would have avowed the marriage, but for her subsequent connection with Gardette. In proof also of the marriage and of the child's legitimacy, they rely upon the facts that Clark made large provisions of fortune for her in trust to others, to whom he declared her to be his legitimate child when the trusts were made, and that a short time before his death, he made a will in her favor as his universal legatee, in which she was declared to be his lawful child, about which will he spoke with anxiety and penitential affection within an hour before his death, as having by that act repaired the wrong he had done her.

The witness, Madame Despau, says she was at the marriage of Zulime and Mr. Clark, in 1803 or 1802, that it took place in Philadelphia, and the ceremony was performed by a Catholic priest, in the presence of other witnesses as well as herself. She states that she was present when her sister gave birth to Mrs. Gaines, that Clark claimed and acknowledged her to be his child, that she was born in 1806. That the circumstances of her marriage with Daniel Clark were these: Several years after her marriage with Desgrange she heard he had a living wife. Our family charged him with the crime of bigamy in marrying Zulime. He at first denied, but afterwards admitted it and fled from the country. These circumstances became public, and Mr. Clark made proposals of marriage to my sister, with the knowledge of all of our family. It was considered essential, first, to obtain record proof that Desgrange had a living wife at the time he married my sister, to obtain which from the Catholic church in New York, where Mr. Desgrange's prior marriage was celebrated, we sailed for that city. On our arrival there we found that the registry of marriages had been destroyed. Mr. Clark arrived after us. We heard that a Mr. Gardette, then living in Philadelphia, was one of the witnesses of Mr. Desgrange's prior marriage. We proceeded to that city and found Mr. Gardette. He answered that he had been present at the prior marriage of Desgrange, and he afterwards knew Desgrange and his wife by that marriage. That this wife had sailed for France. Mr. Clark then said, " You have reason no longer to refuse being married to me. It will be necessary, however, to keep our mar-

riage secret till I have obtained judicial proof of the nullity of your marriage with Desgrange." " They were then married. Soon afterward our sister, Madame Caillavet, wrote to us from New Orleans, that Desgrange's wife whom he had married prior to marrying Zulime had arrived at New Orleans. We hastened our return to New Orleans. He was prosecuted for bigamy, father Antoine, of the Catholic church in New Orleans, taking part in the proceedings against Desgrange. Mr. Desgrange was condemned for bigamy in marrying Zulime, and was cast into prison, from which he secretly escaped by connivance, and was taken down the Mississippi river by Mr. Le Breton D'Orgenois, where he got to a vessel, and, according to the best of my knowledge and belief, never afterwards returned to Louisiana. This happened in 1803, not a great while before the close of the Spanish government in Louisiana. Mr. Clark told us that before he could promulgate his marriage with my sister, it would be necessary that there should be brought by her an action against the name of Desgrange. The anticipated change of government created delay, but at length, in 1806, Messrs. James Brown and Elizaer Fromentin, as the counsel of my sister, brought suit against the name of Desgrange in the city court, I think, of New Orleans. The grounds of said suit were, that said Desgrange had imposed himself in marriage upon her at a time when he had a living lawful wife. Judgment in said suit was rendered against Desgrange. Mr. Clark still continued to defer promulgating his marriage with my sister, which very much fretted and irritated her feelings. Mr. Clark became a member of the United States Congress in 1806. While he was in Congess my sister heard that he was courting Miss Caton, of Baltimore. She was distressed, though she could not believe the report, knowing herself to be his wife; still his strange conduct in deferring to promulgate his marriage with her had alarmed her. She and I sailed for Philadelphia to get the proof of his marriage with my sister. We could find no record, and were told that the priest who married her and Mr. Clark was gone to Ireland. My sister then sent for Mr. Daniel W. Coxe, mentioned to him the rumor; he answered that he heard it to be true that Clark was engaged to her. My sister replied it could not be so. He then told her that she would not be able to establish her marriage with Mr. Clark, if he was disposed to contest it. He advised her to take counsel, and said he would send one; a Mr. Smythe came and told my sister that she could not legally establish her marriage with Mr. Clark, and pretended to read to her a letter in English, (a language then unknown to my sister,) from Mr. Clark, to Mr. Coxe, stating that he was about to marry Miss Caton. In consequence of this information, my sister Zulime came to the con-

46*

clusion of having no further communication or intercourse with Mr. Clark, and soon after married Mr. Gardette, of Philadelphia."

The testimony of this witness has been given in her own words, in her answers to questions put on both sides. The cross-interrogatories were filed by distinguished counsel, having before them at the time the direct interrogatories to be put to the witness. It often happens, in the investigation of causes, that the capacity of the advocate has an influence upon our conclusions in respect to testimony. It is right, also, in this remarkable suit, that those who have been professionally connected with it, for or against the complainant, should be mentioned. In this instance it will show that the cause was conducted by lawyers of ability and experience, and that they made a searching scrutiny into the veracity of the witness, by all of those- ingenious and pressing inquiries which the rules of evidence permit to be asked, and which the case itself and the testimony of the witness suggested. The cross-interrogatories answered by Madame Despau were filed by L. C. Duncan, J. J. Mercier, Z. M. Shepard, John Slidell, Julien Seghers, P. A. Zost, H. Lockett, and Isaac T. Preston, Esquires.

It is worthy of notice, too, that the testimony of Madame Despau was taken three times, at long intervals. It is admitted that she does not contradict herself in any thing she said in her first examination, and that she did not afterward testify to more or less than she did at first. It was urged, however, against her credit, that the subsequent examinations were so frequently in the language of the first, that she must have had copies of the latter and merely repeated them, from which it might be inferred that she had been tampered with. But it was not intimated by whom, as a better discretion, in the absence of all proof of it, restrained counsel from giving personality to the insinuation, either as to the counsel of the complainant or herself. I have carefully compared the depositions in connection with the interrogatories and cross-interrogatories put to the witness, without having been able to find such an identity in her answers, as might not very well have occurred from the sameness of the interrogatories, in each instance to a witness who is asked for a narrative of the same facts. Besides, her testimony was not orally given in court. It was taken by commission each time, long enough before the trial in the court below, for the considerate examination of counsel, who could have obviated what is now complained of, by a motion to the court for an oral examination of the witness in court, which the judges would have granted if they had seen in the depositions any foundation for the charge; or from any thing in them, the slightest indication that the witness had been corrupted, or that the commissioners,

in taking her testimony, had done so irregularly, by permitting her to use a copy of her first deposition. But the conclusive answer to the objection is, that the witness is sustained by other witnesses in all respects, except as to the fact of the marriage, of which she was a witness, and of which they were not, but which they swear was admitted to them by Mr. Clark. The next objection to the credit of the witness, and that most relied upon by the court for discrediting her testimony, and also that of her sister, Madame Caillavet, is, that neither of them, in giving the account of the purpose for which Madame Despau and Zulime left New Orleans for New York, in 1801, tell that Zulime was then *enciente* by Clark, and went there to be confined. There is no doubt that Zulime gave birth, in Philadelphia, during that absence from New Orleans, to the child known in the record maidenly as Caroline Clark, and afterwards as Mrs. Barnes. But as to the time of the birth of that child, there is nothing in the record conflicting with any probability against the declaration of Madame Despau, that it took place in 1801, notwithstanding the uncertain statement made by Mr. Coxe, of her birth having been in 1802, which last date has been used to show that Caroline was the child of Mr. Clark, and could not have been the child of Desgrange, on account of the latter's absence in France.

Before, however, a witness (as Madame Despau,) will be discredited by an omission to state a fact of the kind mentioned, it is necessary to look at the interrogatories put to her by counsel on both sides of a cause, to determine if they called for such an answer either directly or indirectly and that it had been purposely withheld. Or that the fact was in issue between the parties, and that a question to elicit it had been reluctantly answered by the witness. I have more than carefully examined the interrogatories, which both Madame Despau and Madame Caillavet were asked to answer, without finding in any one of them any thing relating to the point, that Zulime left New Orleans to be confined at the north. And if there had been such a question, it would have been suppressed by the court on account of its irrelevancy, to the issues between the parties as they are made by the bill and answers of the defendants. The fact of Zulime's confinement in Philadelphia, is not in any way alluded to in either the bill or the answers, and though disclosed in the testimony of Mr. Coxe in the way it is, it cannot be used to discredit the witness, or to bear upon the subsequent marriage between Clark and Zulime, which is the point at issue, or have any other effect, if it should have any at all, than to show that Clark, according to the religious faith in which he was born, and according to the new laws of Louisiana, en-

couraged by the canon law, and frequently done under like circumstances, had determined to legitimate the child Caroline, *per subsequens matrimonium*, believing her to be his child.   But there is nothing in the evidence of either of the aunts of the complainants, showing that either had wilfully suppressed Zulime's confinement, to the injury of the defendants or with an intention to conceal it; or that they knew Caroline was the child of Clark, and not the child of Desgrange.    Indeed if the then law of Louisiana is to be decisive of the paternity of a child born during the marriage of parties, Caroline would be considered the child of Desgrange, for as the time of her birth is not established, (notwithstanding what is said to the contrary,) on account of the differences between witnesses in respect to it, and the absence of Desgrange in its beginning being equally uncertain according to the proofs in the case, no inference can be drawn of such a time of absence, as precludes the possibility of access between husband and wife.    Besides as there is no proof in this case, when Desgrange sailed for France upon his mission to settle the Carrière estate, the first heard from him there being as late as the — July, 1801 ; in his letter to Mr. Clark, even allowing Mr. Coxe's conjecture to be certain, that Caroline was born in the spring of 1802, and not in 1801, as the other witnesses say she was, she would by the law of Louisiana at that time, be adjudged to be the child of Desgrange, as that declares a child born in ten months in wedlock to be legitimate.   L. 4, tit. 33, p. 4 ; and there could be no legal foundation to exclude her from that paternity, on account of the absence of Desgrange. In this point of view, the witnesses cannot be charged with the suppression of the fact of the confinement of Zulime in Philadelphia, and that was done to conceal from Desgrange that she had conceived and borne a child in his absence.    They could neither have known the fact if it was so, nor had they any right to assert it contrary to the conclusion which is made by the law in such a case.    They therefore are not liable to be discredited in that way, by connecting it with the ecclesiastical paper which the defendants offered as evidence in the case, of which I shall speak hereafter both as to its inadmissibility as testimony, and its worthlessness to establish the validity of marriage between Desgrange and Zulime.    In an inquiry to deprive a child born in wedlock of its legitimacy, on account of the non-access of the husband, the law requires certainty as to the time of absence, and without it, a child's filiation and its inheritance cannot be taken from it, by any comparison of witnesses or inferences from evidence.    In such a case there must be dates, not as to a day or a month, but that time enough has passed from the absence of the husband and birth of a child, to make it certain that he

could not have been the father of it. I will here in this connection give the testimony of Mr. Coxe, as that is principally relied upon to establish that Madame Despau had wilfully suppressed the fact of her sister's confinement in Philadelphia, and that upon that account she should be discredited. The 14th interrogatory, rec. 605, put to Mr. Coxe, is: Did Daniel Clark ever speak to you or write to you, about his relationship with Madame Desgrange, the reputed mother of the complainant Myra. If ay, state what that conversation was, the circumstances connected with it and all about it. The answer will be found on the 615th page of the record. 'Daniel Clark did both write and speak to me about his relationship or connection with Madame Desgrange, the reputed mother of the complainant Myra. In the early part of the year 1802, Madame Desgrange presented herself to me, with a letter from Daniel Clark, introducing her to me and informing me in confidence, that the bearer of that letter, Madame Desgrange, was pregnant with a child by him, and requesting me as his friend, to make suitable provision for her, and to place her under the care of a suitable physician; requesting me at the same time to furnish her with whatever money she might want and stand in need of, during her stay in Philadelphia. As the friend of Clark, I undertook to attend to his request and did attend to it. I employed the late William Shippen, M. D., to attend to her during her confinement, and procured for her a nurse. Soon after the birth of the child, it was taken to the residence of its nurse. That child was called Caroline Clark, and at the request of Mr. Clark, the child was left under my general charge and exclusive care until the year 1811. After that period she was not so exclusively under my charge, but I had a general charge of her, which continued up to the period of her marriage with Dr. Barnes, formerly of this city. She is now dead, as is also Dr. Shippen, before spoken of. Daniel Clark arrived in this city within a very short time after the birth of Caroline, which was, I believe, in April, 1802, when I received from him the expression of his wishes in reference to the child. He left here shortly afterwards, as before stated by me. During Daniel Clark's subsequent visits to Philadelphia, he always visited that child, acknowledged and caressed it as his own, and continued to give me the expression of his wishes in reference to her. On the occasion of Mr. Clark's visit to Philadelphia, immediately after the birth of Caroline, in conversation with me in reference to Madame Desgrange, he confirmed what he stated in his letter of introduction, stating to me that he was the father of this illegitimate child, Caroline, and that he wished me to take care of her, and to let the woman have what money she stood in need of until she returned to New Orleans.' In Mr.

Coxe's answers to subsequent interrogatories, he substantially repeats parts of the foregoing without addition or any thing material besides. In his answers to the 20th, 21st, and 22d interrogatories, he recites the marriage of Zulime Née Carrière with Dr. Gardette, in August, 1808, she having arrived, from New Orleans, in Philadelphia, in the autumn of 1807. In his answer to the 27th interrogatory, he says : " I also think it proper to state, that in the year 1808, after Madame Desgrange had returned to Philadelphia from New Orleans, and when lodging in Walnut street, she sent for me, and during a private interview with her, at Mrs. Rowan's, where she lodged, she stated that she had heard Mr. Clark was going to be married to Miss Caton, of Baltimore, which she said was in violation of his promise to marry her, and added that she now considered herself at liberty to connect herself in marriage with another person, alluding doubtless to Dr. Gardette, who at the moment of the disclosure, entered the room, when after a few words of general conversation I withdrew, and her marriage to Mr. Gardette was announced in few days after."
Now, let it be remembered, that the point under discussion is not whether Caroline is the child of Clark or Desgrange, but whether Madame Despau committed perjury in saying that she was one of the children of Desgrange, and that she purposely and corruptly, concealed and withheld the fact of Zulime's confinement with Caroline in Philadelphia, from her apprehension of its influence upon the interest of the complainant whose witness she was. Nor is it at all a dispute or doubt of Mr. Coxe's veracity. It is merely a question, and a very important one too, of evidence, and the legal use which can be judicially made of it, altogether unconnected with the immorality of the persons disclosed in the record, with whom the complainant is unfortunately associated only as to the legitimacy of her birth, and of whom personally she knew nothing in her bringing up, nor any thing since, beside those voluntary communications to her after her marriage, concerning her birth and paternity, made to enable her to receive her just rights in her father's estate.
By what principle, then, is it, I ask, or by what cases for authority to do so, is it, that the unsworn declarations of Clark, now repeated by Mr. Coxe, have been used to discredit Madame Despau's sworn evidence concerning a transaction in which Coxe discloses Clark to have been the criminal transgressor, and Madame Despau at most, only as the attendant of a frail sister to aid her in her travail, and to shelter her and her family from disgrace. There are those whom the weak, the unfortunate, and the wicked have natural claims upon, not disallowed by the law, and the discharge of which, without a violation of law, it does not even reproach. This is putting the narrative of Mr.

Coxe in the strongest light against Madame Despau, upon a presumption only, however, that she knew Caroline to be the child of Clark, and that she was not the child of Desgrange. I say knew — apart from that intuitive perception, which is not evidence, which women have in other matters, and especially concerning such as we are speaking of, bringing them to a conclusion with the quickness of instinct, and which are only uncertainly reached by men, after a comparison of facts with the instincts of their own nature, without that of women to aid them. The distinguished Sherlock says, without any satirical intention or meaning to say that women are inferior to men, " Whilst she trusts her instinct she is scarcely ever deceived, and she is generally lost, when she begins to reason." And I need not tell my brethren, as evidence rests upon our faith in human testimony, as sanctioned by experience, that the conclusion of the great divine, is that of the law, and that the testimony of women is weighed with caution and allowances for them differently from that of men, but never with the slightest suspicion that they are not as truthful. Here then we have from Mr. Coxe, Clarke's confession of an offence, subjecting him to stripes and the galleys, used to discredit a sworn witness guiltless of any offence against the law in relation to other facts, subsequently occurring as related by her, and who as to the fact related by Mr. Coxe may have been as much the victim of Clark's contrivance, as Zulime had been of his seduction. I make no theory, except in the sense of a theory resting upon facts; but may it not be probable, enough to relieve this witness from the imputation of having wilfully concealed the fact of Zulime's confinement, and her knowledge that Caroline was the child of Clark, that Clark in the absence of Desgrange in France, arranged matters for her confinement in Philadelphia, with the purpose also of having inquiries made concerning the validity of her marriage with Desgrange, or only pretendingly so, without communicating to the witness that he was the father of her sister's child, conceived, and to be born in Desgrange's absence, with the view of protecting both herself and its mother from disgrace, and both of them from prosecutions for their offence upon the return of the deluded husband. Concealment of its birth by the child having been left in Philadelphia, was obviously the motive of Clark and Zulime. When that was determined upon after the birth of Caroline, her filiation might have been obvious enough to the witness, but as there is no proof that it had been previously communicated to her by Clark or Zulime, it does not conflict at all with her declaration that the object of her going to the north with her sister was to procure proofs of the previous marriage of Desgrange. And if it be as it is said by those who

discredit her that Caroline was not born until June, 1802, there had been at the time of her departure from New Orleans no such development of Zulime's pregnancy as necessarily to disclose it to her or any one else. It is in proof in the record, that the witness and Zulime left New Orleans in 1801, that Clark followed them and was in Philadelphia before the expiration of that year and for three months of 1802, or until some time in April. It is not unreasonable then, when the credit of a witness depends upon the supposed concealment of a single fact, that under such circumstances her ignorance of it should be implied until nature pregnantly disclosed it. Further from Mr. Coxe's narrative it does not appear that Madame Despau was ever present at his interviews with her sister, or that he ever had an interview with her. And it does appear that when Zulime delivered to him the letter of which he speaks that Madame Despau was not present. It cannot, then, be assumed, as it has been, without further testimony to bring the knowledge of it home to her, that she knew any thing about that letter, or that Mr. Clark had said he was the father of Caroline, or of any of those arrangements made by Mr. Coxe for Zulime's confinement. Her purpose, then, for accompanying her sister to the north, as it is told by herself, ought to have been relied upon, because it is unaffected by any statement made by Mr. Coxe, of Clark's declarations to him. Madame Despau says she was at the birth of Caroline, and that it took place in 1801. This is all that she does say, which can connect her in any way with her sister's confinement with that child. Mr. Coxe is the only witness who says that the child was born in 1802, shortly after Mr. Clark's departure from Philadelphia. This is said with the qualification, to the best of his belief. Such an immaterial difference between two aged persons concerning a fact which took place more than forty years before they were testifying, cannot be used to discredit either, especially when both are before the court, in legal position equally entitled to credit. I will speak of the equality hereafter. Upon the testimony of Mr. Coxe, I make here a remark to show how little reliance can be put in his memory as to the time when Zulime presented to him the letter of which he speaks, or the time of Caroline's birth, or as to Clark's visits to Philadelphia, except that immediately preceding his departure for Europe. In his first examination, he did not state, I suppose he did not remember what he did state in his second, subsequently disclosed by his correspondence with Clark, that the latter had been in Philadelphia from late in 1801 to the last of April, 1802, all of which time Zulime was there, that it was in April that Clark returned to New Orleans and afterwards revisited Philadelphia in July, 1802, Zulime being

still there, on his way to Europe. When he speaks, too, of the time of Caroline's birth, he does not do so with certainty, but only as he believes. There is then no cause for using any part of his testimony to discredit Madame Despau.

The next objection to Madame Despau's credit is made on account of her alleged want of character. It is said she was unchaste, and the defendants were allowed to put in proof a paper or record of a separation between herself and her husband upon his prosecution for a divorce upon which a judgment was given in his favor, which cut her off on account of his charges of her infidelity, from any interest in the property which he had, to a part of which she would otherwise have been entitled. I confess my inability to see, even supposing it to have been altogether regular, as an adjudication in a competent tribunal, which it is not, how this paper was received as evidence in this case, either against the witness or against the complainant. I have expressed myself too moderately with respect to the character of this paper, but in vindicating what I believe to be the rule of evidence, I am anxious not to offend any one, and to keep myself within the strictest limits of judicial forbearance. I will not say one word by way of inference concerning it, but will appeal to the paper itself for the correctness of what I shall say. It cannot be used as evidence in this suit because it is *res inter alios acta*. It does not in any way affect the truthfulness of Madame Despau, and cannot be used to affect her character, except so far as every wife may be degraded in the public estimation, when she is charged by her husband, truly or not, with infidelity to her marriage vow. This paper itself discloses in terms, and not inferentially, every fact which I am about to state. It seems that Madame Despau and her husband lived unhappily and had agreed to a divorce. Whilst the proceedings for it were pending, for the distribution of property, but after a decree had been made, her husband advertised the property for sale. She, by an application to the court, enjoined the sale, claiming that community in it to which she was entitled by the laws of Louisiana. The husband's answer asks the court to permit the property to be sold and that he may be allowed to give bond to deposit the proceeds with a responsible person. The court allowed him to do so. In a year after this, the husband filed a petition in which Madame Despau is charged with having left Louisiana for " some place in North America," without the consent of her husband, and that she is living in adultery. Supplemental affidavits were filed, declaring that Madame Despau had left the territory, and an affidavit in which it is said " her conduct had not been regular, and that her husband had reason to complain of her." In what respect is not stated.

Upon these *ex parte* affidavits, made without the service of any process upon Madame Despau, or any appearance by her or for her by any person, to the last petition of her husband, the court decreed that she had forfeited her community in the property, divorcing them *a mensâ et thoro*. The grounds of the decree were not stated. It certainly could not have been for proved adultery, there being no such evidence either general or particular against her. It does not become me to utter a word of reproach against the judge by whom that decree was given, but I may say the decree itself and the use of it in this case, show, whatever care may be taken to prevent irregularities in the trials of causes, that they sometimes occur to the great injury of parties, and to a want of confidence in the uniform correctness of judicial action.

But besides this paper, the defendants called witnesses to impeach the character of Madame Despau. I regret too, that there was in this particular a disregard of all of those rules in respect to the impeachment of the credit or character of a witness. I do not remember a more marked departure from them. Before being more particular in this matter, I will state my judicial convictions of the manner of impeaching the character of a witness for veracity or for want of moral character, annexing judicial decisions, that it may be seen how far my views are sustained by authorities, and how much they were violated in this instance.

I understand that the credit of a witness may be impeached, 1st, by the results of a cross-examination. 2d, By witnesses called to disprove such of the facts stated by the witness whether in his direct or cross examination, as are material to the issue. 3d, By evidence reflecting upon the character of the witness for veracity. Under this the evidence must be confined to general reputation, and particular facts will not be permitted, for the law presumes every one to be capable of supporting the one, and that it is not likely that a witness, without notice, will be prepared to answer the other. B. N. P. 296, 297; Rex *v.* Lookwood, 13 How. St. Tr. 210, Sir Thomas Trevor, Att. Gen. argu. Rex *v.* Layer, 16 How. St. Tr. 285, per Pratt, C. J.; Rex *v.* Lookwood, 13 How. St. Tr. 211, per Lord Holt, who says the mischief of raising collateral issues would itself be a sufficient reason for the adoption of this rule. The regular mode of examining into the character of the person in question, is to ask the witness whether he knows his general reputation among his neighbors — what that reputation is, and whether from such knowledge he would believe him upon his oath. Rex *v.* Watson, 32 How. St. Tr. 495, 496; Rex *v.* Delamotte, 21 How. St. Tr. 811, per Buller, J.; Mawson *v.* Hartsink, 4 Esp. 103, 104,

per Lord Ellenborough; The People v. Mather, 4 Wend. 257, 258; The State v. Boswell, 2 Dal. 209, 211. Anon. 1 Hill, S. Car. 258. These cases are cited from Taylor on Evidence, &c. &c. I do not think that the inquiry into the general character of a witness is restricted to his reputation for veracity, but that it may be made in general terms, involving entire moral character. On the other hand, notwithstanding the bad character of the witness in other respects, the witness deposing to that may be asked if the former has not preserved his reputation for truth. Rex v. Lookwood, 13 How. St. Tr. 211; Carpenter v. Wall, 11 A. & E. 803; Lord Stafford's case, 7 How. St. Tr. 1459, 1478; Sharp v. Scoging, Holt. N. P. 2, 541, Gibbs, C. J.; 1 Hill, 251, 258, 259; State v. Boswell, 2 Dev. (Law.) 209, 210; Hume v. Scott, 3 A. K. Marsh. 261, 262. But when it is attempted to impeach a witness on account of a want of moral character, it cannot be done by the impeaching witness "merely stating what he has heard others say, for those others may be but few. He must be able to state what is generally said of the person, by those among whom he dwells or with whom he is chiefly conversant, for it is this only which constitutes his general character." The impeaching witness, too, should be from the neighborhood of the individual whose character is in question. Boynton v. Kellogg, 3 Mass. 192, Parsons, C. J.; Wike v. Lightner, 11 Ser. & Rawle, 198, 200; Kimmel v. Kimmel, 3 Ser. & Rawle, 337, 338; Douglas v. Toucey, 2 Wend. 352; Mawson v. Hartsink, 4 Esp. 103, Lord Ellenborough.

It is scarcely necessary for me to say that when the general reputation of a witness has been impeached, that his credit may be established by cross-examining the witnesses who have spoken against him, as to their means of knowledge and the grounds of their opinion, or as to their own character and conduct, or by calling other witnesses to support the character of the first witness, or to attack in their turn the general reputation of the impeaching witnesses. 4 Esp. 103, 104; 2 Ph. Ev. 433. But no further witnesses can be called to attack the character of the last. In other words, a discrediting witness may himself be discredited by other witnesses, but there the recrimination must end. Lord Stafford's trial, 7 How. St. Tr. 1484. In this instance the character of Madame Despau was most signally supported. I only now mention that another mode of impeaching a witness is by proof that other statements were made out of court contrary to what has been testified in court. No such attempt was made in respect to Madame Despau's statements. It will be seen directly that my particular statement of the rules for discrediting a witness is appropriate to the case. I now proceed to state what was said by those who were called to im-

peach the character of Madame Despau.   Carraby says nothing
good was said of her; another witness, that her reputation was
on the same footing as that of Madame Desgrange.     Two
others, the daughters of Gardette, place her on a footing with
her sister Zulime; Courcelle says the same, and all say reports
were unfavorable to Zulime.   I have given the testimony of all
of them who were introduced to impeach the character of Ma-
dame Despau.   There was no attempt to impeach her credit
except by assailing her for a want of character forty years be-
fore.   Thirty-two witnesses were called to support it.   They
knew her all of that time, several of them in her three different
residences — to the hour when they deposed.   All of them swear
to her exemplary life and conduct in every place she had resided,
and no one of them had found any thing with which to reproach
her character or veracity.   There is, perhaps, not another in-
stance in our law cases, of a witness whose character has been
so triumphantly lifted above every imputation of offence, and
especially above the slanders of her husband, too readily re-
ceived by the public, when he contrived, in her absence, judi-
cially to rob her of her portion of his estate, and that, too, more
than a year after they had been divorced *a mensâ et thoro*, which
released her in every other particular as well as to residence,
from all marital control.   There has then been a signal failure
in the attempt to discredit this witness on account of a want of
character or veracity.   The marked difference between the wit-
nesses upon that point, is that the few who impeach do not
swear positively as to what was generally said of her by those
where she dwelt, and those who were called to sustain her
general reputation do so, every one of them, without any qualifi-
cation.   Nay, more, they swear that in forty years' knowledge
of her, that they had not heard her reproached by any, and that
her life had been exemplary, particularly in the care she had
taken of those children whom her husband had falsely said she
had abandoned.   Under such circumstances the defendants were
precluded from insinuating, much less from insisting upon her
want of character, and the weight of testimony excludes a dif-
ferent judicial conclusion.

In the different examinations of this witness, there were long
intervals between them, without any variation in any particular
but one.   That is, that in her last examination she stated that
there were circumstances which made her think the marriage
between Clark and Zulime had taken place in 1802; and that
she had previously said it took place in 1803.   Such a differ-
ence might have been decisive against her veracity, had it been
connected with any thing else in her testimony which made it
probable that it was an alteration with an untruthful intention.

It was not pretended that such was the case, but for the purpose of raising a suspicion against her, it was intimated that she had learned from an interested source that the defendants could or had proved that Clark had not been in Philadelphia in 1803. Before such an insinuation can be regarded by the court as entitled to its notice, it must be shown that it has some foundation. It has been already said that her evidence did not furnish it. It is disclaimed that the complainant's counsel furnished the information, and was only so feebly suggested that it might have been done by the complainant, that both the ethics of professional practice and the law discountenance such an attempt to prejudice a court or jury against a party in a cause upon its trial. But the difference in the depositions of the witness may be satisfactorily accounted for. She is speaking of the time of an occurrence which took place more than forty years before, in connection with its locality, the presence of the parties there, their return to New Orleans after it, the cause of their return in connection with transactions, the larger portion of which she relates correctly, which the defendants have proved happened in 1802. In respect to Clark's being in Philadelphia, and of his having followed the departure of herself and Zulime from New Orleans in 1801, she is confirmed by the proofs furnished by the defendants, which show that he was in Philadelphia when they were there for several months beginning in 1801 and extending to April, 1802, and also again in July, 1802, until he sailed for Europe in August of that year. In all of this the testimony of Mr. Coxe concurs and that witness also speaks uncertainly as to time in several particulars, relating to Clark and Zulime, with the reserve and caution of old age concerning events happening in the middle time of life when it is engrossed in the cares and perplexities of business.

Hitherto my object has been to show that Madame Despau cannot be discredited by any thing contradictory in her evidence, or by any thing offered exterior from it, or by any contradiction of her by any other witness. It is admitted by all of my brethren that there is no contradiction of herself in all of her examinations. No witness disproves any fact stated by her, her character for veracity rose above the attempt to assail her general reputation. It is not shown that she ever made statements out of court contrary to her testimony at the trial, and it is shown that the scandals against her, as they are reported by the witnesses of the defendant, are made more than improbable, by an exemplary life sustained there, and carried by her through forty years into a respected old age. I think that her testimony, corroborated as it is, in its most material particular, by four othe witnesses, who are not impeached at all by circumstances in th

case, or by any attempt to discredit them, and two of whom the defendant's witnesses declare were men of standing and high character, prove the marriage between the complainant's mother and father as fully as such a transaction can be ascertained by proofs, and in the way which has always hitherto been adjudicated by courts, to be sufficient to establish marriage in cases of this kind.   The corroborating evidence, are the statements of Madame Caillavet, that Clark made proposals of marriage for Zulime to her family, after her voluntary withdrawal from Desgrange, upon her hearing that he had then a previous wife alive. That Clark acknowledged to her the marriage afterwards, and that Zulime did the same.  The oath of Mrs. Harper, who nursed the complainant as the friend of her father, that Clark repeatedly acknowledged to her that Myra was his lawful child.   The will which he made in her favor a short time before his death, which Mrs. Harper saw and read, in which he made Myra his universal legatee, terming her in it his lawful child.   The proof by several witnesses that such a will was made by him, which no one can doubt whose mind is open to the proper bearing of testimony in ascertaining truth.   His solicitude about that will and the object of it, when conscious that he was within the grasp of death without a hope of a reprieve, in that last moment of life here, when that which presses most upon the parting spirit, is revealed in its naked truth; Clark then said, that Myra was his legitimate child, that he had made her the successor of his whole estate.   With dying words pointed out where the will would be found, and directed with all the earnestness of his condition, that it might be delivered as soon as he died, to him who had promised to be her tutor and guardian, to whose hands she was confided to be brought up in the rank and condition of her legitimate paternity, as the dearest and last object of her father's affection.   Mrs. Smyth says that Clark always spoke of Myra to her as his legitimate daughter, before he made the will of 1813, then so describing her in the will, and afterwards in their conversation about her.   This witness, in her answer to the tenth cross-interrogatory, gives the cause of the final separation between Clark and Zulime.   It is, that when Mr. Clark was absent in Washington, individuals had, or supposed they had, a great interest in dissolving his connection with the mother of his child, commenced a plan of breaking it up, by writing to Mr. Clark imputations against her, and by filling her mind with unfavorable impressions against him, till at length his mind was so poisoned, that when he arrived in New Orleans she and he had a severe quarrel, and separated.   She immediately after this left New Orleans.   Madame Caillavet swears that she was not present at the marriage of Clark and Zulime,

but says, "I do know that Clark made proposals of marriage for my sister, and subsequently Zulime wrote to me that she and Clark were married.    Mr. Clark's proposals of marriage were made after it became known that her marriage with Mr. Desgrange was void, from the fact of his having then and at the time of his marrying her a living wife.    These proposals were deferred being accepted, till the record proof of Desgrange's previous marriage could be obtained, and Zulime and Madame Despau sailed for the north of the United States, to obtain the record proof.    Mr. Clark acknowledged her to me as his lawful child."    Pierre Baron Boisfontaine, after reciting with much minuteness, circumstances connected with the will of 1813, says, Clark spoke to him of Myra as his legitimate child, and in speaking to him of her mother, he says, "he spoke of her with great respect, and frequently told me after her marriage with Gardette, that he would have made his marriage with her public, if that barrier had not been made, and frequently lamented to me that this barrier had been made, but that she was blameless." Col. Bellechasse also says, that Clark repeatedly acknowledged to him that Myra was his legitimate child, and styled her in his will of 1813, his legitimate daughter.    This witness also gives a very full account of the will of 1813.    I have cited only so much of the testimony of these witnesses, as is confirmatory of the testimony of Madame Despau, in respect to the marriage of Clark with her sister, and of Clark's acknowledgment to others of his marriage with Zulime, and of their child's legitimacy.

And now it may well be asked, upon what rule of evidence it is, that the testimony of Mr. Coxe, standing as he does in this case in the same legal relation as a witness, with Madame Despau, can be used to discredit both her and her sister Madame Caillavet.    There is no contradiction by him of any fact stated by them or either of them.    No conflict between them in any one point, unless it be, the differences between himself and Madame Despau, as to the time of the birth of Caroline, and the time of Mr. Clark's being in Philadelphia in the last of 1801, until April, 1802, in which Madame Despau is confirmed by Mr. Clark's correspondence with Mr. Coxe, furnished by the latter for the defence in this case.    Indeed, the witnesses, though speaking of the same persons, are testifying to different transactions in their history.    Mr. Coxe to a connection between Mr. Clark and Zulime, founded upon Mr. Clark's declarations of it to him, and Zulime's acknowledgment by her delivery to him of Mr. Clark's letter, his assistance to her in consequence of it, his preparations for her delivery and the birth of Caroline, and Clark's subsequent recognition of that child as his ; and Madame Despau, of a fact of marriage happening afterwards, Madame

Despau being present at it; and Madame Caillavet stating that before it took place, Mr. Clark had made proposals of marriage to all of her family for Zulime, after her separation from Lesgrange. Certainly Mr. Coxe's opinions concerning the marriage, and his recital of Mr. Clark's courtships of another lady, years after it, when his relation to society had become changed, and there had been added to the notoriety of his commercial enterprise, something of political consequence, ought not to be permitted to preponderate against witnesses who swear to the fact of marriage, Clark's subsequent acknowledgment of it when time and trouble had obscured his fancied greatness, and his repeated declarations to disinterested witnesses that Myra was his lawful child. But we shall see how this testimony of Mr. Coxe has been associated with a paper in this case, to give to it a bearing upon the evidence of Madame Despau and Madame Caillavet, without which, they would not have been assailed, and with which, it is according to the rules of evidence, worthless.

Having concluded in my own mind that the evidence establishes the marriage between the father and mother of Mrs. Gaines and that she is the child of their union, I proceed to the next most interesting point in the cause.

It is that neither their marriage nor her birth will be available to establish the claim of Mrs. Gaines, because at the time when Clark married her mother she had then another husband alive. That marriage being admitted, and that Desgrange was alive when the marriage with Clark was solemnized, the objection will be sufficient, unless it can be removed. Upon the part of Mrs. Gaines, it is said, and I think is proved as the law requires it to be done, that her mother's marriage with Desgrange is as void on account of his having been a married man when he married her, as if there never had been such a relation between them.

The attitude of the parties in the cause is then this, that each charges a bigamy in support of their respective rights — with this difference that the defendants do so for the twofold purpose of establishing the fact upon the mother of Mrs. Gaines, and from the nature of the testimony upon which they rely, to show that it also disproves the marriage between her and Clark. I will examine both, and fearing that I may omit something, I will state the proofs upon which each party relies, after having stated the kind of proof which the law permits to be given in a civil suit, where bigamy is the point to be determined.

A charge of bigamy in a criminal prosecution, cannot be proved by any reputation of marriage; there must be proof of actual marriage before the accused can be convicted. But in a civil suit the confession of the bigamist will be sufficient when

Gaines *v*. Relf et al.

made under circumstances from which no objection to it as a confession can be implied. The proofs relied upon by Mrs. Gaines to establish the bigamy of Desgrange when he married her mother, are, his confessions of it to witnesses contemporary with the fact of their separation, more than a year before he was prosecuted for bigamy, when it does not appear by any proof in the cause that he was menaced with a prosecution. To such confession is added his flight from New Orleans during the pendency of an inquiry against him for bigamy and an adjudication afterwards upon his return to New Orleans, by a competent tribunal, in an inquiry into the validity of that marriage, at the suit of Zulime in her maiden name, in which judgment was given in her favor, and against him. In respect to the marriage of her father and mother, the complainant relies upon the proof of it by Madame Despau, who was present when it took place, upon the declaration of Madame Caillavet as to Clark's previous proposals of marriage to her family for her, their and her acceptance of them conditionally upon proof being obtained of Desgrange's previous marriage. Clark's admission of that marriage to several witnesses, as I have already shown, her father's conduct towards her from her birth to his death, his frequent acknowledgment of her legitimacy, the provisions of fortune which he made for her at different times, and the will which he made in her behalf, declaring her to be his legitimate child, and making her as such his universal legatee. On the other hand, the defendants rely upon the validity of Desgrange's marriage to Zulime, upon the secrecy of her intercourse with Clark, or of their alleged marriage, upon their not having lived in open cohabitation as man and wife, upon Clark's subsequent courtship of other females with offers of marriage, upon Zulime's marriage with Gardette in 1808, without any attempt to prove her marriage with Clark, or any application by her to dissolve it by legal means or to enforce it with the proofs which she had of it, when she discovered his infidelity to her. They also rely upon certain papers to be found in the record.

The first of them is what they term an ecclesiastical record of a prosecution of Desgrange for bigamy, and a declaration in it imputed to the complainant's mother. The second paper is her suit against Desgrange for alimony as late as the year 1805. The third is a suit brought by her guardian, Mr. Davis, in her infancy, against the executors of her father for aliment, and the fourth is a record of a court, properly authenticated, of a suit brought by Zulime in her maiden name against the name of Desgrange. This last was introduced by the defendants to show, as late as 1806, that the marriage with Desgrange had not been legally dissolved. And until it was, it is urged that there was

such an impediment in the way of her marriage with Clark as to make that marriage null and void, the offspring of it illegitimate, especially so for the purposes of inheritance, even admitting that her filiation as the child of Clark had been established.

It has been said that the invalidity of a marriage in a civil suit, on account of those causes which make it void *ab initio*, particularly in the case of one void on account of the bigamy of one of the parties, may be proved by the admission of the fact by that party. It so happens in this case that Desgrange's admission of his bigamy, excluding his admission of it to Zulime's family for the present, is proved by a witness whose testimony has not been assailed and cannot be. Madame Benguerel has no connection with the family of the complainant, and her standing and character are such that the defendants' could not impeach her credit on account of the want of either. She was subjected, too, to their cross-interrogation, and it brought out neither difference or contradiction of herself, nor any thing in the way in which she gave her testimony to subject her to any suspicion of friendship to the complainant or of any want of memory or uncertainty of her narrative. Madame Benguerel says, " My husband and myself were very intimate with Desgrange, and when we reproached him for his baseness in imposing upon Zulime, he endeavored to excuse himself by saying that at the time he married her, he had abandoned his lawful wife and never intended to see her again." In her answer to a cross-interrogatory put upon this point, she answers, I am not related to the defendants nor with either of them, nor with the mother of Myra, nor am I at all interested in this suit. It was in New Orleans where I obtained my information. It will be seen by my answers how I know the facts — I was well acquainted with Desgrange, and I knew the lawful wife of Desgrange whom he had married before imposing himself in marriage upon Zulime. Now let this evidence be taken in connection with the arrival of Barbara D'Orci, in New Orleans from France, contemporary with the return of Desgrange and at his instance, and the antecedent connection between them as that is represented by both, and that there is in the record a certificate of a marriage between one Jacobus Desgrange and one Barbara Née D'Orci, in every other particular corresponding with the relation which these persons had been in, to each other in the year 1790, excepting in this that Desgrange was afterwards known as Jerome and not as Jacobus, and it will be admitted that the facts just recited, with Madame Benguerel's evidence, are sufficient to establish the bigamy of Desgrange when he married the complainant's mother. Against this confession, what is urged? Nothing but the misapplication of the case of Harman *v.* McClelland, 16 Louis. 26,

in which it was rightly ruled that in an application for a divorce, it would not be granted upon the confession of a husband and wife of adultery. The proof in the case also shows that Desgrange disappeared from New Orleans in 1802, on account of the current charge that he was a bigamist and whilst a prosecution of him was pending for that offence. There is also proof that he did not return to New Orleans until 1805, when Louisiana having become a portion of the United States, he could do so without liability to a renewal of an ecclesiastical criminal prosecution for bigamy or to the punishment inflicted by the provincial law for that offence.

But sufficient as such proof is to establish bigamy in a civil suit, the complainant adds it to record evidence of the fact of Desgrange having been a married man when he imposed himself upon her mother in marriage. The record and judgment of a court, of competent jurisdiction, was introduced by the defendants as a part of their proofs to show that there was a legal impediment in the way of Clark's marriage with Zulime when it occurred, and that continued up to 1806, when they allege that they were divorced. It was used for that purpose and much relied upon, and it was not until it was shown that the judgment in that case had relation back to the marriage making it absolutely void *ab initio*, that it was urged that the record was of no account because a part of it was wanting. Here it is necessary to be particular. I cite from their answers their averments concerning that record. Upon page 58 of the record the defendants introduce it in the following terms, " That afterwards, on or about the 24th of June, 1806, Zulime Née Carrière, wife of the said Desgrange, did present another petition to the competent judicial tribunal of the city of New Orleans, therein representing herself as the wife and of having intermarried with Jerome Desgrange, and praying for a divorce and a dissolution of the bond of matrimony existing between her and the said Jerome Desgrange, and which was subsequently decreed, subsequent to the birth of the complainant, Myra; and for further answer, say that in the city of Philadelphia, on or about the 2d day of August, 1808, Mrs. Desgrange having obtained a divorce from her husband, Jerome Desgrange, and having resumed her maiden name, did enter into a contract of matrimony with and did intermarry with James Gardette." The preceding extract shows that the defendants not only use it to establish the fact of a divorce, but for the purpose of sustaining the rightfulness of Zulime's marriage with Gardette. Now if the record, imperfect though it may be, shows that the divorce could only have been decreed on account of the legal invalidity of the marriage with Desgrange, at the time of its occurrence, then unless it can be shown that the law interposed an impedi-

ment to marriage in the way of the party imposed upon, until a sentence of nullity had been obtained, Zulime's marriage with Clark was a good and valid marriage, though for marrying without such a sentence, she may have subjected herself to the discipline of the church. It will be seen, before this opinion is closed, what the law is upon that point.

The deficiency in the record of divorce is the want of the petition. In every other particular it is perfect. So much so that it discloses the object of the petition, or the cause for which the suit was brought, and for which the judgment of the court was given.

It was introduced by the defendants, who allege that it was a decree of divorce, annulling the bonds of matrimony between Desgrange and Zulime, by a competent tribunal in New Orleans; record 58, 59; 216, and was so pleaded in their answers. When so introduced by them and admitted by the court as admissible evidence, the complainants proved the loss of the petition, and the short manner of entering judgments in the court of which it was a record. 1206. I must here remark, though so brought forward by the defendants, that the majority of this court has rejected it from having any such effect.

At this point, then, my inquiries begin in opposition to the court's conclusion, as it has been announced by my learned brother. The points are, can we learn what is the effect of judgment without the petition? Can we ascertain the cause for which the judgment was rendered without the petition?

What is the effect of the judgment? It is one of a court of record having jurisdiction of the subject and over the parties to the suit. It annuls the bonds of matrimony — as the act of a competent tribunal the judgment must be presumed to have been rightfully rendered, until the contrary appears. This rule applies as well to every judgment or decree rendered in the various stages of a cause, from initiation of a suit to the final adjudication, affirming that the plaintiff either has or has not a right of action; 10 Pet. 472. The decree then had a legitimate cause until the contrary shall be shown. Now as the defendants plead this record to be true, averring it to be so upon their oaths, it cannot be further inquired into by the court, with a view to take from either party in the suit what it discloses. Its rejection by the court places its judgment in the remarkable and unexampled condition of denying to the complainant the benefit of the defendant's answer, as to a fact which they plead to be true. Further, it decides against the complainant, not upon the deficiency of her proofs, but by a denial of a fact, sworn to by the defendants to defeat the complainant's suit.

What but divorce, as contradistinguished from separation *a*

*mensâ et thóro*, could have been the cause of the suit? The witnesses, one and all of them say, that the bigamy of Desgrange, or his having been charged with it, induced Zulime to separate herself from him, and to return to her family.

But the cause assigned in the petition for the divorce may be satisfactorily made out, from the law of Louisiana as it then was, and from the rest of the record. Between 1803 and 1807, the United States Territorial Government of New Orleans, passed no law upon the subject of marriage and divorce. This judgment then in Zulime's suit could not have been founded upon any statutory enactment after the transfer of Louisiana to the United States. In the discussion of this point, in order that I may be better understood, that must be kept in mind. Then I say, that the laws of Spain as they were in the provincial condition of Louisiana, concerning marriage and divorce, and in every other respect, by the laws of nations, and by the Act of Congress of 1804, organizing a government for New Orleans, remained in force there until legislatively repealed. Now, we learn from those laws, that they provided for sentences of the nullity of marriages and for divorces. From the same law, we learn that marriage could not take place, if there existed any canonical or civil impediment. 1 White, Recop. 44; Johnson's Civil Laws of Spain, 50. There are fourteen canonical impediments for which divorces were granted *a vinevlo matrimonii*. In 1 M. & C. S. Partidas, 460, it is said there are fifteen, but upon the examination of the recital of them, it will be found there are substantially only fourteen, the last mentioned being only a prohibition subjecting the party to the discipline of the church, not extending to the dissolution of the marriage.

Canonical doctors express the fourteen impediments as I shall state them, which for all the purposes of this case, and for understanding them, will be found explained, though not in their order in the Partidas.

> Error, conditio, votum, cognatio, crimen,
> Cultus, disparitas, vis, ordo, ligamen, honestas
> Si sis affinis, si forte coire nequibus
> Si parochi et duplicis desit, presentia testis
> Raptare sit mulier, nec parti reddita tutæ.

The civil impediments are those which proceed from want of understanding, &c. &c., and from previous marriage, the wife or husband of the party contracting a second marriage being alive. For such causes as have just been stated, divorces could be granted *a vinculo matrimonii*. Such was the law of marriage and divorce of the Catholic church, so it is still, and it was the law of Louisiana before its transfer to the United States, and afterward until it was legislatively repealed, and by it the judg-

ment was given which divorced Zulime from Desgrange. For its continuance after the transfer of the territory to the United States, see 2 Story's Laws, 907, and the act of the 3d March, 1805, 2 Story, 972, expressly providing for " the continuance of the former laws of Louisiana, until repealed or modified by the territorial legislature."

With then the law in view, we are prepared to ask for what cause was the divorce sought by Zulime in her petition? We see, from the statement which has been made of the law, that it could not have been for a supervenient cause, and that it must have been for one antecedent to the marriage, which made it absolutely void from its beginning, notwithstanding all the forms of marriage had been observed. And what this cause alleged in the petition must have been, cannot be more conclusively shown than it is by the evidence in this case, and by the record of divorce, excluding all other enumerated causes of divorce *a vinculo*, excepting that of the bigamy of Desgrange. I shall state the evidence hereafter, keeping myself now to the point of the jurisdiction of the court in rendering a judgment of divorce. It having been shown that the provincial law of Louisiana was in force when the judgment upon Zulime's petition was given, it follows, as the County Court of New Orleans was constituted with a civil jurisdiction, comprehending also what had been before exclusively ecclesiastical, that the court could only grant divorces *a vinculo*, for the same causes for which they could have been given by the ecclesiastical courts. Fortunately, the position just stated is that of the highest tribunals of this country, and in those of Louisiana expressly, when they have been called upon to decide what portion of the jurisdiction of the consistory courts for enforcing the canon law, appertained to our tribunals organized with civil jurisdiction. It follows then that the judgment of the County Court upon Zulime's petition, defectively as that judgment is expressed, could only have been given upon a petition for a sentence of the nullity of the marriage between the petitioner and Desgrange. Thus with the guide of a settled principle in respect to the law of a country transferred from one dominion to another, until that law has been repealed, the purpose and object of the lost petition in Zulime's application for a sentence of the nullity of her marriage with Desgrange, is made out with as much certainty as if the petition had not been lost.

I think these results have been shown in respect to the judgment of the County Court upon Zulime's petition for a sentence of the nullity of her marriage with Desgrange.

1. That the territorial government had not, when the County Court gave the judgment, any statutes concerning marriage and

divorce. 2. That the laws of Spain upon those. subjects .were then in force. 3. That by such law a marriage between per-· sons, either or both of whom had a lawful wife or husband alive, was void *ab initio.* 4. that the County Court of New Orleans had a general civil jurisdiction, including the power to divorce, but that it could not divorce for a supervenient cause, and could only divorce *a vinculo,* for an impediment existing before the marriage, which made it dissoluble. 5. That having given such a judgment upon Zulime's petition against Desgrange, it relates back to its origin, and is *res adjudicata* controlling all other testimony in this cause, which has been given with a view of showing that Desgrange, when he married Zulime, did not commit bigamy.

I consider, then, that the complainant has established by such proof as the law requires, that Desgrange committed the offence of bigamy when .he married her mother; that she could legally disregard the connection and marry another person; that she did marry Clark, that the complainant is the only offspring of their union, and is entitled to her legitime in her father's estate.

I will here take another view of the record to show that there is in it, complete, and satisfactory secondary evidence of the object and purpose of the lost petition. The plea put in by. the counsel of Desgrange affords a clew, not of itself entirely sufficient, but which, united with the other proceedings, make up what the law terms good secondary evidence of the contents of the petition. It is admitted or cannot be denied, that secondary evidence may be given to supply the loss. The plea denies the jurisdiction of the court over divorce cases, and then urges that the court could not consider the question of damages, until the. validity of the marriage between the defendant and Zulime had been ascertained and declared, — validity of the marriage, it must be remembered. Can any thing show more plainly that its invalidity was the cause assigned in the petition. Again, the evidence in the record ,of the County Court shows that Desgrange's bigamy in marrying the complainant's mother was the subject of her petition and of the court's inquiry. I take from the record of the County Court a part of what, upon the trial of the case, the defendant introduces as his testimony, which the defendants in this suit have made theirs by the introduction of it. The witnesses speak of imputed bigamy to Desgrange, his flight on account of it, and his confession. In the County Court, not one of them answers. to any thing else than to the inquiry, whether or not Desgrange had been married, and whether or not that wife was not alive when he married Zulime. One of the witnesses, and the most conclusive that could be in such a case,

tells the cause of the suits and no one disputed it. Besides, the suit is in the maiden name of the plaintiff against the name of Desgrange, and the cause is so entitled. Certainly nothing more in the nature of secondary evidence can be wanting to establish the cause for which the divorce from Desgrange was sought. Yet there is more; for two witnesses swear that her suit was brought to get a sentence of the nullity of her marriage with Desgrange on account of his bigamy. I cannot but regard it as singular and unexampled, too, that any objection should have been made to the character and force of this paper on account of the deficiency of the petition after its introduction by the defendants to maintain an averment in their answers to the complainant's bill. It was introduced and used by the defendants to show that there had been a divorce between Zulime and Desgrange. The complainant could not object to its introduction as proof of an averment in the answer to her bill. It was good for what it was worth or for what it might disclose for or against either party in this suit. The complainant relied upon it, as her counsel may very well do, to establish the original invalidity of the marriage with Desgrange. The defendants relied upon it to show the lawfulness of Zulime's marriage with Gardette, and the improbability from that fact that Clark had ever married her. We have then, the defendants admission that the judgment of the County Court was rendered for a cause which made the marriage with Desgrange void *ab initio*. To put, then, this record aside as nothing in the case, is a denial to the complainant of the benefit resulting from the action of the defendants, which in my view is a surprise entitling her to a rehearing of the cause by this court. It matters not whether the surprise has been caused by the action of the court and not by that of a party to the suit. The same right follows. In cases at common law a new trial would be granted, and in cases in chancery a rehearing will be given. If such secondary evidence shall not be deemed sufficient to make up for a lost paper, one, too, in this case, which the complainant had every motive to produce, which she sought for in the office where it was, without success, but which the defendants subsequently obtained and made evidence, as they thought exclusively for themselves. Without regard to the want of the petition then, I cannot suppose that any thing less than a literal copy would satisfy those who have taken a different view of it from myself.

My views having been given upon the credit of Madame Despau and upon the testimony relating to the bigamy of Desgrange, I turn to that upon which the defendants rely to disprove it. Their first paper is termed the ecclesiastical proceedings in a prosecution against Desgrange, in 1802, for bigamy.

It will be found at length in the opinion read by Mr. Justice Catron for the majority of the judges who sat in the trial of the cause.

It is not used to show that he was not a bigamist, for the paper contains only an interlocutory order, suspensive of further action, until the inquiry shall be resumed. But it is used, because it is said there is in this paper a declaration by Zulime of her disbelief of the charge against Desgrange, and that she was then his wife.

It is the misfortune of the complainant, that her case has been considered by the court with the rejection of the judicial proof of the bigamy of Desgrange, which is admitted to be admissible in evidence, and with the allowance against her of another paper, to which her counsel objected in the court below and here also, which in the way it was offered is not admissible. Two questions arise upon this paper: Is it an official register or record of a court, authenticated as it should be to make it testimony? What is its effect as testimony?

It has no other authentication of its genuineness than the declarations of Bishop Blanc and Father Kemper. The latter says, he is the keeper of the records of the Catholic church at New Orleans, and that the copy in the record is an exact copy of a paper found there, Rec. 577. The bishop says, he has the charge of such records of the bishopric as exists, and he finds among them a paper which is truly copied, Rec. 694.

Under these certificates this paper has been used by the court to rebut the parol proofs of the bigamy of Desgrange. The intention cannot be objected to, but rebutting testimony must have legal admissibility before it can be received in evidence. In this instance it is altogether wanting.

Public writings consist of the acts of public functionaries in the executive, legislative, and judicial departments of government, including under such general head the transactions which official persons are required to enter into books or registers, or to file, where books are not kept, in the course of their public duties, and which occur within the circle of their own personal knowledge and observation. To this class may be referred the acts of foreign states and the judgments of foreign courts.

. Now this ecclesiastical record, as it is called, is either a transaction which official persons are required to keep, or it is the judgment of a foreign court. Whether one or the other, the certificates of the bishop and Father Kemper are not sufficient to make it testimony.

If it shall be said to be the first, before it can be received as an official register, it must be shown by the party offering it, to be one which the law required to be kept for the public benefit

Such writings are admissible in evidence on account of their public nature, though their authenticity be not confirmed by the usual tests of truth; namely, the swearing and the cross-examination of the persons who prepared them. They are entitled to this extraordinary degree of confidence, partly because they are required by law to be kept, partly because their contents are of public interest and notoriety, but principally because they are made under the sanction of an oath of office, or at least under that of official duty, by accredited agents appointed for that purpose. Moreover, as the facts stated in them are entries of a public nature, it would often be difficult to prove them by means of sworn witnesses. The same rule prevails with respect to foreign and colonial registers. That is, copies of such foreign registers will only be admissible as proof where they are required to be kept by the law of the country to which they belong. Taylor on Evidence, 2, 1050. In Huet v. Le Messurier, 1 Cox, 275, a copy of a baptismal register in Guernsey was rejected, because it did not appear by what authority it was kept. In Leader v. Barry, 1 Espinasse, 353, and in the Athlone Peerage, 8 C. & Fin. 262, copies of the marriage register in the Swedish ambassador's chapel, at Paris, and a copy of the book kept at the British ambassador's hotel, in Paris, in which the ambassador's chaplain had made and subscribed entries of all marriages of British subjects celebrated by him, were rejected upon the same principle. The rule in its application is made more certain, for we find, contemporary with some of the cases mentioned, that an examined copy of a marriage register in Barbadoes was admitted, it expressly appearing that such a register was kept by the law of that colony. So a Jewish record of circumcision, kept at the Great Synagogue, in London, was rejected, though it was proved that the entries in it were in the handwriting of a deceased Chief Rabbi, whose duty it was to perform the rites of circumcision, and to make corresponding entries in the books. Davies v. Lloyd, 1 C. & Fin. 295, per Lord Denman & Patteson, JJ. When this last decision was made, its correctness was questioned by some members of the profession as not being reconcilable with the principles regulating the admission of the declaration of persons in the course of office or business. But it has not been judicially questioned, and is judicially considered to be a decision within the rule as to official registers, though there have been careless departures from it. The reasons for the rejection of the copy in that case, were, that the law did not require such a record to be kept. That it did not appear how those entries were kept in the synagogue to secure them from false entries, or to whose custody they were exclusively officially confided. So also the birth, marriage, or

burial register, of any dissenting chapel in England was rejected, until the act of 3 & 4 Vict. c. 92, provided for them to be received as evidence, when they have been deposited in the office of the Registrar-General and entered in his list, pursuant to that act.

I have thus shown what the rule of evidence is in respect to public or official writings, from adjudicated cases. The same rule prevails in the courts of all of the States of this Union, and has hitherto done so in the courts of the United States. In England we have just seen, that the statute of 3 & 4 Vict. confirms it; by the provision which it makes in respect to the registers of dissenting chapels. In Louisiana the rule is substantially the same as it is in the courts of the other States — the only difference being that it is better guarded and has been put, in its application to cases there, upon a broader or more precise comprehension of the philosophy of evidence. This paper, under the decisions of the courts of that State, would not have been permitted to be evidence in the cause. Each State may regulate for itself the admission of such writings in evidence. Until it shall be done, the general rule must be in all of them as it has been, and it is binding in the courts of the United States.

It matters not that this paper is termed an ecclesiastical record. Such a designation gives it no authority over any other official register. It has the same force and no more than any other paper of the same kind would have from any other church or sect of Christians in our country. It stands upon the same footing as such a paper would, coming from the bishop and rector of an Episcopal church, or from any other denomination of Christians. All of them under our constitutions — State and national — being separately, according to the faith of each, upon an equality and having the same legal protection from all tortious interference and disturbance. The rule for which I have been contending, induced me, in the consideration of this case, to reject the certificate of the marriage of Desgrange with Barbara D'Orci, introduced by the complainant. It is not sufficiently authenticated to make it evidence any more than the ecclesiastical paper is — but it is as much so. And I should not have mentioned it at all, had it not been that this court, in making its decision, has used her declarations in that paper to show that Barbara and Desgrange were not married, though both admit they were engaged to be married, and that she left her father's house with that intention.

But I have not yet done with this paper. Fatiguing as it is to me to state all of the legal objections to its admissibility in evidence, I yield my own convenience to the importance of the rule for which I am contending, in some hope that what I write may attract professional attention, and prevent the disregard of it again.

Before this paper with such certificates could be made evidence as an entry or file in the course of business or of office, it should have been shown that it was filed or entered contemporaneously with the act to which it relates. So strict is this rule to guard against impositions of papers as official registers, that it requires, either where the original or a copy is offered, that it shall appear to have been made or entered contemporaneously with the transaction. Where several days had passed before the file or entry was made the paper has always been rejected. I give the cases, comprehending, from the first to the last of them, a long time. Price *v.* Torrington, 1 Salk. 285; Vance *v.* Fairis, 2 Dall. 217; Curren *v.* Crawford, 4 Ser. & Rawle, 3, 5; Ingraham *v.* Bockins, 9 Ser. & Rawle, 285; Forsythe *v.* Norcross, 5 Watts, 432. And in Waller *v.* Bowman, 8 Watts, 544, the interval of a day between the transaction and the entry was held to be a sufficient objection.

Indeed, I do not know a rule of evidence which has been more uniformly adhered to than this has been. I regret that it should have been overlooked in this case, for I know it will be mischievously used, though I may not be able to anticipate the extent of mischief it may do. I take the rule to be this; that such registers must be promptly made, at least without such delay as to impair their credibility, and that they must be made by the person whose duty it is to make them, and in the mode required by law, if any has been prescribed. Doe *v.* Bray, 8 B. C. 813; Walter *v.* Wingfield, 18 Ves. 443. This ecclesiastical paper, now so much relied upon and so fatally used against the complainant, has no one of the requisites to make it evidence. It has a date, but how it got among the records of the church, or when, or by whom it was put there, no one knows. I remember a case where the record of a baptism made by a minister before he had any connection with the parish, with the private memorandum of the clerk who was present at the ceremony, was rejected. It was not contemporaneous with the occurrence; but the clerk's memorandum was not enough. How far short this ecclesiastical paper is from having such proof to sustain it! I will now proceed to apply the rules of evidence as they have been stated, because it will show that more formidable objections exist to the use of this ecclesiastical paper than merely legal insufficiency of its authenticity.

It purports to contain the action of public authorities having a criminal jurisdiction, before Louisiana was ceded to the United States. The presumption is that it and other documents like it had a regular official depository. The defendants invoke it as such. It should then have been placed upon the transfer of the public papers of Louisiana, with the authorities of the

United States who were appointed to receive them. That, it seems, was not done. This paper, then, was retained by the civil or ecclesiastical authorities of Spain as one not included in such as were to be delivered up to the United States, but as one which might be left in the cathedral at New Orleans, although it was a public document. The latter being the fact, it is not unreasonable to ask, before it shall be used as an authentic document, upon the certificates of those who had no political connection then, with the cathedral of New Orleans, for some proof that this paper had been regularly derived from the authorities by whom it had been provincially kept, and that it had been faithfully and honestly preserved.

The Catholic church in Spain, and the Spanish ecclesiastical authorities in New Orleans, had a political character, and did exercise an undefined jurisdiction in criminal matters of a certain description. And records may have been kept of its transactions.

But, since the cession of Louisiana to the United States, the Catholic society in New Orleans has not had any political connection with that institution. There has not been any regular association or hierarchy of Catholic Christians there, since the change of government. The cathedral church, formerly a part of that institution, became private upon the transfer of the Province to the United States, whatever may be its voluntary ecclesiastical subordination to the church of which it was once a political part. This separation suggests at once the inquiry, what portion of the records and papers of the original Spanish hierarchy, were transferred to the private and unrecognized body of American Catholics in New Orleans? Also what measures were taken by them in their new relation to our government to preserve them from mutilation or from additions? Have there been in the cathedral of New Orleans regular keepers of these papers from the beginning of the political change in the condition of that church? None of these inquiries can be judicially assumed. Courts cannot recognize any private association of persons or sect of Christians as legitimately the successors of the political authorities of Spain, for the custody of documents of a public nature. If these records had been handed over by the bishop to his successor, or were considered as any part of those public archives which were to be transferred to the United States, proofs of such connection should have been made before the paper in question could be received as evidence. There is no proof of any such connection, or that any thing of the kind was done. All that is proved about it is that the present bishop has the charge of such papers as are to be found in the cathedral, without any proof that they were regularly transmitted to

him by his predecessors or to any one of them who succeeded to the diocese after its separation from the authorities of Spain. Nothing, for the purpose of making this paper evidence, can be inferred from the fact that there is still in New Orleans a congregation of the same name and faith worshipping in the same building. The inquiries suggested cannot be taken upon trust. The pertinency of them must be obvious, when it is remembered that this paper has found its way into this case upon the oaths of the present incumbent of the cathedral, who is only thirty-two years of age and of a prelate of recent accession to that dignity; neither of whom have spoken or can speak of the integrity of the papers of which they say they have the care, or of the manner they have been kept by their predecessors, or how they were derived from the ecclesiastical authorities of Spain.

I speak with a proper sense of the sacred characters which they fill, but I cannot judicially recognize them to be the successors of the public authorities of Spain in Louisiana for the custody of papers forming a part of its provincial judicial documents.

If the paper in question had been handed over officially to the predecessors of the bishop, or had been allowed inadvertently to continue among the archives of the cathedral, the bishop should have been called upon to prove all that he knew about it, before this paper was made evidence in this case. And so of any other that may be in the archives of the cathedral, and which may be hereafter offered as evidence in any other case. For all that appears this paper may have found its way irregularly and fraudulently into the archives of the church. No one proves that it formed a part of them at any time preceding the commencement of this suit. It had been repeatedly sought for without success. When found by the defendants — or for them — it was under circumstances which show that the papers of the cathedral have not been kept with care or regularity, or with any knowledge of what they were. What they now are as a whole is not known. They have neither been collated nor catalogued. What they were when the ecclesiastical authorities of Spain ceased to have a political existence in Louisiana no one knows. The bishop speaks of them as being only a part of what once existed.

In this deficient condition of the archives of the cathedral, without knowing how it has happened, I cannot say that any paper has been abstracted or fraudulently added, to serve such a purpose as this paper has done. But I can say, from the proofs in this cause, that the archives of the cathedral have been too negligently kept, for any paper in them of provincial date, to be received as evidence, without the most cautious scrutiny into its authenticity. The rules for the admission of public papers as

evidence must be rigidly complied with in respect to them, or consequences may follow in Louisiana, which have not hitherto been anticipated. Comprehending, as they must do, notices of marriages, births, and deaths, they may be invoked to guide or disturb the descents of property or to fix and unfix a relationship between persons differently from that which has been generally recognized. My object in what I have hitherto said concerning this ecclesiastical paper, has been to show that it was not admissible in evidence either as an official register or a judicial proceeding.

I proceed now to show the misuse which has been made of it and its worthlessness as testimony.

It does not disprove Desgrange's admission that he was a married man when he married Zulime. It positively leaves him under a criminal prosecution for bigamy. The order given in it is not an acquittal. It suspends proceedings only for further investigation, and releases Desgrange from jail, because, up to that time, his guilt had not been proved. In other words, the evidence was thought sufficient to subject him to another trial, and not enough for a final judgment against or for him. Such is the paper. It cannot, then, be used for any other or larger purpose. The depositions which it contains cannot be made evidence in any case between other parties. The whole of the paper is an unfinished suit in which nothing was determined. It stands upon the same footing as other unconcluded prosecutions, where there has been a judgment of discontinuance, nonsuit, *nolle prosequi*, or the *ignoramus* of a bill by a grand jury. All of us know that the proofs taken in either of these cases cannot be used as evidence in another inquiry into the truth of facts at issue. They are excluded, as well by the practice in Louisiana, as they are by the other State courts, and by those of England. Indeed, the rule excluding such proofs includes the exclusion of such as are annexed to judgments in a criminal prosecution. Such a judgment cannot be given in evidence in a civil action to establish the truth of the facts on which it was rendered, any more than a judgment in a civil action could be given for the same purpose in a criminal prosecution. I cite the cases, Smith v. Rummens, 1 Camp. 9; Hathaway v. Barrow, 1 Camp. 151; 2 C. M. & R. 139; Jones v. White, 1 Str. 68, B. N. P. 233; Hillyard v. Grantham, cited by Lord Hardwicke in Brownsword v. Edwards, 2 Ves. Sen. 246; Gibson v. McCarthy, Cas. Temp. Hardw. 311; Wilkinson v. Gordon, 2 Add. 152; Jamieson v. Leitch, Miln. Eccle. Tr. Temp. Radcliffe, 690. These cases establish, without a doubt, that this ecclesiastical paper ought not to have been admitted as evidence to affect in any way the right of the complainant.

I will now notice another departure from the rules of evidence, in the use which has been made of one of the depositions in it, said to be Zulime's.

The rule is, that depositions taken in one cause may be used in another trial between the same parties, involving the same issues, if the witnesses are dead or absent. They have never been permitted, when the witness was alive and within the jurisdiction of the court. No case can be found in which it has been done before it was allowed in this, and this will never be cited as an authority for a different rule. The rule is the same everywhere. In no courts has it been more clearly affirmed than it has been in the courts of Louisiana. In Hennen *v.* Munro, 4 N. S. 449, it is said that a deposition of a witness taken in a former suit is admissible if he be dead or absent.

Here the fact in dispute was the bigamy of Desgrange. For that he was arraigned, and in fact tried. Among other depositions found in the proceedings, is one which it is said was made by Zulime. The object of the defendants was to use it, to show that she had admitted herself to be the wife of Desgrange, and had expressed her disbelief of his bigamy, after it is said she had married Clark. They were permitted to do so, though it was known to the court and to the parties, that Zulime was alive, and then within the jurisdiction of the court. Indeed, the defendants had joined in a commission to take her testimony. Why it was not executed does not satisfactorily appear. But that she was within the court's jurisdiction when this case was tried, and that it was known to the court and to the defendants, the record proves. The defendants then had no legal right to use a deposition which they ascribed to her, as having been made in a criminal proceeding more than forty years before. If her testimony was wanted for their defence, they ought to have made her a witness. They could have done so. There was nothing in her relation to the parties in this suit to prevent it. Had she been made a witness, and in her examination had made a different representation of facts from those attributed to her in the deposition, then would have occurred the question, whether the latter could be used to contradict and impeach her. The use of such depositions, is what is termed secondary evidence. In order to make them substitutes for the *viva voce* testimony of the deponents, it is essential that they be regularly taken under legal proceedings duly pending, on an occasion sanctioned by law; and unless the case be provided for by statute, or by a rule of court, it must further appear that the witness cannot be personally produced. I give the rule as it is, without meaning that the courts of the United States could make any such exception by a rule of court. But the rule, as I

have given it, is substantially admitted by the defendants, for they did not attempt to avail themselves of the deposition as evidence in their favor, until they had sought to make an apparent foundation for doing so, by an attempt to prove, by a comparison of handwriting, that the signature to the deposition was Zulime's. It will attract the notice of the profession with some surprise, that experts should have been called to prove, by comparison, Zulime's signature to this deposition, when the proof concerning it could have been made by herself, with an explanation of all the attending circumstances.

But I pass on, as hastily as I can, to another objection to the use of this deposition, and one more interesting than those which have been already stated.

It is, that by the law of Louisiana, as it then was and still is, Zulime could not be a witness in the criminal prosecution against Desgrange, supposing her to be his wife, as the defendants assert her to have been. A husband may not be a witness for his wife, or the wife for the husband, in a criminal proceeding. A wife may impeach marriage to obtain a sentence of nullity; she may be a witness to certain facts in relation to those impediments deemed by law sufficient to annul the marriage. But neither by the civil nor canon law, or by the common law, can she be a witness for or against her husband, when he is prosecuted for any offence which the law punishes in his person. Nor can she be a witness in a prosecution of him for bigamy with herself, until after the relation of husband and wife has been proved not to be legal, on account of direct and positive proof of the husband's first marriage; then she may be a witness to prove the second marriage. I read from 1 Greenl. sect. 339, p. 409, this sentence: " Upon a trial for bigamy, the first marriage being proved and not controverted, the woman with whom the second marriage was had, is a competent witness, for the second marriage is void. But if the proof of the first marriage were doubtful, and the fact is controverted, it is conceded she would not be admitted. It is said in Cowen's Phillips, vol. 1, p. 79, ed. of 1849: on an indictment for a second marriage, though the first wife cannot be a witness, yet the second wife may, after proof of the first marriage; after such proof she would be competent to give evidence for as well as against the prisoner. Such was the law of Louisiana when Desgrange was prosecuted for bigamy, and when Zulime was forced into it as a witness. I know of but three exceptions to the incompetency of a wife to testify against a husband in a criminal case; they give to her ample security against his abuse. She is a competent witness in an inquiry against her husband, upon a charge which affects her liberty or person. Such, for

instance, as a prosecution for a forcible marriage, though she may have cohabited with him.  2 Russ. 206; Wakefield's case, 4 How. S. T. 575; Hawkins, P. C., B. 1; C. 41, § 13: or she may be a witness for any gross injury committed on her person. Lord Audley's case, 1 S. T. 393; 3 How. S. T. 413: she may be a witness if he beats her, to protect herself from his future brutality.   Such being the law, the deposition ascribed to Zulime in the prosecution against Desgrange was illegally taken, and it cannot be used for any purpose relative, certainly not to affect the rights of third parties.   What was the state of the prosecution when she was summoned to give testimony? There had been no proof of Desgrange's former marriage. There was proof of his having married her.   She then stood, as far as that prosecution had been carried, as the wife of Desgrange.   The Vicar-General presiding in it, says, not being able to prove the report of Desgrange's bigamy, and having no more proofs for the present, let all proceedings be suspended.   Under such circumstances, the mother of the complainant, then twenty-two years of age, was called upon to give testimony against Desgrange.   He had imposed upon her it is true.   She had parted herself from him on account of it.   But is it remarkable, being the father of two of her children then alive, that she should refuse, when forced to testify, to convict him of an offence, the punishment of which was stripes and the galleys?   I represent the paper precisely as it is.   The deposition of Zulime was illegally taken there; it is so here, and this court, in making up its opinion in this case, should not have considered it as admissible in evidence.

But in another view this deposition is good for nothing.   It places Zulime in an inconsistent position with herself, and it is opposed by all the other proofs in this cause.   Its utmost weight, in respect to her, is to diminish the force of her declaration, in respect to the filiation and legitimacy of her child, and that very remotely.   Her acts and conduct are at variance with the deposition; the last was taken when she had been for some time separated from Desgrange, avowedly for his bigamy in marrying her.   She had not lived with him for more than a year, and did not at any time afterwards live with him.   When the prosecution of Desgrange began she was living with her family. When Desgrange was released from prison no steps were taken by either for a reunion.   He left New Orleans immediately upon his release from jail, and did not return to it until after the Vicar-General's power to resume the prosecution against him had ceased, by the transfer of Louisiana to the United States.   He is charged in the prosecution with an intention to leave New Orleans to avoid it.   He did so instantly upon his release from

prison. He returned in three years; then the relations of man and wife between them were not resumed, nor sought to be by either. On the contrary, as soon as it could be done, she prosecutes him in her maiden name, to be released from his name, and for a divorce. A judgment was given in her favor. The deposition ascribed to her neither proves nor disproves his bigamy. It means, and cannot be made to mean any thing else, than that Desgrange and herself had been married, that she had left him on account of reports of his bigamy, that she had not then been able to get proofs of it; that it then gave her no uneasiness and that she had not heard, and did not believe, that he had three wives. In the condition in which she stood in that tribunal, shall what she there was induced to say to save Desgrange from disgraceful punishment, be relied upon to overturn and outweigh all the other evidence in the cause, of her marriage with Clark; his and her repeated confessions of it to witnesses, and his recognition of their offspring as his legitimate child? It is remarkable, too, that this deposition, as well as others in this ecclesiastical record, confirms all the facts related by Madame Despau. Her voyage from New Orleans to the north — the object of it — the time when it was made; the arrest and imprisonment of Desgrange for bigamy, his flight from New Orleans, though not in the way stated by her; the subsequent cohabitation of Clark and Zulime; that Clark and Zulime were in Philadelphia for several months in the fall of 1801, and spring of 1802, under circumstances involving familiar relations and intercourse; that they thought there was a sufficient cause for them to keep the marriage secret, Clark having been told by counsel that a sentence of the nullity of Zulime's marriage with Desgrange must be obtained, before her marriage with him could be safely proclaimed. Both parties have repeatedly declared that they were secretly married. Clark, from the birth of the complainant until he died, in all of his conduct to her, acted consistently with such a declaration. He frequently declared her to be his lawful child. No one doubts that he made a will, in which he proclaimed her to be so, making her his universal legatee, whatever may have become of that will after his death. Against all of this evidence, there is nothing but the deposition in the ecclesiastical record, which has been forced in evidence in this cause, contrary to law.

I will now briefly notice two other papers which the defendants were permitted to use as evidence in this cause in violation of every rule for its admission. One of them is the record of a suit for alimony, which, it is said, was brought by the mother of the complainant, against Desgrange, in 1805. The other is a proceeding by Mr. Davis, the guardian of the complainant,

against the executors of Clark, for maintenance during her infancy, in which she is termed the natural child of Clark.

The petition in the first is in the usual formula to get such a case before the court, but the facts averred in it are not sworn to. It is signed by counsel in behalf of the petitioner, but without more to show that she had directed it, or that she was in any way informed of its contents. It is dated about the time of the complainant's birth. The object of the defendants in introducing this paper is to show that the mother of the complainant admitted herself in the petition to be the wife of Des grange, three years after her alleged marriage with Clark. This cannot be done. Such a paper would not be admissible in a suit against Zulime herself. It cannot, then, be so in any other suit between other parties. The petition, in such a case, is not admissible in another suit against the petitioner, because, not being sworn to, its language is regarded as merely the suggestion of counsel, made for the purpose of bringing in a defendant to answer. An answer in chancery, put in under oath, is receivable against the party who swears to it; but that the narrative part of a bill in equity, or a declaration at common law can be used in another suit against the plaintiff in the first, has never been decided. The reverse has repeatedly been. It would certainly not do in the artificial and technical modes, in which rights are prosecuted in courts of justice to make us answerable for the manner in which they are described or averred by counsel. If, then, the mother of Zulime would not be bound in another suit by what is stated in the petition of the paper in question, it must be admitted that the paper was erroneously used as evidence, to effect the rights of her child in this suit.

It is only necessary to say concerning the statement in the proceeding brought by Davis, that he denies upon oath that he authorized his counsel to say, that the complainant was the natural child of Clark.

I have now noticed every paper, which has been brought into this suit as evidence. My views of each of them are sustained by cited authorities. They show that the ecclesiastical record, and every paper in connection with it, and the records for alimony, have been forced into this case as evidence for the defendants contrary to law.

Besides these papers, the defendants have no other evidence, to gainsay the proofs which the complainant has given of her father's marriage with her mother, her right to marry him when she did so, on account of the bigamy of Desgrange. There is nothing in the record, making it doubtful that her father and mother repeatedly acknowledged that she was their legitimate child. One witness, and one only, was called by the defendants

to prove that on one occasion, Clark spoke of her to him as a natural child. That was De la Croix. He says that Clark spoke of her as such to him. His testimony cannot be allowed to outweigh Clark's declarations, to Bellechasse, Boisfontaine, and Mrs. Harper, that she was the lawful child of his marriage with her mother, especially when this was said to those witnesses, contemporarily with what De la Croix says, Clark said to him, and to all of them for the same purpose. De la Croix says Clark told him so, when he asked him to become her tutor, and to be, one of his executors to that will in which she was called his legitimate child and universal legatee. The other witnesses speak of the same time in connection with that will. De la Croix says, he saw that will in its envelop; Mrs. Harper saw and read it. She swears that Clark spoke of her in it as his legitimate child and universal legatee. Clark spoke again of that will to his friends at his bedside in the last hour of his life. Their testimony is on the record. It is full, positive, direct, and particular, without any difference between them. The credit and character of those witnesses are unimpeached. The defendants attempted to assail them, but these witnesses examined for that purpose, one and all of them, declare that Bellechasse and Boisfontaine were persons of truth, honor, and standing. No one has attempted to assail the veracity of Mrs. Harper. De la Croix's statement must have been a misunderstanding of Clark's language. If not so, still it must yield to the testimony of three witnesses, to each of whom Clark said at different times in connection with his will, that Myra was his legitimate child, and to two of whom he admitted his marriage with her mother.

There was but one way to get rid of the force of the complainant's evidence in support of her legitimacy. It was to assail the integrity of her witnesses. The way in which that was attempted, I have shown in respect to Mesdames Despau and Caillavet. It has succeeded with the majority of the judges who have tried this cause with me. But I feel authorized to say, that in all of my experience in the profession, I have never heard of witnesses so assailed before and upon such illegal testimony; not insufficient, but inadmissibly introduced into this cause for that purpose. My brother Daniel thinks as I do, and will express himself accordingly. Besides, these witnesses have been said to be unworthy of credit, when in the most important particulars of their testimony, concerning Clark's marriage with the mother of the complainant, and of her legitimacy, they are confirmed by other disinterested witnesses to whom Clark admitted both; not once, but several times on different occasions. These persons are strangers to the parties in this suit,

49*

in all of those relations of life which might be supposed to incline them to favor either. They have not any connection with each other, except in those social relations which made them companions and the intimate friends of Clark. They have lived apart at remote distances for many years since the death of Clark, knowing nothing of his child, except as she was seen by them in her infancy, receiving publicly the caresses of her father and hearing from him his acknowledgments that she was his legitimate child. Boisfontaine tells us, that Clark frequently told him, after Zulime's marriage with Gardette, that he would have made his marriage with her public, if that barrier had not been made, and frequently lamented to him that it had been made, but that she was blameless. But this witness shall speak for himself. His testimony is taken from the record without the change of a word.

" *Court of Probate.*

WILLIAM WALLACE WHITNEY,
    and MYRA, his wife,
        *v.*
E. O'BEARNE, and others.

Interrogatories to be propounded to witnesses on behalf of the complainants in this cause:

1st. Were you acquainted with the late Daniel Clark, deceased, of New Orleans; if so, were you at any time on terms of intimacy with him?

2d. Did the said Daniel Clark leave, at his death, any child acknowledged by him as his own? If so, state the name of such child; whether said child is still living; and, if living, what name it now bears; as also state when and where and at what times said acknowledgment of said child was made.

3d. Have you any knowledge of a will said to have been executed by said Clark, shortly before his decease; did you ever read or see the said will, or did Daniel Clark ever tell you that he was making said will, or had made said will? If so, at what time and place; and if more than once; state how often and when and where.

4th. If you answer the last question affirmatively, state whether the said Daniel Clark ever declared to you, or to any one in your presence, the contents of the said will; and if so, state the whole of said declarations; and the time, place, and manner, in which they were made, before whom, and all the circumstances which occurred, when such declaration was made.

5th. State how long before his death you saw the said Daniel

Clark for the last time ; how long before his death he spoke of his last will, and what he said in relation to his aforesaid child:

6th. State whether you ever heard any one say he had read the said will; if so, state whom, what was said, and whether the said person is now living or not.

(Signed.)         Wm. W. Worthington,
*For Plaintiff.*

### Cross-Examined.

1st. Each witness examined and answering any one of the foregoing interrogatories, is desired to state his name, age, residence, and employment; and whether he is in any manner connected with or related to any of the parties to the suit, or has any interest in the event of the same.

2d. How long did you know Daniel Clark, and under what circumstances ? And if you presume to state that Daniel Clark left any child at his decease, state who was the mother of said child, and who was the husband of that mother. State all the circumstances fully and in detail, and whether said Clark was ever married; and if so, to whom, when and where.

3d. If said Clark ever acknowledged to you that he supposed himself to be the father of a child, state when and where he made such an acknowledgment, and all the circumstances of the recognition of such a child or children, and whether the act was public or private.

4th. Did said Clark consider you as an intimate friend, to whom he might confide communications so confidential as those relating to his will? If aye, state what you know of your own personal knowledge of the contents of said will, and be careful to distinguish between what you state of your own knowledge, and what from hearsay.

The defendants propound the foregoing interrogatories with a full reservation of all legal exceptions to the interrogatories in chief, the same not being pertinent to the issue, and the last of said interrogatories being calculated merely to draw from the witnesses hearsay declarations.

(Signed.)         L. C. Duncan,
*For Defendants.*

In pursuance of the annexed commission, directed to me, the undersigned, justice of the peace, personally appeared Pierre Baron Boisfontaine, who, being duly sworn to declare the truth, on the questions put to him in this cause, in answer to the foregoing interrogatories, says :

1st. In reply to the first interrogatory, he answers :

I was acquainted with the late Daniel Clark, of New Orleans, and was many years intimate with him.

2d. In reply to the second interrogatory, he answers:

Mr. Clark left at his death a daughter, named Myra, whom he acknowledged as his own, before and after her birth, and as long as he lived. In my presence he spoke of the necessary preparation for her birth; in my presence asked my brother's wife to be present at her birth; and in my presence proposed to my sister and brother-in-law, Mr. S. B. Davis, that they should take care of her after her birth. After her birth he acknowledged her to me as his own, constantly, and at various places. He was very fond of her, and seemed to take pleasure in talking to me about her. When he communicated to me that he was making his last will, he told me he should acknowledge her in it as his legitimate daughter. The day before he died, he spoke to me about her with great affection, and as being left his estate in his last will. The day he died he spoke of her with the interest of a dying parent, as heir of his estate in his last will. She is still living, and is now the wife of William Wallace Whitney.

3d. In reply to the third interrogatory, he answers:

About fifteen days before Mr. Clark's death, I was present at his house, when he handed to Chevalier De la Croix a sealed packet, and told him that his last will was finished; and was in that sealed packet. About ten days before this, he had told me that it was done. Previous to this, commencing about four months before his death, he had often told me he was making his last will. He said this in conversations to me on the plantation, and at his house; and I heard him mention this subject at Judge Pitot's. I frequently dined at Judge Pitot's, with Mr. Clark, on Sundays. The day before he died, he told me that his last will was below in his office-room, in his little black case. The day he died, he mentioned his last will to me.

4th. In reply to the fourth interrogatory, he answers:

I was present at Mr. Clark's house, about fifteen days before his death, when he took from a small black case, a sealed packet, handed it to Chevalier De la Croix, and said, my last will is finished; it is in this sealed packet with valuable papers; as you consented, I have made you in it, tutor to my daughter. If any misfortune happens to me, will you do for her all you promised me; will you take her at once from Mr. Davis? I have given her all my estate in my will, an annuity to my mother, and some legacies to friends; you, Pitot and Bellechasse, are the executors. About ten days before this, Mr. Clark, talking of Myra, said that his will was done. Previous to this, he often told me, commencing about four months before his death, that he was making his last will. In these conversations, he told me that in his will he should acknowledge his daughter Myra

as his legitimate daughter, and give her all his property. He told me that Chevalier De la Croix had consented to be her tutor in his will, and had promised, if he died before doing it, to go at once to the North, and take her from Mr. Davis; that she was to be educated in Europe. He told me that Chevalier De la Croix, Judge Pitot, and Colonel Bellechasse, were to be executors in his will. Two or three days before his death, I came to see Mr. Clark on plantation business; he told me he felt quite ill. I asked him if I should remain with him ; he answered that he wished me to. I went to the plantation to set things in order, that I might stay with Mr. Clark, and returned the same day, to Mr. Clark, and stayed with him constantly, till he died. The day before he died, Mr. Clark, speaking of his daughter Myra, told me that his last will was in his office-room below, in the little black case; that he could die contented, as he had insured his estate to her in the will. He mentioned his pleasure that he had made his mother comfortable by an annuity in it, and remembered some friends by legacies. He told me how well satisfied he was that Chevalier De la Croix, Judge Pitot, and Bellechasse, were executors in it, and Chevalier De la Croix Myra's tutor. About two hours before his death, Mr. Clark showed strong feelings for said Myra, and told me that he wished his will to be taken to Chevalier De la Croix, as he was her tutor as well as one of the executors in it; and just afterwards Mr. Clark told Lubin, his confidential servant, to be sure, as soon as he died, to carry his little black case to Chevalier De la Croix. After this, and in a very short time before Mr. Clark died, I saw Mr. Relf take a bundle of keys from Mr. Clark's armoire, one of which, I believe, opened the little black case ; I had seen Mr. Clark open it very often. After taking these keys from the armoire, Mr. Relf went below. When I went below I did not see Mr. Relf, and the office-room door was shut. Lubin told me that when Mr. Relf went down with the keys from the armoire, he followed, saw him then, on getting down, go into the office-room, and that Mr. Relf, on going into the office-room, locked the office-room door. Almost Mr. Clark's last words were that his last will must be taken care of on said Myra's account.

5th. In reply to the fifth interrogatory, he answers :

I was with Mr. Clark when he died; I was by him constantly for the last two days of his life. About two hours before he died, he spoke of his last will and his daughter Myra in connection and almost his last words were about her, and that this will must be taken care of on her account.

6th. In reply to the sixth interrogatory he answers :

When, after Mr. Clark's death, the disappearance of his last

will was the subject of conversation, I related what Mr. Clark told me about his last will in his last sickness. Judge Pitot and John Lynd told me that they read it not many days before Mr. Clark's last sickness; that its contents corresponded with what Mr. Clark had told me about it; that when they read, it was finished; was dated and signed by Mr. Clark; was an holographic will; was in Mr. Clark's handwriting; that in it he acknowledged the said Myra as his legitimate daughter, and bequeathed all his estate to her; gave an annuity to his mother, and legacies to some friends; the Chevalier Delacroix was tutor of said Myra, his daughter; Chevalier Delacroix, Colonel Bellechasse, Judge Pitot, were executors. Judge Pitot and John Lynd are dead. The wife of William Harper told me she read it. Colonel Bellechasse told me that Mr. Clark showed it to him not many days before his last sickness; that it was then finished. Colonel Bellechasse and the lady, who was Madame Harper, are living.

In reply to the first cross-interrogatory, he answers:

My name is Pierre Baron Boisfontaine; my age about fifty-eight; I have been some time in Madisonville; the place of my family abode is near New Orleans, opposite side of the river; I was eight years in the British army; I was several years agent for M. Clark's plantations; since his death have been engaged in various objects; I now possess a house and lots, and derive my revenue from my slaves, cows, &c. I am in no manner connected with, or related to, any of the parties of this suit; I have no interest in this suit.

In reply to the second cross-interrogatory, he answers:

I knew Daniel Clark between nine and ten years; I knew him as the father of Myra Clark; she was born in my house, and was put by Mr. Clark, when a few days old, with my sister and brother-in-law, Samuel B. Davis. I was Mr. Clark's agent for his various plantations — first the Sligo and the Desert, then the Houmas, the Havana Point, and when he died of the one he purchased of Stephen Henderson. He respected our misfortunes, knowing that our family was rich and of the highest standing in St. Domingo before the revolution. The mother of Myra Clark was a lady of the Carrière family. Not being present at any marriage, I can only declare it as my belief, Mr. Clark was her husband. To answer this question in detail as is demanded, it is necessary that I state what was communicated to me. It was represented to me that this lady married Mr. Désgrange in good faith; but it was found out some time afterwards that he already had a living wife, when lady Née Carrière, separated from him. Mr. Clark, some time after this, married her at the North. When the time arrived for it to be made public, interested

persons had produced a false state of things between them; and this lady being in Philadelphia, and Mr. Clàrk not there, was persuaded by a lawyer employed, that her marriage with Mr. Clark was invalid; which believing, she married Monsieur Gardette. Some time afterwards, Mr. Clark lamented to me that this barrier to making his marriage public, had been created. He spoke to me of his daughter Myra Clark, from the first, as legitimate; and when he made known to me that he was making his last will, he said to me that he should declare her in it as his legitimate daughter. From the above I believe there was a marriage.

In reply to the third cross-interrogatory, he answers:

Mr. Clark made no question on this subject before and after her birth, and as long as he lived he exercised the authority of a parent over her destiny. He was a very fond parent; he sustained the house of Mr. Davis and Mr. Harper, because my sister had her in care, and Mrs. Harper suckled her. He sustained Harper as long as he lived, and conferred great benefits on my brother-in-law. He spoke of her mother with great respect, and frequently told me after her marriage with Mr. Gardette, that he would have made his marriage with her public if that barrier had not been made, and frequently lamented to me that this barrier had been made, but that she was blameless. He said he never would give Myra a step-mother. When, in 1813, he communicated to me that he was making his last will for her, he showed great sensibility as to her being declared legitimate in it. While I was with him at his death-sickness, and even at the moment he expired, he was in perfect possession of his senses; and no parent could have manifested greater affection than he did for her in that period. Nearly his last words were about her, and that his will must be taken care of on her account. She, the said Myra, is the only child Mr. Clark ever acknowledged to me to be his. She was born in July, 1805.

In reply to the fourth cross-interrogatory, he answers:

I was a friend of that confidential character, from the time of said Myra's birth. Mr. Clark treated me as a confidential friend in matters relating to her and his affairs generally.

In reply to the fourth cross-interrogatory:

I have stated what I knew concerning Mr. Clark's last will. My recollection of these facts is distinct. The circumstances connected with them were of such a character that my recollection of them could not easily be impaired.

(Signed)                                      P. BARON BOISFONTAINE.

Which answers being reduced to writing were sworn to and signed by the said witness in my presence; in testimony whereof

I have hereunto affixed my hand and private seal, at the parish of St. Tammany, in the State of Louisiana, this twenty-seventh day of May, eighteen hundred and thirty-five.

(Signed)                                        DAVID B. MORGAN,
                                        *Justice of the Peace.* [L. S.]

A true copy of the commission for interrogatories, (and answers thereto,) propounded to Pierre Baron Boisfontaine, on file in court of probates, in and for the parish and city of New Orleans.

                                        W. F. C. DUPLESSIS,
New Orleans, 20th April, 1840.        *Register of Wills."*

Bellechasse's testimony confirms that of Boisfontaine, as to Clark's frequent acknowledgments that Myra was his legitimate daughter. Mrs. Smyth, formerly Mrs. Harper, who nursed her, does the same. Each of them also speak with positiveness concerning the will of 1813. With three such witnesses to sustain them, I believe that Mesdames Despau and Caillavet have spoken the truth concerning Clark's marriage with Zulime. If they did not, the testimony of Bellechasse, Boisfontaine, and Mrs. Smyth, is the most remarkable coincidence of truth with falsehood that has ever happened, and it can only be resisted by imputing to all of them, a combination to perjure themselves for the same purpose. That no one has said or can believe. Bellechasse and Boisfontaine were brought into this case as witnesses, with characters of their own to command belief and respect. Neither of them can be doubted, for the defendant's witnesses who were brought to assail them, could only answer that both had always been honorable men. Mrs. Smyth's veracity has not been questioned in any way. I cannot then but believe, that the paternity and legitimacy of Myra Clark Gaines has been fully established, as the law requires it to be done. There is nothing in the case opposed to it, but those doubts and suspicions which will sometimes bear down truth, in its relation to the extraordinary realities of life. The history of Mrs. Gaines is one of them. It has been made more so by the result of her case in this court.

I will now notice two other points which were urged in the argument of this case.

It was said, the complainant could not recover, even if it had been proved or was admitted that her father and mother were married, because there had not been, before that marriage took place, a sentence of the nullity of the marriage with Desgrange.

The other was, supposing Zulime to have been then free to marry and that she did marry Clark, it was a clandestine

marriage, which has no civil effects according to the law of Louisiana, to give to the issue a right of inheritance.

An inaccurate translation of the 4th Law, of the 20th Tit., of the 8th Book, of the Nueva Recopilacion, was cited in support of the first. It shall be given at length, followed by the original, and with what I believe to be a correct translation. Without doing so, the inapplication of the law to this case, would not be seen.

The 8th Book, Tit. 20, Law 4, Nueva Recopilacion, as translated, and cited reads thus: " Should a woman, *either married*, or even only publicly *betrothed*, before Our Holy Mother the Church, commit adultery, although she should ALLEGE AND SHOW that her marriage is NULL AND VOID, either on account of near relationship by consanguinity, or affinity within the 4th degree, OR BECAUSE ONE OF THE SPOUSES WAS PREVIOUSLY BOUND BY ANOTHER MARRIAGE, or had made a vow of chastity, or was about entering a religious community, or had some other reason — YET FOR ALL THIS she is not to be allowed to do what is forbidden; and she cannot prevent her husband from bringing a suit for *adultery*, both against HER and the ADULTERER, as if THE MARRIAGE WAS NOT A TRUE ONE. We decree against such persons — WHOM WE CONSIDER AS HAVING COMMITTED ADULTERY, (*que habemos por adulteros*,) the law of the fuero be strictly followed, which treats about *adulterers*, and is the first law of this title." See Nueva Rec., Book 8, Tit. 20, Law 4.

The original is as follows:

Ley IIII. Que la desposada que comete adulterio, no se escusa por dezir que el matrimonio fue ninguno y no valio.

Si alguno muger estando con alguno casada, o desposada por palabras de presente en haz de la sancto madre Iglesia cometiere adulterio, que aungue se diga y prueue
[Don Fernando, y doña Juana en las dichas ley es de toto. Cap. 31.] por algunas causas y razones q' el dicho matrimonio fue ninguno, hora por ser parientes en côsanguinidad, o afinidad, dentro del quarto grado, hora porque qualquiera dellos sea obligado antes a otro matrimonio, o aya facho voto de estidad o de entrar en religion, o por otra cosa alguna, pues ya por ellos no q' do de fazer lo q' no deuia, q' por esto no se escusen a que el marido pueda acusar de adulterio, asi ala muger como al adultero, como si el matrimonio fuesse verdadero. Y mandamos, q' euestas tales q' assi auemos por adu teros, y en sus bienes, se execute lo contenido en la ley del fuero de las leyes, que fabla de los que cometen delicto de adulterior, que es la orimera deste titulo.

[Correct Translation.]

Law IV. *That the married woman who commits adultery cannot excuse herself by saying that the matrimony was null and void.*

If any woman being married to a man, or engaged by word *de præsenti*, in the face of the holy mother church, shall commit adultery, and shall say and prove by certain causes and reasons, that the said matrimony was null, either because the contracting parties were related by consanguinity or affinity within the fourth degree, or *because either of them may have before contracted the obligation to marry another person*, or may have made vow of chastity, or to enter into any religious order, or for some other reason, on which account they were not willing to do what they ought not to do, nevertheless these reasons are not such as to prevent the husband from *accusing as well the wife* as the adulterous man, the same as if the marriage had been valid. And we order that, with regard to these persons, whom we hold to be adulterers, and likewise with regard to their goods, there shall be executed what is prescribed in the law *fuero de las leyes;* which relates to those who commit the crime of adultery.

*Recopilacion de las leyes; Libro VIII., Titulo XX., de las adulterios, incestos y esturpros.*

I write diffidently upon such subjects, but not without due care. The result of my examination is, that the law just given has no bearing upon this case.

It has not so, in the first place, because the penalties to be imposed by it can only be applied to one who has been charged and convicted of adultery, upon an authorized accusation. By that is meant, such as the laws of Spain permit to be made against an adulterer or adulteress, only by certain persons, and within fixed times. The Spanish law for such a purpose is as fixed as is the punishment of the offence. It does not permit the charge to be made by any or every one. Certain persons are named who may make it, and another can only do so when the scandal has become notoriously offensive to public purity and morals.

I shall cite from the Institutes of Asa Y. Maniel, illustrated by Palaccos, having the original work and Johnson's translation before me. And I do so because I find the translation introduced into White's Recopilacion is frequently cited in Louisiana, and is so by one of the learned judges who sat in this case in the Circuit Court.

" While the marriage is not dissolved by the sentence of the church, the father, the adulteress, her brother, paternal and maternal uncles were legitimate accusers of the adulterer, and for sixty days after a dissolution, either of them may accuse.

Whilst the marriage continued, if the adultery is publicly scandalous, any one belonging to the town may accuse, and for four months afterward.

If the husband dies, the accusation may be made in six months after, computing from the day when the crime was committed.

So, whilst the married persons were united, five months were allowed for an accusation, unless force was used, and then the ravisher might be charged at any time within thirty years.

An accusation made after the times stated might be avoided by the accused by such an exception. It was another available exception if the wife could prove she had committed the offence with the consent of her husband: so if knowing the adultery he continues to cohabit with his wife. Nor could he accuse after having said before the judge that he did not wish to accuse his wife. After accusation and an acquittal for want of proofs, the prosecution could not be renewed. A husband of bad habits and dissolute character could not accuse." I do not notice the note by Palacios to the text, from which the citation has just been made, because it does not particularly bear upon the point in question. *Palacios mo recula ilus lix da; Tomo Segundo;* Sep. Ed., 150.

I have, however, been more particular in citing the law for such accusations, that it may be seen, as the mother of the complainant was never accused of adultery according to law, that she cannot be charged now with being an adulteress, to bring upon herself or her child any of the consequences which might have resulted to both, if she had been convicted under the 4th Law, in Title 20, of the 8th Book, of *Nueva Recopilacion.* But had she been so, the law *fuero de las leyes*, by which she would have been punished, does not declare a child that she may have had, illegitimate. That can only be done in another proceeding, in which it shall be proved that such child was the conception of an adulterous connection.

Further, a brief analysis of the law will show that it has no relation to the purpose for which it was cited.

It provides for five specific causes of canonical impediments for which a marriage may be invalidated or pronounced null, with a general provision for others of a like kind, without mentioning any civil disability for which a marriage is null and void, and declares that a married woman, for such causes of canonical impediment, even though her marriage on account of them was not valid, should not prevent the husband of that invalid marriage from accusing her of ad.ltery, and the person also with whom she may have offended. And pronounces them adulterers "upon whom shall be executed what is prescribed in the

law *fuero de las leyes*, which relates to those who commit the crime of adultery."

I mention the impediments in the order that they are in the case. Consanguinity or affinity within the 4th degree, a contract to marry another person, a vow of chastity, or one to enter into any religious order.

The error of the first translation is a misapprehension of the original in respect to the contract to marry another person. The words in the original are, "*Hora porque qualquiera dellos sea obligado antes a otro matrimonio.*" They are rendered, "or because one of the spouses was previously bound by another marriage." They should have been, "or because either of them may have before contracted the obligation to marry another person."

The difference between the two is, that the mistranslation substitutes for a contract or obligation to marry, which does not excuse the woman from the charge of adultery, though it may make her marriage invalid, an actual marriage disregarded by her from her marriage with another, which is bigamy, and which being imputed to the complainant's mother, is said to make her illegitimate, because, when she married Clark, there had not been a sentence of the nullity of the marriage with Desgrange.

The law of which we are speaking is one which declares that certain criminal impediments to marriage, mentioning only some of them, shall not excuse a woman from being an adulteress, when she has been either "married or betrothed before the holy mother, the church." But bigamy is not an impediment in the sense in which that word is used canonically in respect to marriage. It is a civil objection, because one already married, and that marriage not being dissolved by death or the operation of law, neither of the parties to it can contract marriage with another without being guilty of the offence of bigamy, which is punished by the Spanish law as an offence, differently from what adultery is, and with the severest penalties. Had it been intended that a marriage with a bigamist should make a woman an adulteress, if, upon finding out the imposition upon her, she shall abandon the impostor and marry another, it would have been so declared. But that is not done, and therefore the 4th law of the 20th title of the 8th book of the *Nueva Recopilacion* cannot be applied in this case.

But there was in the argument a further misapprehension of the ecclesiastical law of Spain in respect to the cases of marriage for which sentence of nullity were necessary, before the marriage was considered as legally dissolved or only partially so for separation *a mensâ et thoro.* Such sentences were so, only in cases of canonical impediments. whether they were such as

made the marriage void or voidable. But in the case of an objection to the validity of a marriage on account of a civil disability, and not a canonical impediment, no declaratory sentence of nullity is absolutely necessary. The most familiar instances of the last found in the books, is, when, at the time of a second marriage, one of the parties had been previously legally married, and that marriage not dissolved by death or the operation of law. Such was the marriage of the complainant's mother with Desgrange.

In such cases, the marriage being void from its beginning, on account of the bigamy, it is not necessary that there should be a declaratory sentence of nullity to reinstate the party imposed upon in all the rights of a single person, or unmarried condition. Where there is bigamy there is never a complete marriage, it being only an abuse of the forms of marriage in violation of the ecclesiastical and civil law, which declares "that marriage is null where either of the parties stand already married to another person, for as one cannot be married to two persons at once, the marriage to the first being valid, the other must be void."

It is true, in such cases, the ecclesiastical court may be resorted to by the party imposed upon, to get a declaration from it that the marriage is void, but not on account of its being a matrimonial cause exclusively of ecclesiastical cognizance, because, as Palacios says, that the causes or trials of those who contract a second marriage during the life of the first wife are by a royal circular of the 5th February, 1770, L. 10, tit. 28, lib. 12, Neu. Recop., declared exclusively of royal or lay and military jurisdictions, according to the persons who may offend; but that by the royal decree of the 10th December, 1781, (which, however, does not appear in the Neu. Rec.) the ecclesiastical jurisdiction may also take cognizance of the mode, and for the reason expressed by the same decree. White, Rec. 1, 46, note 28. But it is optional to the party to make such an application to the ecclesiastial court, and if it be done, the question of the validity of the marriage will be raised, and whatever sentence the court may give will be binding. But if convinced of the bigamy, the victim of it may voluntarily withdraw from cohabitation with the bigamist. For doing so, no penalty, ecclesiastical or otherwise, is incurred, nor any for marrying again without a sentence of the nullity of such vicious marriage.

It has, however, been suggested if in a marriage void for bigamy, a party shall be allowed to withdraw from it, without a sentence of nullity being obtained, that the obligation of marriage will be impaired. The answer is, that experience shows the contrary, as the suit which is allowed in such cases for the restitution of conjugal rights, at the instance of the party who has

been left, is sufficient to prevent such abuse, and to preserve the integrity of marriage. In such a suit, the husband or wife, as the case may be, alleges that the party proceeded against, has withdrawn from cohabitation, and asks that the defendant may be compelled to return to it. The process to compel an answer is vindicatory if the defendant is contumacious. When, however, the party answers, the marriage can be denied; or if there had been a valid marriage, other causes being sufficient to justify a separation *a mensâ et thoro*, can be pleaded in bar of the suit. If, in such a suit, the validity of the marriage is affirmed, the defendant is compelled to return to cohabitation. Again, the law for punishing bigamy prevents parties from marrying in such cases, unless the proof that it was committed against them is certain and conclusive.

In conclusion upon this point, the law declares that bigamy makes a marriage void as if it never had been, replaces the parties as they personally were before such a connection, and though it may be expedient to have a sentence of its nullity declared for the purpose of restoring rights of property, it is not necessary to enable the party imposed upon to marry again. Every thing concerning property or marital rights, when such a sentence has been given, returns *hinc inde* to its former condition. But the sentence in such cases is not a divorce or dissolution of the marriage, for that cannot be dissolved which was never contracted, but it is a declaration that it was null and void from the beginning, and that the party is free from any bond of marriage, and had and hath the liberty and freedom of marrying with another person. Not that as a consequence of the sentence the party has a right to marry another person, but had a right before the sentence of nullity was announced, on account of the marriage having been void from the beginning. Duchess of Cleveland's case against Fielding, in the Arches Court of Canterbury.

Such is the fixed form in ecclesiastical proceedings for a sentence of the nullity of a marriage on account of bigamy.

It now only remains for me to notice the other objection against the right of the complainant to recover. It is that as the marriage of Clark with her mother was clandestine, that it illegitimates her for the purposes of inheritance. I shall not speak of the general or particular consequences of clandestine marriages under the Spanish law, as the facts of the case do not seem to me to make it pertinent. All that may have been said upon this point as to the effect of such a marriage in Louisiana, upon the parties and upon children can have no influence upon the children of marriages validly contracted in another political sovereignty.

The objection assumes that the marriage of Clark and Zulime

in Philadelphia in some way or other, but not definitely stated, was subject on account of the domicil of the parties in Louisiana, to its laws prohibiting clandestine marriages. In other words, that a secret marriage lawfully contracted by persons *in transitu* in a sovereignty in which such a marriage is not prohibited, will not give legitimacy to the offspring within the jurisdiction of the domicil of the parents, if it be kept secret there.

The right of persons to marry in every country where they may happen to be, is not denied, if there be no impediment there or in the condition of the parties in respect to the law of their domicil to prevent them from contracting marriage. Before, then, the validity of the marriage of the complainant's father with her mother in Philadelphia, can be denied, it must be shown that they could not contract it on account of a legal disability either there or in Louisiana. The first is not pretended. The only objection to it is that she was previously married to Desgrange. That cannot prevail, for I think it has been shown that Zulime's marriage was void on account of his bigamy in marrying her, and that she had the right, without any sentence of its nullity, to marry another, either in Louisiana or elsewhere. It is certain that in such a case of bigamy, she could marry again in Pennsylvania. Their offspring there would be legitimate. It cannot be made otherwise, because their child happened to be born in Louisiana. Legitimacy is the lawful consequence of lawful marriage and it cannot be taken away by any subsequent misconduct of parents in respect to the marriage itself. Heirship, or the right of legitimate children to inherit from deceased parents, depends upon the law of the place where the property may be. Parents cannot change it except as they may do so according to law. This being so, their misconduct cannot affect the right of a child to inherit or its legitimacy for such a purpose, though it may, in many particulars, affect their own rights as to each other and as to their property. Concealment, in Louisiana, of a marriage elsewhere by persons domiciled there, might very well affect such rights, or the parties to it as relate to property parted with by either whilst they mutually concealed their marriage. But it would not do so because there was no marriage between them, but from their not holding themselves out to the community as man and wife. It is their duty to do that by the ordinary *indicia* of the relation. If they do not, they must bear the consequences in respect to property and other matters which may concern them, from their misconduct. But as regards their children, as they are legitimate according to the *lex loci* of the marriage for all purposes and to inherit that portion which the law gives them of the

estate of deceased parents, they cannot be affected in any way by their parents' concealment of their marriage, if it shall be proved to have been valid where it was contracted. The rule in such cases is, that where the marriage is valid by the *lex loci*, it will generally be held (not universally) valid everywhere for the purposes of inheritance. If invalid there, it will generally (not universally) be held invalid everywhere. But in either case, the exceptions grow out of law. They must be shown to exist as such, before the right of heirship can be excluded.

The case of Le Breton *v.* Nouges, 3 Mart. 60, cited for a contrary purpose, is absolutely decisive of the reverse. It sustains, inferentially, the view of the right of the inheritance of children under a valid marriage contracted out of Louisiana, and directly, the right of the husband to a marital portion, though he violated the laws of Louisiana in running away with an heiress in her infancy to marry her in another sovereignty. The mother, too, of his wife was declared to be her forced heir after the daughter's death, only because the latter left no child of her own. That case only decides this, that conjugal rights of property in cases of marriages out of the State of Louisiana, the parties being domiciled there, depend upon the laws of the domicil. That is strictly the case everywhere. But the filial right is not the conjugal. The law gives both, and both are protected and measured according to law.

Until it can be shown that there is a law of Louisiana excepting the child of a lawful marriage in Pennsylvania from the rights of heirship in the first, on account of the domicil of the parents at the time of such marriage, the child's right of inheritance cannot be denied.

I have searched in vain all of the codes of Spain and of Louisiana for such a law. I have earnestly sought in judgments of the courts both of Spain and Louisiana for such an one. Nothing can be found in either concerning such a proposition. I think, then, that I run no judicial risk in saying that there is nothing in the way of law to be found interfering with the right of Myra Clark Gaines to the heirship of such portion of her father's estate as the law of Louisiana gives to an only legitimate child.

Something was said that her right to recover was barred by the statutes of prescription of Louisiana. If her right under them shall be measured by the proofs of the time of her birth, she is not barred. If from the time of the illegal disposition or sale of her father's estate by his executors, she is not so. If from the character in which she sues to establish a right of inheritance, there is no statute of prescription to bar her rights.

Those of us who have borne our part in the case will pass

away. The case will live. Years hence, as well as now, the profession will look to it for what has been ruled upon its merits and also for the kind of testimony upon which these merits were decided. The majority of my brothers who give the judgment stand, as they well may do, upon their responsibility. I have placed myself alongside of them, humbly submitting to have any error into which I may have fallen corrected by our contemporaries and by our professional posterity.

The case itself presents thought for our philosophy, in its contemplation of all the business and domestic relations of life.

It shows the hollowness of those friendships formed between persons in the greediness of gain, seeking its gratification in a disregard of all those laws by which commerce can only be honestly and respectably pursued.

It shows how carelessness in business and secret partnerships to conduct it with others who are willing to run the risk of unlawful adventures, may give to the latter its spoils and impoverish those whose capital alone gave consequence to the concern.

It shows how a mistaken confidence given to others by a man who dies rich, may be the cause of diverting his estate into an imputed insolvency, depriving every member of his family of any part of their inheritance.

We learn from it that long-continued favors may not be followed by any sympathy from those who receive them, for those who are dearest to our affections.

It shows if the ruffian takes life for the purse which he robs, that a dying man's agonies soothed only by tears and prayers for the happiness of a child, may not arrest a fraudulent attempt to filch from her, her name and fortune.

We can learn from it, too, that there is a kindred between virtue and lasting respectability in life, and that transgressions of its proprieties or irregular yieldings to our passions in forming the most interesting relation between human creatures, are most likely to make them miserable and to bring ruin upon children.

I do not know from my own reasoning that the sins of parents are visited upon children, but my reason does not tell me that it may not be so. But I do know, from one of those rays shot from Sinai, that it is said for the offence of idolatry, " I, the Lord God, am a jealous God, and visit the sins of the fathers upon the children unto the third and fourth generation of them that hate me, and show mercy unto thousands of those who lov me and keep my commandments." It may be so for other fences. If it be, let the victim submissively recognize him wl inflicts the chastisement, and it may be the beginning of a communion with our Maker, to raise the hope of a richer inheritance than this world can give or take away.

### *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Eastern District of Louisiana, and was argued by counsel.   On consideration whereof, it is now here ordered, adjudged, and decreed, by this court, that the decree of the said Circuit Court, in this cause be, and the same is hereby, affirmed with costs.